Bradley T. Hunsicker (Wyo. Bar 7-4579)
**Markus Williams Young & Zimmermann LLC**
106 East Lincolnway Suite 300
Cheyenne, WY  82001
Telephone: 307-778-8178
bhunsicker@markuswilliams.com

Jeffrey M. Eilender (admitted *pro hac vice*)
Bradley J. Nash (admitted *pro hac vice*)
Vitali S. Rosenfeld (admitted *pro hac vice*)
**SCHLAM STONE & DOLAN LLP**
26 Broadway
New York, NY 10004
Telephone: (212) 344-5400
Facsimile: (212) 344-7677
jeilender@schlamstone.com
bnash@schlamstone.com
vrosenfeld@schlamstone.com

Attorneys for Creditors CWT Canada II Limited Partnership
and Resource Recovery Corporation

## UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF WYOMING

| | |
|---|---|
| In Re: | Case No. 16-20002 |
| | Chapter 11 |
| DENNIS MEYER DANZIK, | |
| xxx-xx-1786 | |
| | |
| Debtor. | |

## MEMORANDUM IN SUPPORT OF MOTION FOR RELIEF FROM AUTOMATIC STAY AND NOTICE OF TIME TO OBJECT

Creditors CWT Canada II Limited Partnership ("CWT Canada") and Resource Recovery Corporation ("RRC") (the "CWT Parties") hereby submit this memorandum, along with the Declaration of Jeffrey M. Eilender (attached hereto at Exhibit "A") and the exhibits attached thereto, and the Declaration of Kris Holliday (attached hereto as Exhibit "B") and the exhibit attached thereto, in support of their *Motion for Relief from Automatic Stay and Notice of Time to Object* (the "Motion for Stay Relief") filed contemporaneously herewith.

## PRELIMINARY STATEMENT AND BACKGROUND

The CWT Parties are Defendants and Counterclaim/Cross-Claim/Third-Party Plaintiffs in a pending action in the Supreme Court of the State of New York, County of New York, Commercial Division, captioned *GEM Holdco LLC, et al. v. Changing World Technologies, L.P., et al.*, New York Sup. Ct. Index No. 650841/2013 (the "New York Action"). The CWT Parties file their Motion for Stay Relief for the purpose of completing the New York Action that has already been pending for three years in order to liquidate their claims against the Debtor, and the Debtor's estate (the "Estate"). It should be emphasized that if the Motion for Stay Relief is granted, it would not entitle the CWT Parties to collect any funds from the Debtor's Estate until such time as a Plan is confirmed. Rather, the sole purpose of finalizing the New York Action is to liquidate the claims of the CWT Parties and prevent this Court from having to re-litigate the issues already addressed in the New York Action.

There are several compelling reasons why good cause exists for this Court to modify the automatic stay to permit the New York Action to proceed against the Debtor, Dennis Danzik (hereinafter referred to as "Danzik"), including: (i) balancing the relevant factors from *In re Curtis*, 40 B.R. 795 (Bankr. D. Utah 1984), which are applied by courts in the Tenth Circuit, militates in favor of the modification of the automatic stay; (ii) although the assets that are the subject of the claims against Danzik in the New York Action are in Danzik's possession, custody or control, they have never belonged to him and are thus not part of the Estate; and, (iii) the CWT Parties will be seriously prejudiced if the automatic stay is not modified in order to allow the New York Action to conclude, which as to Danzik, is literally in the eleventh hour.

Indeed, the purpose of the New York Action is to recover over $5 million that Danzik, or an entity controlled by him, held in trust for the CWT Parties, and subsequently embezzled,

converted, hid, concealed or otherwise stole from them. This case is no different from that of a former client suing his lawyer who stole the client's funds from his escrow account.  Upon the best information and belief, Danzik has engaged in criminal activity, and any further delay will prevent the recovery of funds belonging to the CWT Parties.  These same funds were restrained by an attachment and injunction order in the New York Action, which required Danzik to disgorge them into a segregated account.  Danzik has violated those orders and is now subject to a contempt hearing in the New York court for his misconduct. All that the CWT Parties seek is to complete the New York Action insofar as they can force him to repatriate the money and put it in an escrow account under the supervision of a court until further order from this Court.

The CWT Parties incorporate by reference the facts set forth in the Declaration of Jeffrey M. Eilender, submitted in support of the Motion for Stay Relief, and provide the additional summary below.

### A.    The New York Action

As set forth below, the CWT Parties, Danzik, and the company for which Danzik was the Chief Executive Officer, RDX Technologies Corporation ("RDX"), were originally defendants in an action brought by Plaintiff GEM Holdco, LLC ("GEM") and its affiliates (collectively with GEM, the "GEM Parties"), which was commenced on or about March 11, 2013.  Eilender Decl. ¶ 37.  A copy of the most current Complaint in the New York Action is attached to the Eilender Decl. as Ex. 1.  The GEM Parties' claims arose from the CWT Parties' sale of Changing World Technologies L.P. ("CWT"), a holding company for an entity in Carthage, Missouri, engaged in producing renewable diesel oil ("RDO"). GEM and the CWT Parties were limited partners in CWT.  In its lawsuit, GEM took the position that it had an exclusive right to sell CWT to RDX and obtain 60% of the proceeds and that by engaging in their own sale, the CWT Parties had

breached their agreements with GEM, and Danzik and RDX had tortuously interfered with those agreements. Initially, the CWT Parties, Danzik and RDX were aligned, had a joint defense, and were represented by the same counsel in defending the New York Action against GEM.

The CWT Parties sold CWT to RDX pursuant to an agreement known as the Unit Purchase Agreement (the "UPA"). Under the UPA, RDX was required to convey 25,862,069 shares of common stock  of RDX to the CWT Parties and GEM , and to make principal and interest payments on Promissory Notes in favor of the CWT Parties and GEM for the face amount of $20 million.  A copy of the UPA is attached to the Eilender Decl., Ex. 5.  By August, 2014, it became clear to the CWT Parties that RDX, under the control of Danzik, was refusing to make any of the payments required under the UPA.

### B.       Danzik's Misappropriation of Tax Credits

By August of 2014, the CWT Parties had discovered a more fundamental problem. Under the CWT Partnership Agreement  in effect before the sale of CWT to RDX, at least $6 million of tax credits (the "Tax Credits") owed by the United States Treasury to CWT belonged exclusively to the CWT Parties. These Tax Credits were based on the renewable diesel oil produced by CWT for the 2012 tax year. Inasmuch as CWT did not have any taxable income, it received these Tax Credits in the form of checks from the United States Government.  The UPA was absolutely clear that when CWT was sold to RDX, these Tax Credits were not included in the sale and belonged to the CWT Parties.

Technically, the checks were issued in the name of CWT's subsidiary, Renewable Environmental Solutions, LLC ("RES"), but as CWT and RES were now under the control of RDX by reason of the sale, in practice, RDX was to receive the checks , hold them in trust, and remit them to the CWT Parties. As later discovered by the CWT Parties, however, Danzik (who

4

for all intents and purposes solely controlled RDX) caused RDX to pay him, or entities that he owned or otherwise controlled, $5 million of the Tax Credits.  As the CWT Parties were discovering the scheme, they broke with Danzik and filed cross-claims against him and RDX on September 22, 2014.  A copy of the cross-claims are attached to the Eilender Decl. as Ex. 2.

### C.  The Contempt Proceeding against Danzik and this Bankruptcy Filing

On March 18, 2015, Justice Shirley W. Kornreich, the judge presiding over the New York Action, issued an Order restraining the Tax Credits and requiring Danzik to place the money into a segregated bank account until further order of the court.  Danzik violated this Order by refusing to segregate the Tax Credits with the result that the New York court commenced a Contempt Hearing against him on November 4, 2015, which continued to November 5 and 6, and then was adjourned until January 5, 2016.

In issuing an Order to Show Cause scheduling the Contempt Hearing, on May 5, 2015, Justice Kornreich also issued a Temporary Restraining Order (the "TRO") freezing the assets of RDX.  Danzik caused RDX to violate that Order as well by diverting RDX's tangible assets and receivables to other companies under his control.  Eilender Decl. ¶¶ 76-77.  Indeed, in blatant violation of the TRO, on May 6, 2015 – the day after he learned of the TRO – Danzik set up a new company called M2R Licensing, LLC and had a customer of RDX pay to M2R Licensing LLC money it owed to RDX.  *Id.*

This bankruptcy proceeding is nothing more than another attempt by Danzik to delay the day of judgment.  First, on August 2014, when he realized that he was about to be sued by the CWT Parties, he caused RDX to commence an action against the CWT Parties in Calgary, Alberta (the "Alberta Action").  However, he soon abandoned that action.  Second, in September 2014, he filed a meritless motion to disqualify the CWT Parties' counsel in the New York Action, which was denied with the denial affirmed on appeal.  Eilender Decl. ¶¶ 70-71.  Third, as

the noose grew tighter, Danzik caused RDX to file the equivalent of a bankruptcy proceeding in Calgary (where RDX was incorporated, even though the company's operations were in Scottsdale, Arizona). Eilender Decl. ¶¶ 80-83.  He soon abandoned that proceeding as well. Then, during the hiatus between November and January in the contempt proceeding, Danzik caused RDX to file for Chapter 11 bankruptcy relief in Arizona.

Perhaps most telling, on January 5, 2016, and the night before the Contempt Hearing against him was to resume in New York, Danzik filed for personal bankruptcy in this Court in the hope that the automatic stay would prevent the Contempt Hearing from resuming.  Not surprising, Danzik filed his Chapter 11 case without any prior notice to opposing counsel or the New York court.

Justice Kornreich saw through the scheme and stated on the record that this was a sham bankruptcy filed merely to evade the contempt proceeding. Eilender Decl. ¶ 86.  She correctly held that a civil contempt proceeding falls out the side of the scope of the automatic stay.  *See In re Dingley*, 514 B.R. 591, 597 (9th Cir. BAP 2014) (where the court order underlying the contempt proceeding "does not involve a determination [or collection] of the ultimate obligation of the bankrupt nor does it represent a ploy by a creditor to harass him, the automatic stay does not prevent the proceeding from going forward") (internal citation omitted); *Dominic's Rest. of Dayton, Inc. v. Mantia*, 683 F.3d 757, 761 (6th Cir. 2012) (bankruptcy petition did not stay contempt proceeding arising from "the tort of trademark and service mark infringement" because "commission of a tort is not protected by the Bankruptcy Code"); *Intl. Distrib. Centers, Inc. v. Walsh Trucking Co., Inc.*, 62 B.R. 723, 729 (S.D.N.Y. 1986) (the court's "inherent power to 'punish the debtor for contumacious conduct against the dignity of either the state or federal

6

court' is not curtailed by the bankruptcy action.") (quoting *Guariglia v. Community National Bank & Trust Co.,* 382 F. Supp. 758, 761 (E.D.N.Y. 1974)).

On January 5, 2016, Justice Kornreich denied Danzik's application to stay the continuation of the Contempt Hearing, as discussed above. She directed that the hearing resume then and there, as it had been scheduled for two months. Danzik refused to permit his counsel to cross-examine the CWT Parties' witness or to put on a defense. As a result, the CWT Parties rested and the record was closed, with Justice Kornreich taking the contempt motion on submission. Eilender Decl. ¶¶ 86-87.

### D.    The Urgent Need for the Automatic Stay to be Modified

The CWT Parties seek the modification of the automatic stay so that all aspects of the New York Action can continue against Danzik, including the completion of the contempt proceeding against him, so as to protect the rights of the CWT Parties. Because Justice Kornreich may issue a written decision in the contempt proceeding at any time, it is important for her to know as soon as possible that there are no limitations on the remedies that she can provide to the CWT Parties, and thus, it is urgent that the automatic stay be modified as soon as possible. In particular, the CWT Parties have reason to believe that putting Danzik in jail for a definite term, such as 30 days, will not convince him to surrender the Tax Credits, but that a jail sentence lasting until he does so might possibly work.

On November 4, 2015, Justice Kornreich dismissed all of Danzik's defenses to the CWT Parties' claims. Eilender Decl., Ex. 13 at 69:23–70:5. However, she did not issue a formal judgment, because Danzik had filed for bankruptcy in the interim. Thus, except for the imposition of a contempt remedy and formal entry of a judgment against Danzik, the New York Action against him is concluded. The automatic stay should be modified so that Justice

Kornreich can issue the judgment against Danzik thereby allowing the claims by the CWT Parties to be liquidated for claims purposes in Danzik's bankruptcy.

Danzik undoubtedly knew that he was going to file for bankruptcy all along, and did so just as the Contempt Hearing was about to end to frustrate the judicial process against him. As set forth above, and in the Eilender Declaration, Danzik looted RDX (and thus, its public shareholders) of millions of dollars, and in the process stole the CWT Parties' trust funds, which never belonged to him or RDX, causing substantial damage to the CWT Parties.

Justice Kornreich has closely supervised the complex New York Action for three years and is extremely familiar with the facts. With the striking of his defenses, the claims against Danzik can be immediately resolved and liquidated. In contrast, if the automatic stay is not modified, the CWT Parties will be forced to re-litigate their claims, including discovery, motions and a trial in this Court from the beginning, which will cause enormous litigation expenses – for both the Estate and the CWT Parties – and significant delay, all to no end.

Justice Kornreich has already found that Danzik has embezzled large sums of money from the CWT Parties. Furthermore, he has abused the bankruptcy process to delay his day of reckoning, and this Court should not allow itself to be used for that improper purpose.

## ARGUMENT

## I.   JURISDICTION AND VENUE ARE PROPER IN THIS COURT

This Court has jurisdiction to hear the Motion for Stay Relief pursuant to 28 U.S.C. §§ 157 and 1334. Venue to hear the Motion for Stay Relief in this district is proper in accordance with 28 U.S.C. §§ 1408 and 1409. The Motion for Stay Relief is a core proceeding that this Court may hear.

## II.    GOOD CAUSE EXISTS TO MODIFY THE AUTOMATIC STAY

Bankruptcy Code § 362(d)(1) permits relief from the automatic stay, "for cause, including the lack of adequate protection of an interest in property of such party in interest." 11 U.S.C. § 362(d)(1). "Although cause is not defined . . . Congress did intend that the automatic stay be lifted to allow litigation involving the debtor to continue in nonbankruptcy forums." *In re United Imports, Inc.*, 203 B.R. 162, 166 (Bankr. D. Neb. 1996) (citing legislative history); *see also Robbins v. Robbins*, 964 F.2d 342, 345 (4th Cir. 1992) (citing legislative history). The legislative history of § 362 reveals that Congress intended "that one of the factors to consider when determining whether to modify the stay is whether to doing so would permit pending litigation involving the debtor to continue in a non-bankruptcy forum" as "[i]t will often be more appropriate to permit proceedings to continue in their place of origin, when no great prejudice to bankruptcy estate would result, in order to leave the parties to their chosen forum and to relieve the bankruptcy court from many duties that may be handled elsewhere." H.R. Rep. No. 95-595, at 371 (1977), U.S. Code Cong. & Admin. News 1978 at 5963, 6297; S. Rep. No. 95-989 at 50 (1978), U.S. Code Cong. & Admin. News at 5787, 5836.

The Bankruptcy Code does not define the term "cause," leaving the courts to make "a discretionary determination [] on a case-by-case basis." *Carbaugh v. Carbaugh (In re Carbaugh)*, 278 B.R. 512, 525 (10th Cir. BAP 2002) (citing *Pursifull v. Eakin*, 814 F.2d 1501, 1506 (10th Cir. 1987)). Moreover, the "term 'cause' is used by many courts as a 'broad and flexible concept'" *In re Mid-Atlantic Handling*, 304 B.R. 111, 129-30 (Bankr. D.N.J. 2003) (quoting *In re The Score Bd., Inc.,* 238 Br. 585, 593 (D.N.J. 1999)). Thus, a "Bankruptcy Court is granted wide discretion to determine whether to lift an automatic stay for cause." *Id.* "*Significantly, the leave from the stay may be granted when it is necessary to permit litigation to*

9

*be concluded* in another form, particularly if the non-bankruptcy suit involves multiple parties or

is ready for trial." *Id.* (Internal quotation marks omitted) (emphasis added).

In determining whether to modify or to lift the automatic stay, bankruptcy courts in the

Tenth Circuit have applied a twelve factor test articulated in *In re Curtis*, 40 B.R. 795 (Bankr. D.

Utah 1984).  Those twelve factors are:

> (1) Whether the relief will result in a partial or complete resolution
> of the issues.
>
> (2) The lack of any connection with or interference with the
> bankruptcy case.
>
> (3) Whether the foreign proceeding involves the debtor as a
> fiduciary.
>
> (4) Whether a specialized tribunal has been established to hear the
> particular cause of action and that tribunal has the expertise to hear
> such cases.
>
> (5) Whether the debtor's insurance carrier has assumed full
> financial responsibility for defending the litigation.
>
> (6) Whether the action essentially involves third parties, and the
> debtor functions only as a bailee or conduit for the goods or
> proceeds in question.
>
> (7) Whether litigation in another forum would prejudice the
> interests of other creditors, the creditors' committee and other
> interested parties.
>
> (8) Whether the judgment claim arising from the foreign action is
> subject to equitable subordination under Section 510(c).
>
> (9) Whether movant's success in the foreign proceeding would
> result in a judicial lien avoidable by the debtor under Section
> 522(f).
>
> (10) The interest of judicial economy and the expeditious and
> economical determination of litigation for the parties.
>
> (11) Whether the foreign proceedings have progressed to the point
> where the parties are prepared for trial.

10

> (12) The impact of the stay on the parties and the "balance of hurt."

*In re Dampier*, 2015 WL 6756446, at \*4-\*5 (10th Cir. BAP 2015) (citing *In re Curtis*, 40 B.R. 795 (Bankr. D. Utah 1984)).   "A court need only apply the factors that are relevant to the particular case, and does not need to give each factor equal weight." *In re Project Orange Assocs., LLC,* 432 B.R. 89, 104 (Bankr. S.D.N.Y. 2010). "The most important factor in determining whether to grant relief from the automatic stay to permit litigation against the debtor in another forum is the effect of such litigation on the administration of the estate." *Curtis*, 40 B.R. at 806.

As discussed below, the overwhelming number of relevant factors weigh in favor of modifying the automatic stay to permit the New York Action to conclude, and the CWT Parties' claims against Danzik to be liquidated and reduced to a final judgment.

### A.   *Curtis* **Factor 1:   Modifying The Stay Would Result In A Complete Resolution Of The Issues In The New York Action**

Here, the first *Curtis* factor favors modifying the automatic stay to permit the completion of the New York Action, because doing so will result in a complete resolution of all the issues between the parties in that  proceeding.  All of the claims the CWT Parties have against Danzik have already been asserted against him in the New York Action.  The principal claim is the return and placement in escrow of the $5 million in Tax Credits that he essentially stole from the CWT Parties. Justice Kornreich's ability to impose coercive penalties to force the return of these funds into an escrow account (not necessarily paid to the CWT Parties) would resolve the Tax Credit claims.  Moreover, before the filing of the instant bankruptcy proceeding, Justice Korneich struck all of Danzik's defenses in the New York Action.  Thus, all that remains to be

done is the ministerial process of entering a judgment, and a decision based on the already concluded contempt hearing.

## B. *Curtis* Factor 2: Modifying The Stay Would Not Interfere With The Administration Of The Bankruptcy Estate

The second *Curtis* factor also favors modifying the automatic stay. Permitting the New York Action to conclude and the CWT Parties' claims to be reduced to final judgment will not interfere with the administration of Danzik's bankruptcy estate because the Tax Credits are not part of the Estate to begin with, and, in any event, enforcement of any judgment entered in the New York Action will be enforceable only in this Court.

There is no dispute that the Tax Credits were received by RDX and deposited in its accounts and then paid to Danzik. In the Alberta Action, RDX did not claim to ever own the Tax Credit funds. *See* Eilender Decl., Ex. 7 ¶ 44(c) (alleging that "RDX has been exposed to liability [to the U.S. government] because the Defendants claimed tax credits to which they were not entitled"). The same is true in the New York Action, where Justice Kornreich found "there is no question of fact that the . . . tax credits do not belong to the Ridgeline[1] Parties. The money either belongs to the CWT Parties or the federal government." *Id.*, Ex. 3 at 4. RDX and Danzik always stated that the Tax Credit funds either belong to the CWT Parties or the United States Government, because in their view the Tax Credits were not properly earned. They never claimed those Tax Credits for themselves.

More fundamentally, long before the CWT Parties and RDX entered into the UPA, the CWT Parties had a pre-existing ownership right to the Tax Credit funds. This was recognized by Justice Kornreich when she held in her Attachment Order that RDX could not use those funds to pay for its normal business expenses no matter how financially strained it was. *Id.* ("No matter

---

[1] RDX Technologies Corporation was previously known as Ridgeline Energy Services, Inc.

Ridgeline's liquidity needs, it is not entitled to use this money because, regardless of the outcome of this litigation, Ridgeline will not keep the money."). Thus, long before Danzik's 11th-hour bankruptcy filing, Justice Kornreich held that the Tax Credits did not belong to RDX or Danzik and should have been held in trust, the same way a lawyer holds his client's money in an escrow account.  Where, as here, "a debtor has been declared a constructive trustee before filing a petition in bankruptcy, . . . [t]he beneficiary's equitable interest in the property does not enter the bankruptcy estate. This is so because the equitable interest held in constructive trust for the beneficiary is not property of the debtor."  *In re Leitner*, 236 B.R. 420, 424 (Bankr. D. Kan. 1999).

By far, the single largest claim against Danzik is the $5 million in Tax Credits that he must put in an escrow account under Justice Kornreich's Order, which includes pre-judgment interest.  The resolution of this claim will resolve most of the bankruptcy issues against him.  Indeed, he filed for bankruptcy to avoid further litigation of this claim.  Thus, the final resolution of the New York Action will also aide in the administration of the Estate, because it will allow this Court to distribute any assets *pro rata* to all unsecured creditors based on the amount of those claims as determined in the New York Action.   Indeed, given the New York court's familiarity with the issues in the New York Action, it is in best equipped to give a quick ruling in that matter, which will expedite this bankruptcy proceeding.

### C.    *Curtis* Factor 3:  The New York Action Involves The Debtor As A Fiduciary

The third *Curtis* factor also favors modifying the stay, because Danzik is not being sued as a fiduciary, but rather for defrauding parties at arms' length.  It is true that RDX was holding the tax credit funds in trust for the CWT Parties, but Danzik himself was not supposed to be holding those funds at all.  Nevertheless, he invaded a trust account held by RDX for the benefit of the CWT Parties and stole that money for himself.  *See* Eilender Decl. ¶¶ 54-64.

**D.      *Curtis* Factor 4:  The New York Court Is A Specialized Tribunal**

Here, the fourth *Curtis* factor favors the modification of the stay.  Justice Kornreich is a

member of the Commercial Division of the Supreme Court of New York, County of New York.

This is a specialized division comprised of a small group of elite, specially-trained and

experienced judges, who handle complex commercial litigations such as the one between the

CWT Parties and Danzik.  Thus, the State of New York has established a specialized tribunal to

deal with these cases, and Justice Kornreich has been handling the issues in this case for the past

three years.

**E.      *Curtis* Factor 6:   The Action Essentially Involves Third-Parties And The
Debtor Functions Only As a Bailee or Conduit For The Goods Or Proceeds
In Question**

Here, the sixth *Curtis* factor, too, favors modifying the automatic stay, because the New

York Action involves third parties who do not fall under the jurisdiction of this Court, and have

no connection to this district. Back in September 2014, Danzik entered into a Settlement

Agreement with the GEM Parties settling their claims against Danzik and RDX, but both sides

are now claiming breaches of that Settlement Agreement. The GEM Parties are now seeking to

enforce the Settlement Agreement against Danzik and RDX and are seeking summary judgment

against them.

More fundamentally, the CWT Parties' claims against Danzik really concern the bailment

of property that he was holding in trust for either them or other third parties.  As set forth above,

and as held by Justice Kornreich, RDX and Danzik conceded that the Tax Credits were being

held either in trust for the CWT Parties or the U.S. Government.  Thus, RDX was nothing but a

bailee of that property.  All that the CWT Parties are seeking is the return of the property that has

been bailed and for it to be placed in a safe account until further determinations can be made.

14

**F.** **_Curtis_ Factor 7:  Concluding the New York Action Will Not Prejudice The Interest Of Other Creditors**

The seventh _Curtis_ factor also favors modifying the automatic stay to permit the resolution of the New York Action, because doing so will not prejudice the interests of other creditors.  _See In re Mid-Alt. Handling Sys._, 304 B.R. at 131.

As established above, the principal amount sought by the CWT Parties is not property of the Estate, and thus no creditors are prejudiced by the resolution of the claims with respect to such property.  _See First Fidelity Bank v. McAteer,_ 985 F.2d 114, 117 (3rd Cir. 1993) ("The estate's legal and equitable interest in property rise no higher than those of the debtor" and the estate only "includes property to which the debtor would ever right of the debtor were solvent") (internal quotation marks omitted).

**G.** **_Curtis_ Factor 9:  CWT Parties' Success In The New York Action Will Not Result In A Judicial Lien Avoidable By The Debtor**

The ninth _Curtis_ factor favors modifying the automatic stay to permit the resolution of the New York Action, because doing so will not result in a judicial lien avoidable by Danzik.

**H.** **_Curtis_ Factors 10 and 11:  Concluding the New York Action Will Serve The Interest Of Judicial Economy And The Expeditious And Economical Resolution Of Litigation; And The Parties Are Ready For Trial**

The tenth and eleventh _Curtis_ factors both favor modifying the automatic stay, because doing so will serve the interest of judicial economy and the expeditious and economical resolution of litigation.

All the discovery is completed in the New York Action.  Essentially, the Parties have already had a trial on the claims for the return of the Tax Credit funds in the form of the Contempt Hearing. Justice Kornreich has already struck the defenses of Danzik and RDX as to **all** of the CWT Parties' claims asserted against them.  All that is left is the entry of a formal judgment and the issuance of a written decision resolving the Contempt Hearing.  Given Justice

Kornreich's long history of litigating the highly-complex New York Action, it would be a gross waste of judicial resources to require the parties to begin this litigation anew in this Court, which is completely unfamiliar with the complex and voluminous factual and legal issues that would have to be adjudicated again.  Indeed, courts have granted the relief sought here significantly earlier in the litigation process for these very reasons. *See Musso v. Hirsch*, 2011 WL 4543225, at *12 (E.D.N.Y. Sept. 29, 2011) (a final determination of the fraudulent conveyances found by [the state trial court judge] and the redress she contemplated for those conveyances is long overdue.  Because these issues were already litigated in state court, the shortest path to a final, appealable resolution is through state court" and "the already depleted bankruptcy estate would bear the cost of this litigation."); *In re Project Orange,* 432 Br. at 109 ("The parties have been before [the state trial court judge] since 2008.  The agreements are complicated, long-term arrangements with which [the state trial court judge] is quite familiar. . . . Debtor filed its [bankruptcy petition] on the eve of the hearing on the Summary Judgment motion. . . . which was the same day [the state trial court judge] intended to enter the Order granting the summary dismissal of [the debtor's] counterclaims . . . .  The state court is the most efficient and appropriate place for that discovery to take place and the decision to be made considering [the state trial court judge's] involvement in the various actions."); *In re Gelinas,* 270 Br. at 91-92 ("In light of [the state trial court judge] having already conducted twelve days of trial, judicial economy and expeditious and economical resolution of the litigation lies in the state court, and the damages trial should continue there").  Accordingly, these two factors favor modifying the stay.

I.        *Curtis* **Factor 12:  The CWT Parties Will Be Prejudiced If The Stay Is Not Modified And The Balance Of The Harms Favors Modifying The Stay**

Finally, if the stay is not modified to permit the conclusion of the New York Action, the CWT Parties will be severely prejudiced by having to incur the significant expense of re-litigating this lengthy and complex case from "soup to nuts" in this Court, including flying out witnesses again from Canada and Missouri.  Moreover, on practical terms, it would cause severe and unfair prejudice to the CWT Parties to have to incur what will be hundreds of thousands of dollars (if not more than a million dollars) in additional litigation expenses, and further delay of months (if not years) to restart this case that is only the entry of a judgment away from being completed in the New York Action.  *See In re Peterson*, 116 B.R. 247, 250 (D. Colo. 1990) (affirming bankruptcy court's order lifting stay where "continuance of the stay forces [creditor] to undertake redundant litigation in state and bankruptcy court").

The New York Action began in March 2013, and the CWT Parties asserted claims against Danzik in September 2014.  Up to now, the CWT Parties have spent well over $2 million to take the New York Action to this point, which is virtually concluded against Danzik.  The CWT Parties did this because it is firmly believed that Danzik has stolen at least $7 million from them (counting interest), and they not only want to attempt to get this money back, but a measure of justice.  Danzik, at every step of the way, has frustrated the New York Action litigation, causing at least two lengthy stays by first filing a meritless disqualification motion, and then repeatedly hiring and firing lawyers.  Indeed, he is now up to his fourth attorney in the New York Action and counting.  As noted by Justice Kornreich on the record, for at least a year and a half, Danzik and RDX have refused to cooperate in discovery, which required application after application to compel.  Eilender Decl. ¶ 84.  Finally, after actively participating in the Contempt Hearing in November 2015, and then knowing that there was a two month adjournment until

17

January 5, 2016, Danzik waited until the last possible moment (the evening of January 4, 2016) to file his bankruptcy petition. Danzik surely knew all along that he was going to file for bankruptcy, but waited until the very end after causing the CWT Parties to incur over $2 million in litigation and trial costs and wasting Justice Kornreich's time.  His game plan has been delay and more delay. No doubt, Danzik will contend that the case (all but over except to the entry of judgment and the entry of the Contempt Order) should begin again in this Court with new discovery and a new trial, and of course, Danzik will presumably again delay any action in this Court by refusing to comply with discovery, as he did for at least a year and a half in New York. We respectfully submit that this Court should say "enough is enough."

Last, the CWT Parties' forensic accountant has traced the Tax Credits to Danzik and his wife, and to persons and entities that they control. Eilender Decl., Ex. 10. In the best of circumstances, it will be difficult for the CWT Parties to obtain the return of this money.  Every day that goes by makes it more and more difficult.

In sum, the balance of the harms favors modifying the stay, especially since any funds disgorged by Danzik in response to a contempt measure imposed on him by the New York court will be put in escrow and the fate of which will ultimately be determined by this Court.

## CONCLUSION

For the foregoing reasons, and for good cause having been shown, the CWT Parties respectfully request that this Court enter an Order modifying the automatic stay to allow the continuation of all aspects of the Pre-Petition New York Action against Debtor, Dennis Danzik.

Dated this 18th day of February, 2016.

Respectively submitted,

**MARKUS WILLIAMS YOUNG & ZIMMERMANN LLC**

By:    /s/ Bradley T. Hunsicker
Bradley T. Hunsicker

106 East Lincolnway, Suite 300
Cheyenne, WY 82001
Telephone:  (307)-778-8178
Facsimile:  (307) 638-1975
bhunsicker@markuswilliams.com

**-and-**

**SCHLAM STONE & DOLAN LLP**

By:    /s/ Jeffrey M. Eilender
Jeffrey M. Eilender (admitted *pro hac vice*)
Bradley J. Nash (admitted *pro hac vice*)
Vitali S. Rosenfeld (admitted *pro hac vice*)

26 Broadway
New York, NY 10004
Telephone: (212) 344-5400
Facsimile: (212) 344-7677
jeilender@schlamstone.com
bnash@schlamstone.com
vrosenfeld@schlamstone.com

*Attorneys for the CWT Parties*

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that a copy of the foregoing **Memorandum in Support of Motion for Relief from Automatic Stay and Notice of Time to Object** was served on February 18, 2016, via U.S. Mail, postage prepaid, upon the **Debtor**, Dennis Danzik, **Ken McCartney**, counsel for the Debtor, **Paul Hunter**, counsel for Sigma Opportunity Fund II, LLC, **Daniel Morse of the Office of the United States Trustee**, and the **Debtor's Top Twenty Unsecured Creditors**:

**Dennis Danzik**
1334 Sunset Blvd. South
Cody, WY 82414

**Ken McCartney**
The Law Offices of Ken McCartney, P.C.
P.O. Box 1364
Cheyenne, WY  82003
bnkrpcyrep@aol.com
*Attorney for Debtor*

**Paul Hunter**
2616 Central Ave.
Cheyenne, WY  82001
attypaulhunter@prodigy.net
*Attorney for Sigma Opportunity Fund II, LLC*

**Daniel Morse**
Office of the United State Trustee
308 West 21st St, 2nd Floor
Cheyenne, WY 82001

BANK OF AMERICA
P.O. BOX 15019
WILMINGTON, DE 19850-501

BUILTMORE LOAN
7025 N. SCOTTSDALE ROAD,
SUITE 105
SCOTTSDALE, AZ 85260

CHASE BANK-UNITED VISA
P.O. BOX 94014
PALATINE, IL 60094-401

CITI BANK-DIAMOND
PREFERRED
P.O. BOX 6500
SIOUX FALLS, SD 5711

CITI BANK-DIVIDEND
P.O. BOX 6500
SIOUX FALLS, SD 5711

CITI BANK-REWARDS PLUS
P.O. BOX 6500
SIOUX FALLS, SD 57117

DINER'S CLUB
P.O. BOX 6101
CAROL STREAM, IL 60197-610

HOME DEPOT CREDIT
P.O. BOX 790328
ST. LOUIS, MO 6317

INTERNAL REVENUE SERVICE
P.O. BOX 7346
PHILADELPHIA, PA 19101-7346

LISA HEIL
P.O. BOX 35336
PHOENIX, AZ 8506

*s/Jenny F. Tokuoka*
Jenny F. Tokuoka