## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF WYOMING

| | |
|---|---|
| In re:<br><br>DENNIS MEYER DANZIK,<br><br>Debtor. | Chapter 11<br>Case No.: 16-20002<br><br>**DECLARATION OF JEFFREY M. EILENDER IN SUPPORT OF CWT CANADA II LIMITED PARTNERSHIP'S AND RESOURCE RECOVERY CORPORATION'S MOTION FOR RELIEF FROM AUTOMATIC STAY AND NOTICE OF TIME TO OBJECT** |

**JEFFREY M. EILENDER** declares the following to be true, under penalty of perjury, pursuant to 28 U.S.C. § 1746:

1. I am a member of Schlam Stone & Dolan LLP, counsel to CWT Canada II Limited Partnership ("CWT Canada") and Resource Recovery Corporation ("RRC") (collectively, the "CWT Parties"), who are creditors of Dennis M. Danzik in the above-captioned bankruptcy proceeding. The CWT Parties are also Defendants and Counter-claim/Cross-claim/Third-Party Plaintiffs in *GEM Holdco LLC, et al. and Changing World Technologies, L.P., et al.*, N.Y. Sup. Ct., Index No.: 650841/2013 (the "New York Action"), which has been pending in the Supreme Court of the State of New York, County of New York, Commercial Division since March 11, 2013 under the supervision of Justice Shirley W. Kornreich.[1] As well as being co-counsel with Marcus Williams Young & Zimmermann LLC in this bankruptcy, I have been lead counsel for the CWT Parties in the New York Action since its inception.

---

[1] Despite the term "Supreme," the Supreme Court in New York State is the trial court and the trial judge and intermediate appellate judges are called "Justices."

2.    I submit this declaration in support of the CWT Parties' *Motion for Relief from Automatic Stay and Notice of Time to Object* made pursuant to § 362(d) of the Bankruptcy Code, Fed. R. Bankr. P. 4001, and Local Rule 4001-1, wherein the CWT Parties seek the entry of an Order modifying the automatic stay to allow the continuation of the pre-petition New York Action against Debtor Dennis M. Danzik ("Danzik"), who is a Cross-Claim Defendant in that action.   Unless otherwise specified, the matters set forth herein are based upon my personal knowledge of the New York Action.

## INTRODUCTION

3.    The claims against Danzik by my clients arise from misconduct as the Chief Executive Officer of RDX Technology Corporation ("RDX"), a now-defunct, delisted public company located in Scottsdale, Arizona.   Danzik actually lives and works in Arizona, and contrary to his bankruptcy petition, does not reside in Wyoming.  A local process server who has been to Danzik's alleged residence in Cody, Wyoming a dozen times over the past year confirms in a declaration submitted with this motion that the house is empty, and it is clear no one is living there.

4.    RDX is a defendant and a cross-claim defendant along with Danzik in the New York Action, being sued by the CWT Parties for the same theft. Danzik has always controlled RDX, and he caused it to file a bankruptcy in Arizona, while he filed his bankruptcy in Wyoming just to create multiple proceedings.[2]

5.     RDX and Danzik were originally sued because Plaintiffs GEM Holdco, LLC ("GEM") and its affiliates (collectively, with GEM, the "GEM Parties") asserted claims against them similar to those against the CWT Parties because the CWT Parties sold a business entity called Changing World Technologies, L.P. ("CWT") to RDX instead of allowing GEM to make

---

[2] The CWT Parties are filing a parallel motion to lift the automatic stay in the RDX Arizona bankruptcy.

that sale.  The GEM Parties claimed that under certain other agreements that they had with both

the CWT and RDX Parties, GEM had the exclusive right to sell CWT to RDX and that the sale

by the CWT Parties violated those agreements.  The GEM Parties sued all the defendants for

breach of contract and tortious interference.  Copies of the most current version of the complaint

in the New York Action and the CWT Parties' Counterclaims and Cross-Claims are attached

hereto as Exhibits 1 and 2, respectively.

6.      As the time that Danzik and RDX were brought in as Defendants in the New York

Action on May 1, 2013, they had a joint defense with the CWT Parties and all of them were

represented by the same counsel – me and my firm.[3]  However, in August 2014, the CWT Parties

and the RDX Parties had a falling out.  As a result, on September 22, 2014, the CWT Parties

asserted cross-claims against the RDX Parties in the New York Action.  *See* Ex. 2.  Using

separate counsel, the RDX Parties settled with GEM in December 2014.  It is the CWT Parties'

Cross-Claims that we seek to continue by lifting the automatic stay.

---

[3]RDX's counsel has threatened to seek to disqualify my firm from representing the CWT Parties in the bankruptcy
proceedings, as I formerly represented Danzik in the New York Action. For fourteen months I represented all the
defendants in the New York Action until the conflict developed between the CWT Parties and the RDX Parties.
However, RDX and Danzik had waived any such conflict in advance by signing my firm's retainer letter with them,
which contained a joint advance waiver conflict provision permitting me to withdraw from representing the RDX
Parties and to be adverse to them in the New York Action or any other matter if there was ever a conflict between
them, and the CWT Parties, my original clients. In July 2014, when it became apparent to me that there was
precisely the conflict contemplated by the advance waiver provision, I withdrew from my representation of Danzik
and RDX.  As permitted by the advance waiver provision, I asserted cross-claims on behalf of the CWT Parties
against Danzik and RDX in September 2014.  Also, in September 2014, notwithstanding the advance waiver
provision, Danzik and RDX moved to disqualify me in the New York Action.  The trial judge enforced the conflict
waiver in my engagement letter with the RDX Parties and was affirmed by the Appellate Division, First Department.
*See infra* ¶¶ 70-71.  Under New York procedure, that ruling is not appealable to any higher court.

The issues that I seek to litigate against Danzik in this bankruptcy are identical to those in the New York Action, and
thus the advance waiver applies here.  The ruling denying the disqualification motion based on the language in the
advance waiver provision that permitted me to be adverse to the RDX Parties in the New York Action, or "any
other" has preclusive effect in this Court. *See, e.g.*, *Mines v. Hauck*, 2010 WL 2943090, at *5 (E.D. Va. July 20,
2010) ("where an adverse party had previously tried to have an attorney disqualified in a state court proceeding, that
party was estopped from resurrecting, in a subsequent litigation, the issues previously resolved against it"). I discuss
this issue at the outset in the interests of full disclosure and candor to this Court.  Based on the New York Action's
denial of the prior disqualification motion and the fact that the CWT Parties have separate Wyoming counsel
anyway, the status of my firm as counsel in the Wyoming bankruptcy action is completely irrelevant to, and cannot
be a basis to delay, the determination of the instant motion.

7.     Litigation of the  Cross-Claims as to Danzik  are virtually finished: the New York Court has struck all of Danzik's defenses, and all that remains is for the entry of judgment against him and the issuance of a written decision on a civil contempt hearing that is already completed. After having participated in most of the contempt hearing, Danzik filed this bankruptcy petition at the last possible moment in an attempt to foil a contempt ruling and the entry of judgment.

8.     The CWT Parties' claims against Danzik are primarily to require him to repatriate and place in escrow $5 million in trust funds (called the "Tax Credits") belonging to the CWT Parties that he embezzled. These Tax Credits never belonged to Danzik, and he does not pretend that they do.  RDX received them from the U.S. Department of Treasury in the form of checks as the agent for the CWT Parties, and as already held by the New York Court, was legally obligated to hold them in escrow.  Instead, Danzik diverted these funds to his own personal bank accounts. In this sense, he is no different from a lawyer stealing client funds from the law firm's escrow account. As stolen property, the Tax Credits are not assets of Danzik's bankruptcy estate. Thus, this bankruptcy proceeding will not be prejudiced by the continuation of the three-year old pre-petition New York Action, which has been closely supervised by Justice Kornreich for that entire time, and who has intimate knowledge of what is a factually and legally complex case.

9.     On March 18, 2015, Justice Kornreich issued an attachment and injunction order, specifically requiring Danzik to return the money by depositing it into a segregated trust account. (The "Attachment Order") (Ex. 3). Danzik ignored the Attachment Order and the CWT Parties moved to hold him in contempt, which culminated in the evidentiary hearing occurring November 4 to 6, 2015, and then concluding on January 5, 2016 (the "Contempt Hearing"). (Copies of the contempt motion papers are attached hereto as Exhibit 4).

10.    After fully participating in the bankruptcy hearing in November, Danzik filed the instant bankruptcy proceeding in Wyoming on the night of January 4, 2016, just hours before the Contempt Hearing was going to resume on January 5.  Danzik had been threatening bankruptcy for months since the March 18, 2015 Attachment Order had been issued.  Yet, he waited until the last minute to make this filing to cause delay and frustrate the New York court proceeding.  The gambit failed.

11.    Justice Kornreich rebuffed Danzik's argument that his bankruptcy filing stayed the continuation of the contempt hearing; she held that a civil contempt proceeding to remedy violations of her orders involved the integrity of the court system, and thus did not interfere with the bankruptcy estate and was not subject to the automatic stay.  In so ruling, Justice Kornreich relied on a plethora of cases that supported her position.[4]  From the bench, she directed Danzik to resume his participation in the hearing.  Notwithstanding her explicit order to do so, Danzik refused to permit his counsel to cross-examine the CWT Parties' witness or to put on a defense.  As a result, the CWT Parties rested, and Justice Kornreich closed the contempt hearing and reserved decision.  She has promised a written opinion soon.

12.    The contempt motion did not seek an order requiring the payment of money to the CWT Parties.  Rather, it merely sought an order from Justice Kornreich to keep Danzik in jail and impose daily fines on him for so long as he refused to deposit the $5 million to a segregated

---

[4] *See, e.g.*, *In re Dingley*, 514 B.R. 591, 597 (9th Cir. BAP 2014) (where the court order underlying the contempt proceeding "does not involve a determination [or collection] of the ultimate obligation of the bankrupt nor does it represent a ploy by a creditor to harass him, the automatic stay does not prevent the proceeding from going forward") (internal citation omitted); *Dominic's Rest. of Dayton, Inc. v. Mantia*, 683 F.3d 757, 761 (6th Cir. 2012) (bankruptcy petition did not stay contempt proceeding arising from "the tort of trademark and service mark infringement" because "commission of a tort is not protected by the Bankruptcy Code"); *Intl. Distrib. Centers, Inc. v. Walsh Trucking Co., Inc.*, 62 B.R. 723, 729 (S.D.N.Y. 1986) (the court's "inherent power to 'punish the debtor for contumacious conduct against the dignity of either the state or federal court' is not curtailed by the bankruptcy action.") (quoting *Guariglia v. Community National Bank & Trust Co.*, 382 F. Supp. 758, 761 (E.D.N.Y. 1974)).

bank account as she originally ordered.  Once the Tax Credits are put in escrow, as the New

York court had ordered, this Court can then supervise the distribution of such funds.

13.     On November 4, 2015, the first day of the Contempt Hearing, Justice Kornreich

also struck all of the defenses of Danzik and RDX to the Cross-Claims in the New York Action.

All document discovery has been completed in the New York Action and no deposition of

Danzik or summary judgment motion against him is necessary.  To the extent any trial was

needed on the embezzlement of the Tax Credits, that occurred in the Contempt Hearing.  (No

party in the New York Action has a right to trial by jury, and therefore Justice Kornreich is the

fact finder on any claims).

14.     Although striking all of Danzik's defenses, Justice Kornreich did not have an

opportunity to issue a formal judgment against him on the CWT Parties' claims because of the

bankruptcy filings of RDX and Danzik, which occurred before she could actually sign a formal

judgment.

15.     The only two remaining tasks in the New York Action against Danzik are the

formal entry of the judgment fixing the liability against him and the issuance of the written

contempt decision.  Justice Kornreich has expressed confidence that sending Danzik to jail for a

definite term to punish him for contempt would not violate the automatic stay.  However, she has

also expressed uncertainty about her power, given the automatic stay to impose coercive, rather

than punitive measures on Danzik, such as putting him in jail for an indefinite period and

imposing daily fines until such time as he disgorges the money he stole and places it in the

escrow account, because she is concerned that such remedies would have a financial effect on the

estate.

16.     We presented authority to Justice Kornreich that because the stolen money is not part of Danzik's bankruptcy estate, she is free to impose coercive as well as punitive remedies. We also cited cases to her that a state court always has the power to impose remedies for civil contempt (which involves coercive measures) as well as criminal contempt (which involves punitive measures for past conduct).

17.     Nevertheless, out of an abundance of caution, and at the express request of Justice Kornreich's law clerk, who asked us to do this expeditiously, we are asking this Court to modify the automatic stay so as to enable Justice Kornreich to impose whatever remedies she deems appropriate to coerce Danzik to disgorge the stolen money.  We also ask that the automatic stay be modified so that the judgment can be entered against him.

18.     The only realistic chance of forcing Danzik to give up the stolen money is for the New York court to put him in jail and keep him there until he does so.  Based on what I observed at the Contempt Hearing, I am confident that Justice Kornreich is likely to put Danzik in jail for a definite term as a punitive measure, but other than emotional satisfaction, that will not help my clients.  The CWT Parties are crime victims who need immediate relief, which only a coercive penalty for the violation of the Attachment Order will achieve.

## BACKGROUND

19.     All filings in the New York Action are publicly available and can be accessed at: https://iapps.courts.state.ny.us/nyscef/Login.

**A.**     **Events Leading Up To The New York Action**

**1.**     **Danzik Appointed To Manage CWT**

20.     The CWT Parties' participation in these events began in connection with RDX's acquisition in March 2013 of a Delaware limited partnership called Changing World

Technologies, L.P. ("CWT"), a holding company for and sole member of a Delaware Limited

Liability Company called Renewable Environmental Solutions, LLC ("RES").   RES was

engaged in the manufacture and sale of renewable diesel fuel oil ("RDO").  RES had developed a

thermal depolymerization technology to generate RDO from waste grease.

     21.     Under a subsidy program enacted by Congress, RES was eligible for Tax Credits

equal to $1 per gallon of RDO produced and sold.  These credits could be applied to offset excise

or corporate income taxes.  Because RDX owed no such taxes (as it had no profits), it stood to

receive a payment from the U.S. Treasury for each gallon of RDO.  For RDO produced and sold

in 2012, RES stood to receive at least $6 or $7 million in cash payments from the Treasury

Department.

     22.     In 2011, the subsidy program expired and was not renewed (retroactively) until

2013.  That meant that the millions in Tax Credits earned by RES for 2012, when it was solely

owned by the CWT Parties, would not be paid until 2013 or even 2014, as there was a lengthy

application process.

     23.     Jean Noelting and Bruce MacFarlane are the principals of CWT Canada and

RRC, the original owners of CWT and RES.  By December 2012, MacFarlane and Noelting's

investors had already invested about $20 million into CWT.  Yet the company still needed more

funding. The CWT Parties formulated a plan to reorganize CWT as a Delaware L.P. (it has

originally been a New York corporation) and invited GEM to be a limited partner with the CWT

Parties.  GEM claimed it wanted to invest enough to own 60% of CWT, which would have

required it to contribute at least $4 million in cash.  GEM also claimed that it intended to resell

that 60% to RDX, which was in a similar kind of business.[5] According to GEM's complaint, in November, 2012, a GEM affiliate signed an agreement with Danzik, which purported to commit RDX to buy the 60% share from GEM and no one else.

24.    On December 21, 2012, CWT, RRC and GEM entered into a securities purchase agreement ("SPA").  It provided for a limited period (December 2012 to April 2013) in which GEM could buy the 60% of CWT for $4 million.  During this period, at GEM's request, Danzik and RDX were retained to manage CWT as the "Acting Chief Executive Officer" of CWT.

25.    RDX was a prospective buyer of CWT.  It made sense for Danzik to run the company as part of RDX's due diligence before buying it.

26.    Until GEM made additional investments, it was a 12% owner while the CWT Parties were 88% owners of CWT.

**2.    Acknowledgement of Pre-Existing Right To The Tax Credits**

27.    A significant asset of CWT was its Tax Credits entitlement from the U.S. Government for RDO produced in 2012.

28.    In December 2012, the GEM and CWT Parties acknowledged in their agreements what had always been true: that CWT Canada and RRC owned 100% of any Tax Credits due to the company for the period prior to CWT becoming a limited partnership and GEM joining as a limited partner – *i.e.*, December 2012.  Specifically the Amended Limited partnership Agreement (the "ALPA"), executed on December 21, 2012, recognized that any tax credit payments received by CWT for activity prior to December 21, 2012 belonged to the CWT's prior owners – RRC and CWT Canada.

---

[5] RDX was then known as "Ridgeline Energy Services, Inc."  Following a 2013 sale of its Canadian operations to Ridgeline Canada, Inc., the name was changed to RDX Technologies, Inc.  In this Affirmation, I use "RDX" to refer to the company even when it was known as "Ridgeline."

3.      **The UPA**

29.     On March 11, 2013, realizing that GEM was not complying with its contractual obligations to fund the company and obtain its 60% interest, and because the company was desperate for cash, the CWT Parties contracted separately with RDX to sell CWT to that company.  Danzik (an American citizen who has legal training in the U.S.) solely drafted this agreement known as the Unit Purchase Agreement or "UPA." (Ex. 5).  He signed it on behalf of RDX.  However, the only parties to the UPA were CWT Canada and RRC on one hand and RDX on the other.

30.     In exchange for CWT and RES, RDX signed two promissory notes in face amounts totaling $20 million and provided large amounts of CWT stock to RRC and CWT Canada.  In addition, Mr. MacFarlane and Mr. Noelting were appointed to the RDX Board from May 2013 to May 2014 (when Danzik had them removed in breach of the UPA).

31.     When the CWT Parties sold CWT to RDX, the UPA did not "create" the CWT Parties' ownership rights to the 2012 Tax Credits.  It merely acknowledged that this right existed before the sale to RDX.  Given that under the December 2012 Agreements between the GEM Parties and the CWT Parties CWT did not own the tax credit payments, it could not sell them to RDX.  Under the December 2012 Agreements between the GEM Parties and the CWT Parties, the Tax Credits belonged to the CWT Parties independent of CWT.

32.     Under the UPA, RDX acknowledged this pre-existing right, and agreed that when RDX received tax credit payments from the U.S., it was doing so as an agent for the CWT Parties, and would remit such tax credit payments to the CWT Parties.

33.    In these circumstances, the Tax Credit payments are trust property.  A contract that acknowledges property is being held in trust for a beneficiary does not *create* the beneficiary's interest in the property.  It merely recognizes what already exists.

### 4.    GEM's "Secret Agreement" with RDX

34.    At the time of CWT's sale to RDX, Danzik had withheld crucial information from the CWT Parties.  He and RDX were already contractually obligated to buy any interests in CWT from GEM alone.  They were forbidden to buy them from the CWT Parties.

35.    GEM, like Danzik, never told the CWT Parties about the secret agreements.  The CWT Parties innocently sold CWT to RDX.

36.    Danzik not only failed to disclose this information, but he affirmatively lied about it.  RDX represented and warranted in the UPA, which Danzik prepared and signed on RDX's behalf, that there were no legal impediments to its buying CWT from the CWT Parties.[6]

37.    In March, 2013, GEM sued the CWT Parties claiming that they had breached their agreements with GEM by preventing it from obtaining its 60% interest and selling CWT to RDX.  In May, 2013, GEM added Danzik and RDX as Defendants.

### 5.    Danzik Has Waived Objections To The Jurisdiction Of New York

38.    When Danzik was sued in the New York Action, he made a motion to dismiss on various grounds, which was granted in part and denied in part.  Significantly, Danzik did not move to dismiss for lack of personal jurisdiction, nor did he reserve the right to do so.

39.    After Danzik's first motion to dismiss was resolved, GEM amended its Complaint and in March 2014, Danzik made a second motion to dismiss.  Again, he did not move to dismiss for lack of personal jurisdiction, nor did he reserve the right to do so.

---

[6] See Ex. 5, § 4.2(a), (b).

40.     When Danzik was ultimately sued by the CWT Parties in September 2014, he moved to dismiss the cross-claims for, *inter alia*, lack of personal jurisdiction.  On November 4, 2015, Justice Kornreich ruled from the bench that the jurisdictional objections had been waived by Danzik's failure to assert them in his first motion to dismiss and by his active participation in the New York Action. *See* Ex. 6 at 79-83.

**6.      The Falling Out Between the RDX Parties And the CWT Parties**

41.     In August 2014, I withdrew from representing the RDX Parties because I learned that Danzik and the RDX Parties refused to pay the purchase price for CWT under the UPA and that he was refusing to allow RDX to remit the Tax Credits to the CWT Parties.

42.     At that time, I had first learned that Danzik was claiming that he and RDX had been defrauded because the CWT Parties had allegedly lied about the qualities of the CWT refinery process.  Thus, according to Danzik, CWT was not worth even a fraction of the money that RDX was supposed to pay for it.

43.     Danzik also claimed that because the refining process was fraudulent, CWT was not entitled to the tax credits it had claimed, and that any of the Tax Credits received by RDX had to be held in trust for the US government and returned to the U.S. government.  Pointedly, Danzik did not claim that RDX owned these Tax Credits, but that they belonged to the U.S. government.

44.     In correspondence from Danzik and his attorney, he repeatedly stated that the Tax Credits would be held in trust for the U.S. government.  As events later showed, these were blatant lies.

45.     In August, 2014, RDX commenced an action in Calgary, Alberta for a declaration that it was not required to pay the purchase price for CWT because of the alleged fraud, and that

the Tax Credits should be remitted to the U. S. government. (the "Alberta Action") (Ex. 7, the Statement of Claim form the Alberta Action).

46.     In correspondence dated December 16, 2014, Danzik through his Canadian lawyer, Robert Beeman, said:

> With respect to Tax Credits, again as detailed in the Statement of Clam, your client's fraudulent conduct has put RDX in the impossible position of having taken credits to which it is not entitled.  The product at the Carthage refinery did not qualify as "fuel" much less as renewable diesel (contrary to your clients' various statement).  **Tax credits received by RDX with the closing will be paid to the U.S. government.  I am instructed, however, that my clients prepared to give notice prior to any such payment so that your client can assert any rights you believe they may have to those funds.**

Ex. 8 (emphasis added).

47.     Likewise, in an e-mail to Jean Noelting, Danzik wrote: "Any and all tax credit checks that are found to be collected on or associated with a false claim will be returned immediately to the Internal Revenue Service."  Ex. 9.

48.     We now know that these statements were false.

49.     Discovery has revealed, and Danzik has admitted under oath that, all the while that he was claiming to hold the funds in trust, he was actually spending the money as if he owned it.  The tax credit payments went straight to Danzik himself or corporations controlled by him. Danzik's misappropriation is an embezzlement of the money.

50.     On September 22, 2015, the CWT Parties asserted cross claims against Danzik and RDX in the New York Action for, *inter alia*, the misappropriation of the Tax Credits.

51.     In November 2014, based on those claims, the CWT Parties moved for a preliminary injunction and an order of attachment against Danzik and RDX, requiring them to set aside the Tax Credits in a segregated accounted.  On March 18, 2015, the New York Court

granted the Preliminary Injunction and Attachment and thus ordered them to set aside the Tax

Credits in a segregated account.

52.     In her decision attaching the tax credit funds, Justice Kornreich of the Supreme

Court of the State of New York:

> It is unclear if Danzik is attempting to transfer assets to a new
> company to evade the Ridgeline parties' creditors' claims or if he
> is forming a new corporate entity for the purpose of raising
> additional capital.  However, Danzik is a non-domiciliary and
> Ridgeline (*i.e.* RDX) is a foreign corporation.  Moreover ***there is
> no question of fact that the $3,173,967 in Tax Credits do not
> belong to the Ridgeline parties.  The money either belongs to the
> CWT Parties or the federal government.  See Dkt. 271 at 39
> (UPA § 2.3 providing that 100% of the Tax Credits must be
> remitted to the CWT Parties at closing).  No matter Ridgeline's
> liquidity needs, it is not entitled to use this money because,
> regardless of the outcome of this litigation, Ridgeline will not
> keep the money.***  Indeed, Ridgeline's admitted lack of liquidity
> demonstrates the need to restrain the tax credit funds to ensure that
> the Ridgeline Parties will be able to satisfy judgment.

Ex. 3 (emphasis added).

53.     Significantly, the New York Attachment Order required Danzik personally to

ensure that RDX placed the Tax Credits into a segregated account.  Thus, the New York Court's

Order was directed to Danzik in his personal capacity.

54.     Danzik and RDX indisputably never complied with the Attachment Order.  On

April 3, 2015 Danzik filed an Affidavit claiming that RDX had no money and that it could only

place $500 in the segregated account.

55.     Significantly, on March 20, 2015 Danzik and RDX moved for a stay of the

Attachment Order before the Appellate Division.  On April 23, 2015 that motion was denied.

They also essentially moved for re-argument of the Attachment Order, which was also denied.

Both of these motions are significant, because in making them, Danzik submitted Affidavits in

which he admitted that he had treated the Tax Credits as his own money by causing RDX to spend them on regular business expenses. This is in plain contradiction to his prior written statements that the money belonged to the U.S. Government and was being held in trust.

56.    Discovery, in fact, has shown that the money did not even pay for RDX's expenses.  Rather, the Tax Credits were deposited into an RDX account, and then transferred to the bank account of Danzik Applied Sciences, a company wholly owned by Danzik himself, or to an Arizona escrow account, also controlled by Danzik.  He simply stole the Tax Credits.

57.    There is no doubt about this. Candy Blazar, the former Chief Executive Officer of RDX, testified that she caused RDX to wire $2.8 million of the Tax Credits that were received by RDX between July and December 2013, to those two Danzik accounts under Danzik's specific orders.  Blazar has further testified that Danzik "justified" these payments on back-dated, false invoice from Danzik Applied Sciences to RDX for work or services that were never done.  According to Blazar, Danzik ordered wires for millions of dollars more from RDX funds to himself in the same manner.  As CEO he would simply order her or her staff to pay DAS the money and then months later would produce one line "invoices" from DAS to justify these wires. Of course as CEO of RDX and the owner of a vendor to whom he caused it pay millions of dollars, Danzik stood at both ends of these transactions.

58.    In its consolidated financials for March 2014 (RDX's fiscal year goes from March to March), RDX (at page 44) disclosed that it had a liability to the CWT Parties of $3.1 million (Canadian) in Tax Credits that its subsidiary RES had received from the United States Government.  A narrative in the financial statements admits that this money is due and owing to the CWT Parties as trust funds and would be paid.  The statement of an intention to pay those

Tax Credits was fraudulent. Danzik failed to disclose that he already had RES pay the $3.1 million (Canadian) to his own company, based on false billings by DAS to RES and RDX.

59.     Blazar testified that RDX was a thinly traded public company in which Danzik was the largest single shareholder and that for all intents and purposes he controlled the company.  Thus, what he said went—and no one would say no to him if he wanted to steal company money or even funds that did not belong to the company but was merely being held in trust for third parties.

60.     Statements made by Blazar and documents that we obtained from banks showed an even more brazen criminal scheme. In February 2014, RDX received another $1.8 million in Tax Credits that it was obligated to pay to the CWT Parties.  Blazar has testified that as soon as this money came in, Danzik ordered her to open a secret, off-the books bank account, deposit the $1.8 million in that account, and then immediately wire those funds to Danzik's personal account, without any disclosure whatsoever to anyone else. Danzik had instructed Ms. Blazar not to record either the receipt of the $1.8 million or its payment to him on the Company's ledgers, which the Company did not.  Thus, Danzik hid from the auditors and the public investors that he stole another $1.8 million of funds paid to RES.  Danzik paid Blazar $50,000 of the Tax Credits to buy her silence and assistance.

61.     Blazar's testimony is supported by the bank records.  This money was never listed in any of RDX's financial records and we discovered the theft through the mere happenstance of a whistleblower telling us to subpoena a particular bank.

62.     Thus, Danzik has stolen about $5 million in Tax Credits of which we know. (Only he and RDX know how much money the U.S. government paid RDX as the CWT Parties' agent).

63.     The Company also filed a corporate Form 1120S tax return for the fiscal year ending March 30, 2014 which lists the $2.8 Million U.S.  Tax Credits as an obligation to the CWT Parties.  However, the $1.8 in Tax Credits intentionally were not reported, making the return false.  Danzik signed the return.

64.     An analysis by our forensic accountant of financial records produced by Danzik, RDX and various banks shows that the $5 million in Tax Credits went from the U.S. government to RDX to Danzik personally and then he took at least $430,000 in cash withdrawals for himself, $600,000 in cash withdrawals for his wife, $659,000 in payments for his use of a private jet, $335,000 to pay his Diners Club, $285,000 to pay his own personal lawyers, $294,000 in gifts and other payments to his friends and hangers on, $634,000 to his private company called BioIndustrial Investments, $384,000 to Tea Party organizations and so on.  *See* Ex. 10.

65.     That still does not account for another $2 million that is likely just hidden.

**B.      The First Alberta Action**

66.     As stated above, on August, 2014, RDX filed the Alberta Action.  The action was commenced about 12 days after CWT's lawyer wrote to RDX's lawyer about the millions of dollars in Tax Credits that were owed by RDX.

67.     In response, the CWT Parties brought an application to dismiss the Alberta Action on the basis that the Alberta Court lacked jurisdiction over the dispute as neither RDX nor any of the defendants had any assets, business or other meaningful connection to Alberta, and further that New York was by far the most convenient forum to determine issues between the parties, given the connections of the parties and subject matter of the claims to that forum and the fact the New York Action was already dealing with the same issues that were raised in the First Alberta Action.

68.     When apprised of the First Alberta Action, Justice Kornreich, the judge overseeing the New York Action, observed:

> You know, most courts don't look kindly on a second action started in a different venue, when an action is going on in a first venue, and for quite some time.  Most courts don't like that.  It is game-playing.  But I don't know what the Canadian court is going to do, I don't know what I'm going to do.

Ex. 11 at 14.

69.     At Danzik's request, the motion was adjourned *sine die* in February, 2015.  In fact, RDX has all but abandoned the Alberta Action.  Rob Beeman, Esq., its Alberta counsel, admitted to us back in February, 2015 he was no longer being paid by RDX, and we have heard nothing about the action since then.

## C.     The Disqualification Motion Brought To Delay The Recovery of The Tax Credits

70.     Danzik and RDX signed a retainer letter with my firm on May 2, 2013 that explicitly stated that if there was a conflict between them on one side and the CWT Parties on the other, I could withdraw form representing the RDX Parties and represent the CWT Parties in litigation against the RDX Parties in the New York Action or "any other matter."  Notwithstanding this clear waiver, the RDX Parties moved to disqualify me and my firm in September, 2014.

71.     The motion was frivolous. Justice Kornreich denied it and that decision was affirmed by the Appellate Division.  *See GEM Holdco, LLC v. Changing World Techs., L.P.*, 2015 WL 120843 (Sup. Ct. N.Y. Co. Jan. 9, 2015) (Kornreich, J.), *aff'd*, 130 A.D.3d 506 (1st Dep't 2015).

72.     However, as Danzik knew, the established procedure is to stay all proceedings pending a disqualification motion, and it would take Justice Kornreich time to hear and decide

18

the motion.  Thus, Danzik obtained a four month stay of the CWT Parties' claims against him.

His attempts to delay is a running theme throughout all the proceedings.

**D.**    **The Scheduling of The Contempt Hearing And Violation of The New York TRO**

73.    On May 5, 2015, the CWT Parties moved by Order to Show Cause to hold Danzik

and RDX in contempt for violating the Attachment Order.

74.    Justice Kornreich signed the Order to Show Cause on that date.  Notably, the

Order to Show Cause contained a Temporary Restraining Order enjoining Danzik from causing

RDX to transfer its assets without directive of the Court.  *See* Ex. 12.

75.    The contempt hearing was originally supposed to occur on June 26, 2015, but was

then postponed.

76.    In the interim, we discovered that not only had Danzik violated the Attachment

Order, but he also violated the TRO contained in the Order to Show Cause to hold him in

contempt.  Specifically, the day after he learned of the TRO, Danzik caused RDX employees to

change a purchase order from an RDX customer, National Beef, so that the seller was not RDX

but M2R Licensing, LLC, an entity Danzik set up and controlled to divert RDX receivables and

avoid the TRO and Attached Order entered by Justice Kornreich.

77.    Danzik directed that National Beef pay money owed to RDX to M2R Licensing.

Discovery has shown that he did this multiple times with various entities he controls to

circumvent the TRO.

78.    We brought this to the New York Court's attention through additional

submissions.

79.    On July 31, 2015, the New York Court held oral argument on the contempt

motion and determined that an evidentiary hearing should be held on November 4, 5 and 6, 2015.

Specifically, the Court stated that the contempt hearing was to determine whether Danzik should be held in criminal and civil contempt for not only violating the Attachment Order, but also the TRO.

**E.      The Canadian Bankruptcy Proceeding Brought To Stay The Contempt Hearing**

80.      In August 2015, only days after the New York Court re-scheduled an evidentiary contempt hearing, which likely would result in Danzik going to jail, Danzik caused RDX (which was incorporated in Alberta) to file the equivalent of an insolvency and reorganization proceeding in Alberta, Canada known as a "CCAA."  RDX's only connection with Alberta is its place of incorporation.  The company has been run out of Scottsdale, Arizona by Danzik and all the fraud has occurred in the United States, largely in Arizona and in Missouri, where RES is located.  The true purpose of the CCAA filing was made apparent with its including a request for a stay of the proceedings in New York, not only against RDX, but Danzik himself—stop the proceeding in New York that could land Danzik in jail.

81.      Many of the Affidavits that Danzik caused RDX to file in this CCAA Proceeding were dated months before this CCAA Application was commenced.  They were obviously ready weeks before filing and being held in abeyance until Danzik felt the sword at his throat.  Danzik was obviously aware that if the Alberta Court granted a stay, he could then apply to a U.S. bankruptcy court to enforce that stay in New York.

82.      Remarkably, he filed affidavits in the New York Action in March, 2015, right after the Attachment Order was issued, swearing that RDX did not have a penny to its name and that it would file for bankruptcy any day.  In contrast, when he ultimately caused RDX to file for the Canadian version of bankruptcy months later, he submitted an affidavit saying the opposite.  Now, he was swearing under oath that RDX had over $7 million dollars and could easily

reorganize.  The striking thing is that these were the same receivables that Danzik had already diverted to himself.

83.    In August, 2015, the CWT Parties filed a motion to dismiss the CCAA proceeding and to oppose the stay application.  RDX never responded, and as with the first Alberta Action, it abandoned the CCAA.

**F.    The Striking of Danzik's Defenses and the Conduct of the Contempt Hearing**

84.    The Contempt Hearing finally began on November 4, 2015.   Before taking testimony, Justice Kornreich heard argument on and then granted the CWT Parties motion to strike all of the defenses of Danzik and RDX to the cross-claims. She imposed this extreme sanction because of Danzik's and RDX's persistent refusal to comply with discovery orders. Justice Kornreich asked the CWT Parties to prepare the papers necessary for her to issue a formal judgment.  *See* Ex. 13 (holding that Danzik "did not abide by Court orders requiring him to turn over information. He ignored them blatantly and repeatedly, willfully and contumaciously").

85.    The CWT Parties presented their direct case on the contempt motion for violations of the Attachment Order and the TRO in the Contempt Order to Show cause itself on November 4-6, 2015.  Because of Justice Kornreich's busy trial schedule, her next opening to resume the hearing was January 5, 2016.  Danzik caused RDX to file for bankruptcy on December 29, 2015.  He filed his own bankruptcy on January 4, 2016, the evening before the contempt hearing was to resume.

86.    Initially, Danzik's counsel refused to even appear on January 5, 2016, but was ordered to do so by Justice Kornreich.  When he did appear, Danzik's counsel argued that the automatic stay precluded the continuation of the hearing.  Justice Kornreich disagreed and

ordered counsel to begin his cross-examination of the CWT Parties' witness. Danzik's counsel refused. He also said that he would not put on his own case.

87.     As a result, the CWT Parties rested and Justice Kornreich closed the record, taking the motion on submission.

88.     From the bench and in chambers, Justice Kornreich expressed her belief that she could send Danzik to jail for a definite term as a punitive measure without violating the automatic stay as that would not have an economic impact on Danzik's bankruptcy estate. She expressed concern, however, whether she could imprison him indefinitely or impose fines as a coercive measure.

89.     Justice Kornreich's law clerk asked us to make an expeditious motion to this Court to lift the automatic stay.

Dated:  New York, New York
        February 17, 2016

_____
JEFFREY M. EILENDER