## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF WYOMING

In re:

DENNIS MEYER DANZIK,

                    Debtor.

Case No. 16-20002
Chapter 11

## DECLARATION OF NIGEL J. FORSTER

I, NIGEL J. FORSTER, Barrister and Solicitor, of Edmonton, Alberta, Canada, declare the

following to be true, under penalty of perjury, pursuant to 28 U.S.C. § 1746:

      1.      I am a barrister and solicitor with the law firm of Bishop & McKenzie LLP, a

regional Alberta, Canada law firm with offices in Edmonton and Calgary.  I am licensed to

practice law in Alberta.  I received my legal education via a bachelor of laws (LL.B.) from the

University of Alberta in 2008, and I was called to practice at the bar in Alberta in August 2009,

and I have practiced continuously in private civil law in Alberta since that time.  I am an active

member in good standing of the Law Society of Alberta, the Canadian Bar Association, and the

Alberta Civil Trial Lawyers Association.  I am the Alberta agent for counsel for CWT Canada II

Limited Partnership and Resource Recovery Corporation (collectively, the "CWT Parties"),

creditors and parties-in-interest in the above-captioned bankruptcy case.  I have personal

knowledge of the matters described in this Affidavit, except where stated to be based on

information and belief, in which case I believe the same to be true.

      2.      I make this Declaration to bring to this Court's attention the Canadian and Alberta

law and legal issues relevant to the CWT Parties' *Motion for Relief from Automatic Stay and*

*Notice of Time to Object* (the "CWT Motion for Stay Relief") and to assist this Court in

understanding the process and background of litigation commenced in Alberta, which is the subject of the Debtor's opposition to the CWT Parties' Motion for Stay Relief, dated March 3, 2016 in the above matter (the "Debtor's Opposition"). In particular I make this Declaration in response to the contention in the Debtor's Opposition to the CWT Parties' Motion for Stay Relief that non-party RDX Technologies Corp. ("RDX") is currently amending its Statement of Claim (the Canadian equivalent of a complaint) in Action No. 1401 09394 in the Court of Queen's Bench of Alberta, Judicial District of Calgary (the "Alberta Action").

3.      In preparing this Declaration I have reviewed the Debtor's Opposition, along with the relevant pleadings, Orders, evidence, and proceedings filed in the Alberta Action, as well as the relevant pleadings, Orders, evidence, and proceedings filed in Action No. 1501 08364 in the Court of Queen's Bench of Alberta, Judicial District of Calgary (the "CCAA Application"). I have also reviewed the statutes, laws, and jurisprudence of the Province of Alberta and the Supreme Court of Canada, including but not limited to the *Companies' Creditors Arrangement Act*, R.S.C. 1985, c. C-36, and the *Alberta Rules of Court*, Alta. Reg. 124/2010.

4.      The Debtor appears to be arguing that the CWT Parties' Motion for Stay Relief, to permit the conclusion of the New York Action, should not be granted, because RDX (a third party and not the Debtor) plans to proceed with the Alberta Action to litigate its claims. The Debtor appears to content that certain Tax Credits do not belong to the the CWT Parties because the sale of CWT to RDX was "fraudulent" and that the Tax Credits belong to the U.S. Treasury, as they were not earned by the CWT Parties.

5.      As an initial matter, the Alberta Action is of questionable relevance to Mr. Danzik's personal bankruptcy proceeding, because he is not a party to the Alberta Action. It is

RDX, and not Mr. Danzik, who is the party to the Unit Purchase Agreement described in the Alberta Action. It is RDX, not Mr. Danzik, that asserts claims in the Alberta Action. Thus, the Alberta Action seems to hold no relevance to this bankruptcy proceeding.

6.     Even if the Alberta Action were of relevance, any claims regarding the Tax Credits would likely now be precluded from determination in the Canadian court. I am informed by Mr. Eilender, New York counsel to the CWT Parties, that the New York Court has struck all of the defenses mounted by Mr. Danzik and RDX related to, *inter alia*, the issue of the CWT Parties' entitlement to the Tax Credits. These claims asserted by Mr. Danzik and RDX in the New York Court were based on the same facts and legal issues as were raised in the Alberta Action. In such circumstances, the Canadian legal principles of comity, *res judicata*, and relitigation would likely cause a Canadian court to defer to the New York Court's prior judicial ruling and to not permit re-litigation of those issues.

7.     Further, the Alberta Action, as a matter of Canadian law, likely never belonged in Alberta but in New York in the first place, which is a further reason why the CWT Parties' Motion for Stay Relief should be granted.. On December 4, 2014, I swore an Affidavit in the Supreme Court of the State of New York, County of New York, Index No. 650841/2013 (the "New York Action"). The Debtor, Mr. Danzik, is personally a party to that litigation as is RDX. My Affidavit in the New York Action was sworn for the assistance of the New York Court in assessing the jurisdiction of the courts in Alberta to hear or interfere with the process before the New York Court. A copy of that Affidavit is attached to my current Declaration as **Exhibit "A"**.

8.     As my Affidavit in the New York Action explains, it is highly unlikely that the Alberta Court has jurisdiction over the subject matter of the New York Action, or any of the

alleged issues as between the Debtor and what the Debtor's Opposition refers to as the "CWT Parties". Specifically, Canadian courts will likely disregard a venue selection provision naming a Canadian province, where, as here, the parties and the dispute have no real and substantial connection to the Province of Alberta. Here, as explained in my New York Affidavit, the only connection with Alberta was appears to be that RDX (a British Columbia Corporation) was continued into Alberta in 2006. Under Canadian law, that is likely insufficient for a Canadian Court to establish jurisdiction over a matter. In this case, it would appear that all of the relevant factors under Canadian law favor the jurisdiction of New York as the appropriate forum for the resolution of the matters at issue.

9.      A final reason why the Alberta Action seems irrelevant to the CWT Parties' Motion for Stay Relief is that it has clearly been abandoned.

10.     Within the Alberta Action, what has occurred to date is that RDX commenced an action in Alberta having to do with the same subject matter as what was before the Court in the New York Action. In response to this action, CWT Parties filed an Application on October 22, 2014 (the "Stay Application") for a stay of proceedings on the grounds that the Alberta Action could not be heard by the Courts in Alberta, or in the alternative that the proceedings in the New York Action were the more appropriate forum in which to resolve the matters in dispute. A copy of the Stay Application is attached to my Declaration as **Exhibit "B"**. As my New York Action Affidavit explains, this is the process for challenging jurisdiction in Alberta without "attorning" (waiving the objection by conduct) to the jurisdiction of the Alberta Court.

11.     Within the Alberta Action, Mr. Danzik submitted an Affidavit on RDX's behalf opposing the Stay Application. But, Mr. Danzik's evidence from the Alberta Action was not

unopposed.  Mr. Jean Noelting, also a party to the New York Action, supplied a substantial

Affidavit, which is attached to my Declaration as **Exhibit "C".**  I have omitted the exhibits for

brevity, as they are lengthy.  This is supplied only to illustrate the point that Mr. Danzik's

statements in the Debtor's Opposition, about what the evidence in the Alberta Action allegedly

shows, are not unopposed.

12.    The Stay Application has never been heard.  The reason is that the Stay

Application was set to be argued at a "special chambers" (a dedicated afternoon) hearing on

April 30, 2015.  In Alberta, however, in most matters affiants to motions may be subject to pre-

trial cross-examination, under oath, before the motions are argued.  Mr. Danzik was cross-

examined on his Affidavit made in the Alberta Action on March 25, 2015.  Mr. Danzik refused

to answer numerous questions and to provide requested documents at that cross-examination.  He

also failed to supply the answers to multiple "undertakings", which are sworn obligations to

obtain further information and provide the documents or answers to the examining party at a

later date.  As a result, his evidence was incomplete, and the Alberta Court could not hear the

Application.  Accordingly the Stay Application was adjourned by consent of counsel who

represented RDX at his cross-examination, to a future special chambers hearing.  Copies of the

Applications and Orders evidencing these proceedings are collectively attached to my

Declaration as **Exhibit "D".**

13.    I have not heard from counsel for Mr. Danzik in the Alberta Action since April

16, 2015, and no answers to undertakings given have been received.

14.    Accordingly, what the Debtor's Opposition states about the Alberta Action is

inaccurate.  The statement about an "amendment process to add six Defendants", made within

the Debtor's Opposition at paragraph 12, is the first I have heard of any amendment.  The
Alberta Action is not undergoing any sort of "amendment process" – the action on the merits is
completely inactive and has been so since it was first filed.  All of the evidence, applications, and
orders in the Alberta Action to date have been directed at the issue of the Alberta Court's
jurisdiction, and nothing has been done to advance the merits of the Alberta Action since the
lawsuit was first filed on August 26, 2014.  It has been apparently abandoned.  It would appear
that RDX and Mr. Danzik never truly intended to advance the Alberta Action on the merits.

15.    Indeed, as a matter of Alberta law, the merits of the Alberta Action, and any
allegations raised within it, cannot be heard or determined until the Alberta Court elects to take
jurisdiction over the matter, which will not happen until the Stay Application is heard and
determined, at the earliest.

16.    Rather than pursuing the Alberta Action or completing Mr. Danzik's evidence for
the Stay Application, RDX then attempted to obtain a stay of the New York proceedings against
Mr. Danzik personally by use of the *Companies' Creditors Arrangement Act* (*"CCAA"*), a statute
in Canada similar to a bankruptcy statute that yet permits the insolvent corporation to continue
managing its own affairs during rearrangement.  A discretionary order under the *CCAA* is
available to stay all proceedings against an individual director of the subject corporation, which
was sought on behalf of Mr. Danzik.  Again, this use of litigation in the Alberta jurisdiction was
vigorously contested and sought to be stayed by the CWT Parties.  A copy of the written
submissions filed by the CWT Parties in response to RDX and Mr. Danzik's application under
the *CCAA* is attached to my Declaration as **Exhibit "E"** – again without the attachments, as it is

provided only as an illustration that the Debtor's claims within the CCAA Application were far from unopposed.

17.     The CCAA Application was adjourned several times between August and October 2015.  Ultimately it, too, was abandoned by RDX.  Copies of correspondence between counsel and the Alberta Court evidencing this are collectively attached to my Declaration as **Exhibit "F"**.  I know of no further attempt to revive or move forward with the CCAA Application since that time.

18.     I make this Declaration solely to bring to this Court's attention the Canadian and Alberta law and legal issues relevant to the motion now before and for no other purpose.  I express no opinion about the law in force in New York or Wyoming, the merits of the pending application this Court, the ultimate merits of any action between the parties to any such proceedings, or any other related matters except as expressly described herein.

Declared before me this _____9_____ day of March, 2016

_____
A Notary Public
In and for the Province of Alberta

_____
NIGEL J. FOSTER

Zachary H. Lindop
Barrister & Solicitor

7

**SUPREME COURT OF THE STATE OF NEW YORK**
**COUNTY OF NEW YORK: IAS PART 54**

| | |
|---|---|
| GEM HOLDCO, LLC, and GEM VENTURES, LTD., <br><br> *Plaintiffs*, <br><br> -against- <br><br> CHANGING WORLD TECHNOLOGIES, L.P., CWT CANADA II LIMITED PARTNERSHIP, RESOURCE RECOVERY CORPORATION, JEAN NOELTING, RIDGELINE ENERGY SERVICES, INC., DENNIS DANZIK, DOUGLAS JOHNSON, and KELLY SLEDZ, <br><br> *Defendants*. | Index No.: 650841/2013 <br><br> (Kornreich, J.) <br><br> Mot. Seq. No. 010 <br><br> **AFFIDAVIT OF NIGEL FOSTER IN SUPPORT OF THE CROSS-CLAIM PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION, OR IN THE ALTERNATIVE AN ATTACHMENT, FOR EXPEDITED DISCOVERY AND TO STAY ANY SETTLEMENT** |
| CWT CANADA II LIMITED PARTNERSHIP, RESOURCE RECOVERY CORPORATION and JEAN NOELTING, <br><br> *Third-Party Plaintiffs*, <br><br> -against- <br><br> CHRISTOPHER BROWN, EDWARD TOBIN, RDX USA, INC and DEJA II, LLC. <br><br> *Third-Party Defendants*. | This is Exhibit " A " referred to in the Affidavit of <br> ___Nigel J. Forster___ <br> Sworn before me this ___9___ day <br> of ___March___ A.D. 2016 <br> _____ <br> A Notary Public in and for <br> the Province of __Alberta__ <br> **Zachary H. Lindop** <br> **Barrister & Solicitor** |

| | | |
|---|---|---|
| CITY OF EDMONTON | ) | |
| | ) *ss:* | |
| PROVINCE OF ALBERTA | ) | |

NIGEL J. FOSTER, being duly sworn, deposes and says:

1.     I am a barrister and solicitor with the law firm of Bishop & McKenzie LLP, a regional Alberta, Canada law firm with offices in Edmonton and Calgary. I am licensed to practice law in Alberta. I received my legal education via a bachelor of laws (LL.B.) from the University of Alberta in 2008, and I was called to practice at the bar in Alberta in August 2009, and I have practiced continuously in private civil law in Alberta since that time. I am an active member in good standing of the Law Society of Alberta, the Canadian Bar Association, and the Alberta Civil Trial Lawyers Association. I am the Alberta agent for counsel for the defendants

in the matter of *RDX Technologies Corporation v. Brian Appel, Resource Recovery Corporation, CWT Enterprises (Canada), Inc., CWT Canada II Limited Partnership, Jean Noelting, Bruce MacFarlane*, Court of Queen's Bench of Alberta Action No. 1401-09394 (the "Alberta Action"). Therefore I have personal knowledge of the matters described in this Affidavit, except where stated to be based on information and belief, in which case I believe the same to be true.

2.      I make this Affidavit in support of the motion by Defendants and Counter-Claim Plaintiffs/Cross-Claimants and Third-Party Plaintiffs CWT Canada II Limited Partnership ("CWT") and Resource Recovery Corporation ("RRC")(collectively the "Cross-Claimants") (1) for a temporary restraining order and preliminary injunction, pursuant to CPLR 6301 and the Court's inherent authority, (a) restraining Cross-Claim Defendants Ridgeline Energy Services, Inc. (n/k/a RDX Technologies Corporation ("RDX")), and Dennis Danzik, from converting, spending or transferring any federal tax credit funds (the "Tax Credit Funds") received by Changing World Technologies, L.P. ("CWT"), or its subsidiaries, relating to the period prior to and including December 21, 2012, and (b) requiring RDX to deposit any such tax credit funds into a separate trust account that is off the balance sheet of RDX and out of the control of RDX's management; or, in the alternative, (2) for an attachment, pursuant to CPLR 6201, of RDX's assets in the amount of $3,175,967, to prevent RDX from rendering itself judgment proof; (3) for expedited discovery concerning RDX's creation of an affiliate incorporated in the United States, including without limitation, RDX's actual or planned transfer of RDX's assets to the newly formed entity or to any other entity affiliated directly or indirectly with RDX and/or Dennis Danzik; and (4) preventing the purported settlement between Danzik and RDX on one hand and Plaintiffs on the other from being effectuated until there is at least discovery regarding the consideration for the settlement.

2

3.     For greater clarity, I make this affidavit to bring to the Court's attention the Canadian and Alberta law and legal issues relevant to this motion and in particular to assist this Court in understanding why this application cannot be made in Alberta.

4.     In preparing this Affidavit I have reviewed and rely on the Affidavit of Jean Noelting, sworn October 14, 2014 in the Alberta Action (the "Alberta Noelting Affidavit"), the statutes, laws, and jurisprudence of the Provinces of Alberta and Ontario, and the Supreme Court of Canada, including but not limited to the following: *Norex Petroleum Ltd. v. Chubb Insurance Co. of Canada*, 2008 ABQB 442; *Morguard Investments Ltd. v. De Savoye*, [1990] 3 S.C.R. 1077; *Hansraj v. Ao et al.*, 2004 ABCA 223; *Manson v. Canada (Department of Justice)*, 2006 ABCA 212; *Van Damme v. Gelber*, 2013 ONCA 388; *Bansal v. Ferrara Pan Candy Co.*, 2014 ABQB 384; *R.J.R. MacDonald v. Canada*, [1994] 1 S.C.R. 311; *Lustre Studio Inc v West Edmonton Mall Property Inc.*, 2014 ABQB 575; *Proprietary Industries Inc. v. Workum*, 2006 ABCA 225; *Ridge Development Corp. v. Crestwood Condominiums Inc.*, 2008 ABQB 599; *Boma Manufacturing Ltd. v. Canadian Imperial Bank of Commerce* [1996] 3 S.C.R. 727; *Stevenson Estate v. Siewert*, 2000 ABCA 222; *Lion Creek Properties, Ltd., LLP v. Sorobey*, 2014 ABQB 405; *Telford v. Holt*, [1987] 2 S.C.R. 193; the *Civil Enforcement Act*, R.S.A. 2000, c. C-15; and the *Alberta Rules of Court*, Alta. Reg. 124/2010.

## DISCUSSION

5.     The Defendants to the Alberta Action (the "Alberta Defendants") have applied to the Alberta Court for an order staying the Alberta Action on the basis that the Alberta Court lacks jurisdiction to try the case (the "Jurisdiction Application"). I have been retained in that action as Alberta agent for Fogler Rubinoff LLP of Toronto, who represents the Alberta Defendants. A

copy of the Notice of Application filed in the Alberta Action is attached to my Affidavit as
**Exhibit "A"**.

6.   The Jurisdiction Application presently stands adjourned to a "Special Chambers"
hearing on April 30, 2015.   The reason for the adjournment is that, in Alberta, matters set for
ordinary chambers are limited to 20 minutes of oral argument and no written materials.   In order
to deal with more complex matters, the Alberta court sets a special afternoon hearing referred to
as "Special Chambers", with a longer time allotted for argument and written materials and
evidence to be submitted to the chambers judge in advance.   To allow time for all evidence to be
presented and for written argument to be prepared regarding the Jurisdiction Application, a
Special Chambers date was sought and obtained from the court.   Due to the limited availability
in Alberta of such Special Chambers dates, the Jurisdiction Application will not be heard until
April 30, 2015.   A copy of the Order of Master J.B. Hanebury, setting out this adjournment and
hearing date, is attached to my Affidavit as **Exhibit "B"**.

7.      The only basis articulated by the Plaintiffs in the Alberta action for jurisdiction in
Alberta is a choice of venue provision, section 12.4 in the Unit Purchase Agreement (the
"UPA").   However, under the law of Alberta if there is not a real and substantial connection
between the Province of Alberta and the matter before the Court, then the Court may still decline
to adjudicate the case for want of *"jurisdiction simpliciter"* or fundamental jurisdiction.   In
addition, even where there is a real and substantial connection to the Province of Alberta, the
Alberta Court may choose to stay the action if the matters at issue are already being litigated
elsewhere and the Alberta Court considers it just, expeditious, or appropriate as a matter of
judicial comity, to allow those matters to be tried in the foreign jurisdiction.   Here, besides the
choice of venue provision in the UPA, the only other connection to the Province of Alberta is

4

that the Alberta Plaintiff, RDX, was incorporated in the nearby Province of British Columbia and continued into the Province of Alberta in 2006.

8.       As argued by the Alberta Defendants in the Jurisdiction Application, the connections to the Province of Alberta in the Alberta Action are insufficient to give effect to the choice of venue provision for the purposes of dealing with the Tax Credit Funds. I believe there is a strong case to be made that the Alberta Court should decline to hear that matter as it lacks *jurisdiction simpliciter*, for reasons including but not limited to: (1) that the subject matter of this motion and the parties to the UPA appear to lack a real and substantial connection to the Province of Alberta; (2) that according to the Alberta Noelting Affidavit, there is a significant doubt as to whether or not the parties to the UPA were *ad idem* as to the choice of venue provision in the first place; and (3) that as a matter of public policy the Alberta Court may decline to decide or determine issues relating to the rightful ownership of Tax Credit Funds issued by the Federal Government in the United States of America, notwithstanding the contractual provisions between the parties to the UPA.

9.       Even if the Alberta Court does determine it has jurisdiction over the subject matter of the Alberta Action (and the subject matter of this present motion), there is a strong case to be made that the Alberta Court should still stay the Alberta Action in favour of the New York action, as a matter of the New York court being a better, more convenient venue for the hearing of these issues, and as a matter of judicial comity, especially as the New York action pre-dates the Alberta Action by almost two years and appears to be dealing with the same or substantially similar issues.

10.       Because the Alberta Defendants have an objection to jurisdiction pending before the Court in Alberta, they cannot seek affirmative relief in the form of an injunction or

attachment or similar provisional remedy, as any such application would almost certainly be held to constitute a waiver of the jurisdictional objection and be considered to be an "attornment" by the Alberta Defendants to the jurisdiction of the Alberta Court, thereby irrevocably and substantially prejudicing (and likely defeating) the Jurisdiction Application. Thus, the Cross-Claimants need relief from this Court, which I am told by Mr. Jeff Eilender, and I believe, already has jurisdiction over Danzik and RDX and the Cross-Claimants.

11.     In addition, it is my opinion as a matter of Alberta law that even assuming the venue provision in the UPA were enforceable as to the claims otherwise asserted by RDX in the Alberta Action, the cross-claims in this action relating to the Tax Credit Funds do not necessarily arise under the UPA and thus may not be subject to the choice of venue provision. In March 2013, the Cross-Claimants sold Changing World Technologies, L.P. to RDX, pursuant to the UPA. The UPA recognized a pre-existing obligation in the Amended Limited Partnership Agreement (the "ALP") between RRC and CWT Canada, on one side, and Plaintiff GEM Hold Co. ("GEM"), on the other, that the Tax Credit Funds received by CWT would be remitted to the Cross-Claimants as they were generated when the Cross-Claimants were the owners of CWT. I note that the UPA seemingly did not create the right of ownership to the Tax Credit Funds but merely acknowledged what had apparently already been the case — that the Cross-Claimants owned those Funds and that they were not being transferred along with the other assets that were being conveyed to RDX. Thus, the rights to the Tax Credit Funds would appear to exist separate and apart from (and indeed, pre-date) the UPA, and thus any dispute concerning those Tax Credit Funds should not be subject to the choice venue provision in the UPA, but are a matter of property law under the jurisdiction of the laws in force in the United States of America governing such funds.

12.    I understand from Mr. Eilender and I believe that, to prevail on this motion there must be a showing of likelihood of success on the merits.  To the extent Alberta law may govern the Cross-Claimants' causes of action with regard to the Tax Credit Funds, I believe the Cross-Claimants have a strong case.  The Eighth Cause of Action in the Answer, Counterclaims and Cross-Claims is for conversion against Danzik and RDX of the Tax Credit Funds.  Under the law in force in Alberta, the tort of conversion is a wrongful interference with the goods of another in a manner inconsistent with the owner's right of possession.  It is a strict liability tort, to which innocence (or the "purpose" of the interference) is no defence.  Here, there appears to be no dispute that: CWT's tax credits from the period on or before December 21, 2012 are the exclusive property of CWT Canada and RRC; RDX has received the Tax Credit Funds from the U.S. Treasury in the amount of at least $3 million; and RDX has failed to remit the money to CWT Canada and RRC, but has instead retained it.  If such facts are proven, it would appear that the tort of conversion would be made out under Alberta law.

13.    The Ninth Cause of Action is for misappropriation of assets in trust against Danzik and RDX.  Under Alberta law, if the property in fact belongs to RRC and CWT Canada, or someone else, and was paid to and received by RDX and Danzik for the benefit of that someone else, it is held in trust by RDX and Danzik.  RDX has apparently conceded through its Alberta counsel that it does not own the Tax Credit Funds and is holding them in trust.  The U.S. government has apparently made no claim to the Tax Credit Funds, however, if RDX believes that it is a trustee caught between competing claims to the Tax Credit Funds, its most advisable remedy under Alberta law would be to deposit those funds into Court and allow the competing parties to litigate ownership.  The UPA seemingly confirmed the Cross-Claim Plaintiffs' rights already established under CWT's ALP that the Tax Credit Funds belonged solely to RRC and

CWT Canada. Thus, the claim for the Tax Credit Funds does not appear to arise under the UPA but rather under the New York or Canadian common law of property, making the UPA venue provision arguably irrelevant.

14.     In light of RDX's admission that it has no claim to the Tax Credit Funds and its imminent threats to pay these funds to the U.S. government, it should not be permitted to keep those Funds as a set-off for its as yet unresolved claims in the Alberta Action.  Under Alberta law, an equitable set-off is only available where the party seeking to establish a set-off can show a claim for a money sum that arises out of the same or closely inter-related transactions, and is so closely connected with the one party's demands that it would be manifestly unjust to allow that party to enforce payment on that demand without considering the cross claim.  If the property rights to the Tax Credit Funds had indeed already been created and vested prior to the UPA, and the UPA did not otherwise deal with them, then it seems impossible to establish the necessary inter-relatedness between RDX's claims under the UPA in the Alberta Action, and the Tax Credit Funds, in order to establish an equitable set off, most especially if RDX does not claim beneficial entitlement to the Tax Credit Funds at all.

15.     I have authored and sworn this Affidavit for the sole purpose of providing information and assistance to this Court regarding the law in force in Alberta in relation to the matters at issue on this pending application.  I have relied entirely on the evidence provided to date, publically available records such as corporate searches, my own review of the law in force in Alberta, and to a limited extent upon information from and belief in what I am advised about New York law by co-counsel.  I make this Affidavit for no other purpose and express no opinion about New York law, the merits of the pending application before the New York court, the

ultimate merits of the Alberta Action, or any related matters except as expressly described herein.

Dated: at Edmonton, Alberta
December 2, 2014

_____
NIGEL J. FOSTER

Sworn to before me this
2nd day of December, 2014

_____
A Notary Public
In and for the Province of Alberta

**Zachary H. Lindop**
**Barrister & Solicitor**

9

403-297-3805                                                    04:51:13 p.m.    10-23-2014    3/6

**Form 27**
**[Rules 6.3 and 10.52(1)]**

| | |
|---|---|
| COURT FILE NUMBER | 1401 09394 |
| COURT OF QUEEN'S BENCH OF ALBERTA | |
| JUDICIAL CENTRE | CALGARY |
| PLAINTIFF/RESPONDENT | ROX TECHNOLOGIES CORPORATION |
| DEFENDANTS/APPLICANTS | BRIAN APPEL, RESOURCE RECOVERY CORPORATION, CWT ENTERPRISES (CANADA), INC., CWT CANADA II LIMITED PARTNERSHIP, JEAN NOELTING, BRUCE MACFARLANE |
| DOCUMENT | APPLICATION |
| ADDRESS FOR SERVICE AND CONTACT INFORMATION OF PARTY FILING THIS DOCUMENT | BISHOP & MCKENZIE LLP, agent for FOGLER RUBINOFF LLP 2300, 10180 – 101 St. Edmonton, AB T5J 1V3 Attn: Nigel J. Forster Phone: 780-426-5550; fax 780-426-1305 Fogler Rubinoff LLP, Attention: Milton Davis Phone: 416-864-9700; Fax: 416-941-8852 |

**NOTICE TO RESPONDENTS**
This application is made against you. You are a respondent.
You have the right to state your side of this matter before the master/judge.
To do so, you must be in Court when the application is heard as shown below:

| | |
|---|---|
| Date | November 10, 2014 |
| Time | 10:00 a.m. |
| Where | 601N – 5th St. SW, Calgary, Alberta |
| Before Whom | Presiding Master in morning Chambers |

Go to the end of this document to see what else you can do and when you must do it.

This is Exhibit " A " referred to
in the Affidavit of
Nigel J. Forster
sworn before me on this 2nd day
of December 2014

A Notary Public in and for the
Province of Alberta

**Zachary H. Lindop**
**Barrister & Solicitor**

**Remedy claimed or sought:**

1.   If necessary, an Order affirming, dispensing with, or abridging the time for service of this Application and any supporting materials, and deeming service of this Application and any supporting materials to be good and sufficient;

2.   An Order pursuant to Rule 3.68 of the *Alberta Rules of Court* and s. 17 of the *Judicature Act* (Alberta), staying the within action and any and all applications or proceedings within it;

3.   An Order declaring that this application and any resulting Order made does not constitute an attornment to the jurisdiction of the Province of Alberta for the hearing of this matter; and

4.   Such further and other relief as this Honourable Court deems just and appropriate.

**Grounds for making this application:**

5.   Save and except for a forum selection clause contained in an agreement between some of the parties to this Action, there is no connection between any of the parties to this proceeding and the Province of Alberta.

6.   The matters and issues described in the Statement of Claim by RDX Technologies Corporation ("RDX") are closely related to and already joined in judicial proceedings already underway in the Supreme Court of the State of New York (the "New York Action");

7.   Neither the subject matter of the action, nor the parties to the action, have any real or substantial connection to the Province of Alberta whatsoever;

8.   The Plaintiff, RDX, has been named in and participated actively in the New York action;

9.   The Defendants, with the exception of Brian Appel ("Appel") are or were all named in and have participated actively in the New York Action. Appel resides in the State of New York and has no real or substantial connection to the Province of Alberta;

10.   The State of New York is a more appropriate and convenient forum for the trial and resolution of the matters described in the action;

11.   The results and findings in the New York action would judicially resolve all or substantially all of the issues raised in this action;

602804

Page 2 of 4

12.  Trying parallel proceedings in Alberta and New York would allow for a substantial risk of inconsistent or contrary findings;

13.  The proceedings in New York do not prejudice any party, as all parties have already actively engaged in and participated in the New York Action.

14.  Such further and other grounds as counsel may advise and this Honourable Court may permit.

**Material or evidence to be relied on:**

15.  The Affidavit of Jean Noelting, sworn on October _14, 2014;

16.  The Pleadings filed within this action; and

17.  Such further and other materials or evidence as counsel may advise and this Honourable Court may permit.

**Applicable rules:**

18.  Rules 1.3, 1.4, 1.5, 3.68, 6.3, Part 11, and 13.5 of the *Alberta Rules of Court;* and

19.  Such further and other rules as counsel may advise and this Honourable Court may permit.

**Applicable Acts and Regulations:**

20.  The *Judicature Act*, R.S.A. 2000, c. J-2; and

21.  Such further and other Acts and Regulations as counsel may advise and this Honourable Court may permit.

**Any irregularity complained of or objection relied on:**

22.  The action has been commenced in an improper and/or inconvenient forum.

**How the application is proposed to be heard or considered:**

23.  In person, with all of the parties present, before a Justice in morning Chambers.

┌─────────────────────────────────────────────────────────────────────────┐
│  WARNING                                                                  │
│                                                                           │
└─────────────────────────────────────────────────────────────────────────┘

403-297-3805
OCT-22-2014 08:46 From:BISHOP & MCKENZIE   04:52:11 p.m.   10-23-2014   6/6

403-297-3805   04:19:15 p.m.   10-21-2014   5/5

If you do not come to Court either in person or by your lawyer, the Court may give the applicant(s) what they want in your absence. You will be bound by any order that the Court makes. If you want to take part in this application, you or your lawyer must attend in Court on the date and at the time shown at the beginning of the form. If you intend to rely on an affidavit or other evidence when the application is heard or considered, you must reply by giving reasonable notice of the material to the applicant.

COURT FILE NUMBER            1401 09394

COURT OF QUEEN'S BENCH OF ALBERTA

JUDICIAL CENTRE               CALGARY

PLAINTIFF/RESPONDENT         RDX TECHNOLOGIES CORPORATION

DEFENDANTS/APPLICANTS        BRIAN APPEL, RESOURCE RECOVERY
CORPORATION, CWT ENTERPRISES (CANADA),
INC., CWT CANADA II LIMITED PARTNERSHIP,
JEAN NOELTING, BRUCE MACFARLANE

DOCUMENT                  **ORDER**

ADDRESS FOR SERVICE AND      BISHOP & MCKENZIE LLP
CONTACT INFORMATION OF       2300, 10180 – 101 Street
PARTY FILING THIS DOCUMENT     Manulife Place
Edmonton, AB  T5J 1V3
Attn:  Nigel J. Forster
Phone: 780-426-5550; fax 780-426-1305

as agent for:

FOGLER, RUBINOFF LLP
77 King Street West
Suite 3000, P.O. Box 95
TD Centre North Tower
Toronto, ON  M5K 1G8
Attention: Milton Davis
Phone: 416-864-9700; Fax: 416-941-8852

CLERK OF THE COURT
FILED
NOV 1 0 2014
JUDICIAL CENTRE
OF CALGARY

I hereby certify this to be a true copy of
the original _ORDER_
Dated this _10_ day of _Nov 2014_
_____
for Clerk of the Court

*This is* Exhibit " _B_ " referred to
in the Affidavit of
_Nigel J. Forster_
sworn before me on this _2nd_ day
of _December 2014_
_____
A Notary Public in and for the
Province of Alberta

**Zachary H. Lindop
Barrister & Solicitor**

DATE ON WHICH ORDER WAS PRONOUNCED:     November 10, 2014

NAME OF MASTER WHO MADE THIS ORDER:    Master _J.B. Hanebury_

LOCATION OF HEARING:                    **Calgary, Alberta**

        UPON THE APPLICATION of the Defendants/Applicants for a procedural direction regarding the

pending Application of the Defendants/Applicants for a stay of this action, filed October 22, 2014 (the

"Application"); AND UPON hearing reference to the Affidavit of Jean Noelting  sworn October 14, 2014

(the "Noelting Affidavit"); AND UPON hearing from counsel for the Applicants; AND UPON being advised

that the Plaintiff wishes to cross-examine on the Noelting Affidavit; AND UPON being advised that, at

the request of the Plaintiff, the Application will be adjourned by consent to Special Chambers; AND

2

UPON being advised of the agreement of the Plaintiff by its counsel to the dates set out herein; IT IS HEREBY ORDERED THAT:

1.   Neither the present procedural application of the Defendants/Applicants, nor the appearance today of counsel or agent for the Plaintiffs, nor the granting and entry of this Order, shall constitute an attornment by the Defendants/Applicants to the jurisdiction of Alberta for the hearing of the subject matter in this action.

2.   The Application is adjourned to be heard in Special Chambers on **April 30, 2015**, ~~or such other date as the parties may mutually agree.~~ *at 2 P.M. - "J.H."*   *"J.H."*

3.   The Plaintiff will cross-examine Jean Noelting on the Noelting Affidavit on **February 12, 2015**, commencing at **10:00 am (EST)** at Network Court Reporting, 100 King Street West, Suite 3600, Toronto, ON, or such other location as the parties may subsequently agree.

4.   The Plaintiff shall provide any reply evidence respecting the Application by not later than **5:00 pm (EST)** on **February 28, 2015**, and any affiants of such evidence shall be made available to be cross-examined on their evidence by not later than **March 24, 2015**, at a location to be determined.

5.   This Order and the examinations referred to herein shall be entirely without prejudice to the positions of the parties upon the main Application.

6.   There shall be no costs arising from this Order.

"J. B. Hanebury"
_____
M.C.Q.B.A.

403-297-3805                                                      04:51:13 p.m.    10-23-2014              3/6

**Form 27**
[Rules 6.3 and 10.52(1)]

COURT FILE NUMBER                1401 09394

COURT OF QUEEN'S BENCH OF ALBERTA

JUDICIAL CENTRE                  CALGARY

PLAINTIFF/RESPONDENT             RDX TECHNOLOGIES CORPORATION

DEFENDANTS/APPLICANTS            BRIAN APPEL, RESOURCE RECOVERY
                                 CORPORATION, CWT ENTERPRISES (CANADA),
                                 INC., CWT CANADA II LIMITED PARTNERSHIP,
                                 JEAN NOELTING, BRUCE MACFARLANE

DOCUMENT                         **APPLICATION**

ADDRESS FOR SERVICE AND          BISHOP & MCKENZIE LLP, agent for
CONTACT INFORMATION OF           FOGLER RUBINOFF LLP
PARTY FILING THIS DOCUMENT       2300, 10180 – 101 St.
                                 Edmonton, AB  T5J 1V3
                                 Attn:  Nigel J. Forster
                                 Phone: 780-426-5550; fax 780-426-1305
                                 Fogler Rubinoff LLP, Attention: Milton Davis
                                 Phone: 416-864-9700; Fax: 416-941-8852

**NOTICE TO RESPONDENTS**
This application is made against you.  You are a respondent.
You have the right to state your side of this matter before the master/judge.
To do so, you must be in Court when the application is heard as shown below:

       Date              November 10, 2014
       Time              10:00 a.m.
       Where             601N – 5th St. SW, Calgary, Alberta
       Before Whom       Presiding Master in morning Chambers

Go to the end of this document to see what else you can do and when you must do it.

This is Exhibit " B " referred to in the
Affidavit of

___Nigel J. Forster___

Sworn before me this ___9___ day
of ___March___ A.D. 2016

_____
A Notary Public in and for
the Province of Alberta

Zachary H. Lindop
Barrister & Solicitor

403-297-3805                                                    04:51:32 p.m.    10-23-2014        4/6
OCT-22-2014 06:46 FROM: BISHOP & MCKENZIE    1604681303    TO:14036291303        Page 4/6

403-297-3805                                                    04:18:35 p.m.    10-21-2014        3/5

**Remedy claimed or sought:**

1. If necessary, an Order affirming, dispensing with, or abridging the time for service of this Application and any supporting materials, and deeming service of this Application and any supporting materials to be good and sufficient;

2. An Order pursuant to Rule 3.68 of the *Alberta Rules of Court* and s. 17 of the *Judicature Act* (Alberta), staying the within action and any and all applications or proceedings within it;

3. An Order declaring that this application and any resulting Order made does not constitute an attornment to the jurisdiction of the Province of Alberta for the hearing of this matter; and

4. Such further and other relief as this Honourable Court deems just and appropriate.

**Grounds for making this application:**

5. Save and except for a forum selection clause contained in an agreement between some of the parties to this Action, there is no connection between any of the parties to this proceeding and the Province of Alberta.

6. The matters and issues described in the Statement of Claim by RDX Technologies Corporation ("RDX") are closely related to and already joined in judicial proceedings already underway in the Supreme Court of the State of New York (the "New York Action");

7. Neither the subject matter of the action, nor the parties to the action, have any real or substantial connection to the Province of Alberta whatsoever;

8. The Plaintiff, RDX, has been named in and participated actively in the New York action;

9. The Defendants, with the exception of Brian Appel ("Appel") are or were all named in and have participated actively in the New York Action. Appel resides in the State of New York and has no real or substantial connection to the Province of Alberta;

10. The State of New York is a more appropriate and convenient forum for the trial and resolution of the matters described in the action;

11. The results and findings in the New York action would judicially resolve all or substantially all of the issues raised in this action;

403-297-3805                                     04:51:54 p.m.   10-23-2014          5/6,

403-297-3805                                     04:18:57 p.m.   10-21-2014          4/5

12.   Trying parallel proceedings in Alberta and New York would allow for a substantial risk of inconsistent or contrary findings;

13.   The proceedings in New York do not prejudice any party, as all parties have already actively engaged in and participated in the New York Action.

14.   Such further and other grounds as counsel may advise and this Honourable Court may permit.

Material or evidence to be relied on:

15.   The Affidavit of Jean Noelting, sworn on October _14, 2014;

16.   The Pleadings filed within this action; and

17.   Such further and other materials or evidence as counsel may advise and this Honourable Court may permit.

Applicable rules:

18.   Rules 1.3, 1.4, 1.5, 3.68, 6.3, Part 11, and 13.5 of the *Alberta Rules of Court*; and

19.   Such further and other rules as counsel may advise and this Honourable Court may permit.

Applicable Acts and Regulations:

20.   The *Judicature Act*, R.S.A. 2000, c. J-2; and

21.   Such further and other Acts and Regulations as counsel may advise and this Honourable Court may permit.

Any irregularity complained of or objection relied on:

22.   The action has been commenced in an improper and/or inconvenient forum.

How the application is proposed to be heard or considered:

23.   In person, with all of the parties present, before a Justice in morning Chambers.

WARNING

602504                                                        Page 3 of 4

If you do not come to Court either in person or by your lawyer, the Court may give the
applicant(s) what they want in your absence. You will be bound by any order that the Court
makes. If you want to take part in this application, you or your lawyer must attend in Court on
the date and at the time shown at the beginning of the form. If you intend to rely on an
affidavit or other evidence when the application is heard or considered, you must reply by giving
reasonable notice of the material to the applicant.

602804                                                           Page 4 of 4

CLERK OF THE COURT
**FILED**
OCT 2 1 2014
JUDICIAL CENTRE
OF CALGARY

COURT FILE NUMBER                    1401 09394

COURT OF QUEEN'S BENCH OF ALBERTA

JUDICIAL CENTRE                      CALGARY

PLAINTIFF/RESPONDENT                 RDX TECHNOLOGIES CORPORATION

DEFENDANTS/APPLICANTS                BRIAN APPEL, RESOURCE RECOVERY
                                     CORPORATION, CWT ENTERPRISES (CANADA)
                                     INC., CWT CANADA II LIMITED PARTNERSHIP,
                                     JEAN NOELTING, BRUCE MACFARLANE

DOCUMENT                             **AFFIDAVIT OF JEAN NOELTING**

This is Exhibit " C " referred to in the
Affidavit of
_Nigel J. Forster_
Sworn before me this ___9___ day
of ___March___ A.D. 2016
_A Notary Public in and for
the Province of ___Alberta___

ADDRESS FOR SERVICE AND            FOGLER RUBINOFF LLP
CONTACT INFORMATION OF
PARTY FILING THIS DOCUMENT         77 King Street West

                                   Suite 3000, P.O. Box 95

                                   TD Centre North Tower
                                   Toronto, ON   M5K 1G8
                                   Attn: Milton A. Davis / Brent D. McPherson
                                   Phone: 416-864-9700
                                   Fax: 416-941-8852

**Zachary H. Lindop
Barrister & Solicitor**

I, JEAN NOELTING, of the City of Toronto, in the Province of Ontario, MAKE OATH
AND SAY AS FOLLOWS:

1.      I am named as a personal defendant in this action.  I was also the sole Director of CWT

        Enterprises (Canada) II Inc. ("CWT Enterprises"), the general partner of Changing World

        Technologies, LP ("CWT") until December 2012 and am a former director of the plaintiff

        RDX Technologies Corporation ("RDX").  As such I have knowledge of the matters to

        which I hereinafter depose, save and except where I have been advised of such facts by

1

- 2 -

others, in which case I have indicated the source of my belief and believe such information to be true.

2.    This affidavit is sworn in support of a motion brought by the defendants for an order staying this action (the "RDX Action"). As will be set out below, there is a prior action filed in New York (the "New York Action") involving most of the same parties and the same issues and facts, Alberta is not a proper forum for the RDX Action as there is no connection between Alberta and any of the parties. In swearing this affidavit, I am not agreeing to or attorning to the jurisdiction of Alberta, but rather I am swearing it for the sole purpose of contesting Alberta's jurisdiction. Further, for the reasons set out below, the State of New York, in the United States, where the New York Action has already been pending for more than a year and a half, and not Alberta, is clearly the most appropriate and convenient forum for the matters and claims raised in the RDX Action to be adjudicated.

**Overview**

3.    In this action, RDX asserts claims arising from its acquisition of the outstanding units of CWT from the defendants Resource Recovery Corporation ("RRC") and CWT Canada II Limited Partnership ("CWT Canada") (together the "Corporate Defendants") pursuant to a unit purchase agreement (the "Unit Purchase Agreement") dated March 11, 2013.

4.    The Unit Purchase Agreement contains a forum selection clause under which the Corporate Defendants agreed to submit to the exclusive jurisdiction of the courts of the Province of Alberta in respect of any proceeding arising out of or relating to the Unit Purchase Agreement. However, there are strong reasons why the RDX Action should not be heard in Alberta and should proceed in the State of New York ("New York").

- 3 -

5.   First, there is no real or substantial connection between Alberta and any of the parties to the RDX Action or the claims asserted in the RDX Action.

6.   None of the defendants reside in or have any assets, presence or connection to Alberta whatsoever.   CWT has no assets in Alberta and neither it, nor any of the parties to this proceeding carries on business in Alberta.

7.   While RDX is an Alberta corporation, and at one time had operations there, those operations were sold in 2013.  Since that sale, neither RDX nor any other party to this proceeding carries on business or has assets in Alberta. Indeed, the business of RDX is carried out from the United States.

8.   Second, the RDX Action raises matters and claims which overlap very significantly, and in most instances completely, with the matters and claims which have for the past year and a half been the subject of an action before the Supreme Court of the State of New York (the "New York Action").

9.   Both the New York Action and the RDX Action arise from the sale of all of the units of CWT, a Delaware limited partnership, to RDX in in March 2013.

10.   All of the parties to the RDX Action are parties to the New York Action except for CWT Enterprises (Canada) Inc. (wich is incorrectly named in that action), Brian Appel ("Appel") and, since his recent removal from the New York Action, Bruce MacFarlane ("MacFarlane").  RDX is a defendant in the New York Action and has participated actively in that proceeding.

- 4 -

11.  The matters and issues raised in the RDX Action are all closely related to the matters and claims raised in the ongoing litigation in New York involving most of the parties to the RDX Action.   There is a serious risk that if the RDX Action is permitted to proceed separately from the New York Action, there will be inconsistent or perhaps contrary findings on the core issues in each proceeding.  Indeed, the New York Action has already been progressing for over a year and a half and is quite likely to conclude long before the RDX action.  Given the overlap in issues, the resolution of the New York Action will quite likely have a preclusive effect on the RDX Action.

12.  There is almost complete overlap between the two cases.  In the RDX Action, RDX is essentially claiming that it was fraudulently induced to purchase CWT by the defendants, and that those defendants were also obligated to indemnify RDX and its CEO, Dennis Danzik for any attorneys fees or liability incurred by them in the New York Action.

13.   Similarly, in the New York Action we have asserted claims against RDX and Danzik for breaches related to very same Unit Purchase Agreement.  We have also asserted that no fraud or breach with respect to the Unit Purchase Agreement occurred on our end.  Thus, it is inescapable that whether there was a fraudulent inducement or breach of the Unit Purchase Agreement will be litigated and adjudicated in the New York Action.

14.  There should be no prejudice to any party if the claims raised in the RDX Action are brought instead in the New York Action since all of the parties are based in the United States except CWT Enterprises, CWT Canada and me, and all have already participated in the New York Action, except Appel, who is himself a New York resident and was the

President of CWT until December 2012, which at the time was based in New York As stated above, essentially the same claims have already been made in the New York Action.

**Background Facts**

15. The claims raised in the RDX Action and in the New York Action concern the events and circumstances leading up to the sale of CWT, a limited partnership formed under the laws of the State of Delaware, to RDX pursuant to the Unit Purchase Agreement on March 11, 2013. Until late December 2012, when RDX's Chief Executive Officer, Dennis Danzik ("Danzik") took over management and control of CWT, CWT's head offices were located in West Hempstead, New York.

16. At the time the Unit Purchase Agreement was completed, CWT's general partner was CWT Enterprises, a corporation incorporated under the Ontario *Business Corporations Act* with its head office located in Toronto, Ontario.  CWT's limited partners were as follows:

   (a)   RRC, a corporation incorporated under the laws of Delaware with its head office located in West Hempstead, New York;

   (b)   CWT Canada, a partnership formed under the laws of Delaware with its head office located in Toronto, Ontario; and

   (c)   GEM Holdco, LLC ("GEM"), a limited liability company incorporated under the laws of the State of New York with its head office located on Madison Avenue, in New York.

Copies of the corporate searches for the above-noted entities are attached hereto and marked as Exhibits "A", "B", "C" and "D" respectively.

17.     CWT was at all material times engaged in the manufacture and sale of renewable diesel oil ("RDO"). Its predecessor, CWT, Inc., was founded by Appel in New York. Both CWT, Inc. and CWT operated from New York. Appel had, along with others, developed a thermal depolymerisation technology to generate RDO from waste grease, offal, animal carcasses and other organic-rich wastes.

18.     In May 2004 one of CWT's operating subsidiaries opened an RDO refinery in Carthage, Missouri (the "Carthage Facility"), which began selling RDO in or about 2007. The Carthage Facility is CWT's only refinery. CWT also had a research and development facility in Philadelphia, Pennsylvania. However, Danzik caused that facility to be shut down in late December 2012 or January 2013. CWT never had any facilities or operations in Canada and to my knowledge still has no presence in Alberta or elsewhere in Canada.

19.     In the period leading up to the sale of CWT to RDX, CWT only had a handful of customers. They were located in United States, specifically in New Hampshire, Vermont, Massachussets, Virginia and Missouri. In supplying its fuel products to its customers CWT used a distribution services contractor called Westway Terminal Company Inc., which was based in Albany, New York. CWT has never had any customers in Canada, so far as I am aware.

20.     In addition to revenues from the sale of its fuel products, CWT's fuel products enabled it to apply for environmental credits with the United States Environmental Protection Agency (the "EPA"). The EPA rewards producers of renewable fuel with special "Renewable Identification Numbers", or "RINs" for each unit of fuel meeting the program's standards that is made and sold, under its renewable fuels standards, (or "RFS") program. These

RINs may be bought and sold as a regulated commodity. Producers of fuel not meeting certain renewable EPA standards can purchase the RINs as an offset against the EPA requirements.

21.   The RDO produced at the Carthage Facility was submitted to the EPA and was determined to meet the EPA's standards for RINs. CWT was therefore able to claim, and was found to be eligible for, tax credits through 2013 equal to $1 per gallon of RDO produced and sold. These credits could be applied to offset excise or corporate income taxes. However, CWT owed no such taxes and accordingly was entitled to receive a payment from the U.S. treasury for each gallon of RDO.

22.   By December 2012, CWT was running into cash flow problems and was in need of significant additional capital. In order to obtain additional financing, in early December 2012, RRC and CWT Canada obtained a commitment from GEM, one of CWT's limited partners that was based in New York to invest a minimum of $2,500,000 (USD) in CWT upon request, and up to $4,000,000 (USD) by April 30, 2013 in return for an increased ownership interest in CWT based upon the investments made.

23.   On December 21, 2012 GEM, CWT Canada and RRC entered into a Securities Purchase Agreement (the "Securities Purchase Agreement") and other related agreements to establish and govern the ownership, control and funding of CWT. Under these agreements, GEM agreed to invest a minimum of $2,500,000 (USD) and a maximum of $4,000,000 (USD) in CWT upon request from CWT by April 30, 2013 in exchange for up to a 60% ownership interest in CWT. A copy of the Securities Purchase Agreement is attached hereto and marked as Exhibit "E".

- 8 -

24.     The Securities Purchase Agreement contained a venue provision requiring all litigation to be in New York.  The related agreement provided for GEM, a New York entity, to have management control over CWT because it was anticipated that GEM would shortly become the largest equity holder by making investments under the Securities Purchase Agreement.

25.     In or about December 2012, GEM introduced RDX and its Chief Executive Officer, Danzik, to RRC, CWT Enterprises and CWT Canada.

26.     In anticipation of GEM taking over management control of CWT, on or about December 12, 2012 Danzik was appointed as Chief Executive Officer of CWT.  In his capacity as Chief Executive Officer ("CEO") of CWT Danzik assumed responsibility for all management and operational aspects of the business.  It is my understanding that from that time, Danzik had full and unrestricted access to all of CWT's records, information and assets, including its plants, equipment and fuel products.

27.     At the time, CWT Canada and RRC welcomed the appointment of Danzik as CEO because of his extensive knowledge of renewable fuels. Danzik had previously filed a patent for the production of renewable fuel using food waste in a process similar to that used at CWT, and as a result was intimately familiar with the field.

28.     As will be set out below, Danzik's appointment as CEO of CWT is noteworthy, because it predated RDX's purchase of CWT's units by approximately 4 months.  In other words, Danzik was in control of the CWT enterprise that he, through RDX, purchased some four months later.

29.    At or about the same time as Danzik's appointment as CEO of CWT, RES Management, Inc. ("RES Management"), a GEM affiliate that was based in New York, was appointed as general partner of CWT.

30.    GEM has claimed that in late December 2012 or early 2013 it entered into discussions with RDX to sell its units in CWT to RDX.

31.    Unfortunately, after December 2012, GEM breached the Securities Purchase Agreement by, among other things, failing to comply with numerous funding requests by Danzik on behalf of CWT. This placed CWT in a severe cash crunch. CWT had little or no inventory left to sell to its customers and was in crisis. The CWT limited partners other than GEM therefore took the position that GEM had fundamentally breached the Securities Purchase Agreement, and as such the agreement was treated as at an end. They also removed RES Management as the general partner of CWT and replaced it with CWT Enterprises.

32.    The CWT limited partners then entered into discussions with RDX regarding the sale of all of the units in CWT to RDX. On March 11, 2013 CWT Canada and RRC, CWT Enterprises entered into the Unit Purchase Agreement with RDX pursuant to which RDX acquired all of the issued and outstanding units in CWT in return for the following consideration:

(a)    a promissory note in favour of RRC in the principal amount of $16,936,262.68 (the "RRC Note") and a promissory note in favour of GEM in the principal amount of $3,063,737.32 (USD) (the "GEM Note");

- 10 -

(b)   25,862,069 shares in the common stock of RDX, of which RRC was to receive 6,243,860 shares and CWT Canada was to receive 15,656,479 shares; and

(c)   warrants to purchase 4,100,000 shares in the common stock of RDX at a strike price of one dollar per share, of which CWT Canada was to receive warrants to purchase 3,471,934 shares of RDX and RRC was to receive warrants to purchase 628,066 shares of RDX.

33.   A copy of the Unit Purchase Agreement is attached hereto and marked as Exhibit "F". Copies of the RRC and the Gem Note are annexed as Exhibits "G" and "H" respectively.

34.   Article 2.3 of the Unit Purchase Agreement provides that one hundred percent of all amounts received by CWT as the result of the reinstatement of any Federal or State tax credit relating to the period prior to and including December 21, 2012 would be allocated and distributed to CWT Canada and RRC such that CWT Canada received the $5,015,000 and thereafter RRC received the next $1,066,858.   I believe these tax credits exceed $3,000,000 (USD).

35.   RDX has failed to make any payments on the RRC Note. It has further defaulted in its obligations to pay the tax credits to CWT Canada and RRC.

**The New York Action**

36.   On March 11, 2013 GEM commenced the New York Action, suing CWT, CWT Canada RRC, and RDX. In that action, GEM sought to enjoin, among other things, the closing of the sale to RDX under the Unit Purchase Agreement.   A copy of the Complaint is attached hereto and marked as Exhibit "I".   In that proceeding, all of the Defendants were

represented by one law firm, Schlam Stone & Dolan LLP. Jeffrey M. Eilender of that firm acted as counsel to all of the parties.

37. In opposition to GEM's motion to enjoin the sale to RDX, Danzik submitted an affidavit, dated March 10, 2013. A copy of that affidavit is annexed as Exhibit "J".

38. On March 12, 2013, the New York Court denied the motion, and the parties were permitted to implement the Unit Purchase Agreement. A copy of the reasons for decision are annexed as Exhibit "K".

39. On April 29, 2013 GEM filed a First Amended Complaint which added claims against, among others, RDX, Danzik (the CEO of RDX) and me. A copy of the First Amended Complaint is attached hereto and marked as Exhibit "L".

40. On June 27, 2013 RDX and the other defendants to the New York Action filed a motion to dismiss the First Amended Complaint, and GEM brought a cross-motion to add GEM Ventures, Ltd. ("GEM Ventures") as a plaintiff.

41. On December 24, 2013 the New York Court issued an order granting the motion in respect of certain of the claims in the First Amended Complaint. A copy of the order dated December 24, 2013 is attached hereto and marked as Exhibit "M".

42. On January 14, 2014 GEM filed a Second Amended Complaint adding GEM Ventures as a plaintiff. A copy of the Second Amended Complaint is attached hereto and marked as Exhibit "N".

43.   On consent, GEM and GEM Ventures filed a Third Amended Complaint on February 20, 2014, which added additional plaintiffs and added MacFarlane, and existing and former RDX board members Tony Ker, Richard Carrigan, Dennis Johnson and Kelly Sledz as defendants with respect to a newly added defamation claim. A copy of the Third Amended Complaint is attached hereto and marked as Exhibit "O".

44.   On August 28, 2014 the New York Court dismissed the defamation claim, thus removing all of the plaintiffs except GEM and GEM Ventures. The New York Court also dismissed the claims against MacFarlane, Mr. Ker and Mr. Carrigan. A copy of the August 28, 2014 New York order is attached hereto and marked as Exhibit "P".

45.   As the pleadings are presently constituted in the New York Action, GEM and GEM Ventures have claimed that CWT, CWT Canada, RRC, RDX, Danzik, Douglas Johnson, Kelly Sledz and I conspired to deprive GEM of the ability to acquire 60 percent of the limited partnership units in CWT pursuant to the Securities Purchase Agreement. Gem and Gem Ventures further claim that the Defendants took advantage of GEM's introduction of RDX, and then entered an agreement for RDX to acquire all the shares of CWT. GEM and GEM Ventures have asserted the following claims:

(a)   as against CWT, damages of $27,000,000 (USD) for breach of the Securities Purchase Agreement by its alleged conduct in repudiating the Securities Purchase Agreement and precluding GEM from making any further contributions under it;

(b)   as against CWT Canada, RRC, RDX, Danzik, Douglas Johnson, Kelly Sledz and me, damages of $27,000,000(USD) for tortious interference with the Securities



Purchase Agreement by our alleged conduct in entering into the Unit Purchase Agreement with RDX when we were aware of the Securities Purchase Agreement;

(c)     as against RDX and Danzik, damages of $27,000,000 (USD) for breach of a non-disclosure agreement between GEM Ventures, Danzik and RDX by their alleged conduct in contacting CWT Canada, RRC and me regarding the purchase of a 100% interest in CWT which culminated in the Unit Purchase Agreement;

(d)     as against CWT, CWT Canada, RRC and me, damages of $27,000,000 (USD) for tortious interference with contract by our alleged conduct in contracting with RDX, through Danzik, to sell all of the units in CWT directly from us and providing that CWT would not issue further limited partnership interests in CWT to GEM pursuant to the Securities Purchase Agreement; and

(e)     as against RDX, damages of $950,000 (USD), plus interest, for breach of contract for failing to pay a breakup fee which it claims is payable under a letter of intent between GEM and RDX.

44.     RDX never made payment on the Notes. As of the summer, it announced that it had no liability to pay. As a result of these breaches, we disclaimed any liability to indemnify Danzik and RDX in the New York Action. As of about August 6, 2014, Danzik and RDX have been represented by separate counsel while all of the defendants in the New York Action are still represented by Mr. Eilender and Schlam Stone.

- 14 -

46.     On September 22, 2014, CWT Canada, RRC and I filed our Verified Answer and Counterclaims ,Crossclaims and Third-Party Complaint in which we have asserted the following counterclaims, crossclaims and third party claims in the New York Action:

(a)     as against GEM, GEM Ventures, Tobin and Brown, damages for fraud in connection with misrepresentations made to MacFarlane and me that GEM would permit CWT Canada and RRC to make investments in CWT up to $1,500,000 (USD) if they agreed to sign, among other things, the Securities Purchase Agreement when they knew these representations to be untrue;

(b)     as against GEM, GEM Ventures, Tobin, Brown and RES Management, damages for indemnification and contribution on the basis that if RDX and Danzik's allegations of fraud or breach of warranty presently raised in the RDX Action are upheld, Tobin, Brown, Gem Ventures and GEM had full awareness of all the facts concerning CWT, the Carthage Facility and its fuel and the related process, because they were in charge of managing the company and would have made representations to Danzik concerning the fuel and equipment at the Carthage facility;

(c)     as against RDX and Danzik, indemnification and contribution in respect of any liability CWT Canada, RRC and I may be found to have in the New York Action;

(d)     as against RDX, Danzik, Elisabeth Danzik and Deja II, LLC ("Deja II"), damages for fraud arising from false representations made by Danzik, Elizabeth Danzik, and Deja II that they would use $1,000,000 (CDN) of funds advanced by CWT Canada and RRC to repay the GEM Note, which would, among other things, give CWT

- 15 -

Canada and RRC a first-in-priority security interest in CWT's Carthage Facility in accordance with their agreements, when they knew these representations to be false;

(e)    as against Danzik, Elizabeth Danzik and Deja II, damages for money had and received in connection with their conduct in receiving money belonging to CWT Canada and RRC and benefitting from receipt of the money;

(f)    as against Danzik, Elizabeth Danzik and Deja II, damages for conversion arising from their conduct in misappropriating the $1,000,000 (CDN) and wrongfully retaining the money;

(g)    as against RDX, Danzik and Deja II, damages for breach of contract arising from their conduct in failing to use the $1,000,000 (CDN) referred to above for the purpose for which it was paid and for failing to deliver freely tradable shares in RDX;

(h)    as against RDX and Danzik, damages for breach of trust, or in the alternative breach of a constructive trust, and disgorgement and an accounting arising from their conduct in receiving at least $3,000,000 (USD) in tax credits payable from the United States Treasury which belonged to and were to be paid to CWT Canada and RRC under the terms of the Unit Purchase Agreement, and misappropriating such funds for themselves;

(i)    as against RDX and Danzik, damages for conversion arising from their misappropriation of at least $3,000,000 (USD) in tax credits referred to above;

(j)    as against GEM and GEM Ventures, a declaratory judgment that in the event the claims asserted in the RDX Action are substantiated, meaning that the fuel and Carthage Facility were worthless or had little value and therefore CWT had little value, CWT Canada, RRC and I cannot be liable for tortious interference with the Securities Purchase Agreement because the agreements relied upon by GEM would be invalid on the basis of unilateral mistake or mutual mistake (depending on the extent of knowledge of RDX, Danzik, GEM and GEM Ventures as to the value of CWT when those agreement were signed); and

(k)    as against GEM, GEM Ventures, Tobin, Brown and RES Management, damages for breach of fiduciary duty on the basis that from December 12, 2012 to March 6, 2013, they controlled the management of CWT and breached their duties of loyalty by failing to properly fund CWT, and by putting their interest ahead of CWT by using the funds they "invested" for their own benefit, and permitting Danzik to harm CWT by altering its RDO production processes to save money and gutting the management of CWT, all of which harmed CWT.

A copy of the Answer with Counterclaims, Crossclaims and Third Party Claims is attached hereto and marked as Exhibit "Q".

47.    As the New York pleadings are presently constituted, GEM has sued for the profit it would have obtained had it sold its 60% of CWT to RDX. However, one of our asserted defenses is that because Danzik is claiming that CWT is valueless there would have been no profit because RDX would never have paid GEM, just as it failed to pay us. We have also asserted as a defense in the New York Action that if Danzik and RDX are correct and CWT

is valueless or has little value, there could not have been a valid agreement between GEM and RDX for the sale of CWT, and thus we cannot be liable for allegedly tortuously interfering with it.

48.    In short, we cannot be liable to both GEM and RDX on these facts, and almost certainly we are not liable to either and both are liable to us—GEM for not fulfilling its funding obligations, and RDX for not paying under the Unit Purchase Agreement.  The point with respect to this application is that the New York Action will necessarily decide whether CWT had the value that GEM and we attributed it to Danzik and RDX or did not and thus whether there was a fraudulent inducement and breach of the Unit Price Agreement.

49.    Further we have asserted in the New York Action that at all times because he was running the facility, Danzik knew all of the relevant facts about CWT and thus knew full well what RDX was buying.  In that regard, if there were any significant problems not only did he know about them but he caused them because of his management and GEM's.  Thus, we have asserted as a claim in the New York Action that both Danzik, individually, and GEM are liable to us for any diminishment of the value of CWT.  Whether there was such diminishment and why are central issues in both the New York and RDX Actions.

50.    Further we have asserted in the New York Action breaches of the Unit Purchase Agreement and related agreements.  For example, the Unit Purchase Agreement required RDX to transfer the Tax Credits to us and it has not done so. .  In this regard, we have also sued Danzik personally in the New York Action for breach of trust in misappropriating those assets.  We have also sued Danzik and RDX for breach of the Deja II agreement which was not only related to the Unit Purchase Agreement but intended to secure it.

- 18 -

51.    Deja II is a U.S. LLC owned by Danzik and his wife, Elizabeth, both of whom are U.S. residents.  Pursuant to the March 2013 Letter Agreement between RDX and Deja II, of which we were third-party beneficiaries, Deja II received CDN$ 1 million for us in exchange for freely tradable RDX stock.

52.    As further consideration for this money, Deja II and RDX were required to pay off a Note signed by CWT in favor of GEM under the Securities Purchase Agreement.  This payment was vital to us.  Under this Note, GEM had a first-priority lien on all of CWT's assets and we had no real security for the RRC Note.  Once GEM's CWT Note was paid off, we would then have a first priority secured lien on all of CWT's for the RRC Note.  We would never have entered into the Unit Purchase Agreement but for this related transaction.  However, as it transpired, we did not receive tradable RDX stock and the GEM Note was never paid.  Simply put, in connection with the Unit Purchase Agreement, Danzik, Deja II and RDX took our money and provided nothing in return.  These claims are inextricably bound up with the Unit Purchase Agreement and will inevitably be litigated in both the New York and RDX actions.

**RDX Action in Alberta**

53.    The RDX Action raises issues and asserts claims which duplicate or are closely related to the issues and claims which are raised and are to be determined in the New York Action.

54.    The RDX Action was clearly commenced in Alberta for tactical reasons.  On or about August 15, 2014, Robert P. Tedesco, counsel for the Corporate Defendants, sent the lawyer for RDX a letter outlining RDX's various breaches of the Unit Purchase Agreement and the RRC Note, including in particular its failure to make the payments due under the RRC

Note and to account for the tax credits. A copy of the letter dated August 15, 2014 is attached hereto and marked as Exhibit "R".

55. This action was commenced 12 days after Mr. Tedesco's letter.

56. It seems clear to me that RDX commenced the RDX Action in an effort to pre-empt the claims of the Corporate Defendants resulting from RDX's failure to make the payments it contracted for under the RRC Note and the tax credits owing under the Unit Purchase Agreement.

57. As well, the RDX Action deflects attention away from Danzik and his wife Elizabeth's breach of a letter agreement, requiring their company Deja II LLC ("Deja"), to reinvest the $1 million paid to Deja II on March 11, 2013. A copy of that letter agreement is annexed as Exhibit "S".

58. I believe that the RDX Action is an attempt by Danzik to frustrate and delay our attempts to compel performance of the obligations under the Unit Purchase Agreement and the RRC Note. Furthermore, it is telling that RDX chose to commence the RDX Action in Alberta notwithstanding the fact that none of the defendants or the subject matter of the RDX Action have any real or substantial connection to Alberta and the issues RDX was raising fall within the matters being litigated in New York.

59. In the RDX Action RDX has asserted claims against the Corporate Defendants, and also against Appel, MacFarlane and me, for damages and indemnity for allegedly having made false representations and/or concealed facts regarding the following issues:

- 20 -



(a)  **Issue #1** - the capability of CWT's Carthage Facility in Missouri to produce renewable diesel;

(b)  **Issue #2** - whether the CWT Corporate Defendants had absolute and unrestricted authority to sell their units in CWT, given GEM's claims in the New York Action;

(c)  **Issue #3** - whether RDX was improperly exposed to liability because the defendants claimed tax credits from the EPA to which they were not entitled;

(d)  **Issue #4** - whether RDX's acquisition of CWT would result in the loss of renewable diesel RINs as a result of uncovering the defendants' alleged deceitful conduct;

(e)  **Issue #5** - whether CWT's accounting records were sound with respect to CWT's claims for credits for fuel and shipments, and whether there were undisclosed liabilities which CWT has been or will be forced to record under GAAP; and

(f)  **Issue #6** - whether CWT was in compliance with all outstanding contracts given RDX's allegation that it never produced renewable fuel.

60.  None of the factual issues raised in RDX's statement of claim have any connection to Alberta, and all of these issues have also been raised in and are central to the litigation between the parties in the New York Action, as outlined below.

**Overlap Between the RDX Action and the New York Action**

61.  The relationship between the issues in the RDX Action, and the New York Action are apparent. A fundamental issue in the New York Action is RDX's breach of the Unit

- 21 -

Purchase Agreement. Paragraph 101 of the New York Verified Answer, Counterclaim and

Cross claim provides:

> "101.   The Deja II fraud was just a prelude to deception on a larger scale.
> Danzik caused RDX to breach virtually all of its material obligations under the
> UPA. First, RDX failed to make any of the required interest payments. Worse,
> in or about June 2014, Danzik told the CWT Defendants that RDX would not
> make any payments at all, even of principal, and disclaimed any obligations to
> pay the Note."

62.     The capability and value of the Carthage Facility and of CWT's fuel products (**Issue #1** in

the RDX Action) are central issues in the New York Action because the quantum of GEM's

and GEM Venture's damages claims depend upon the value of the units and interest in

CWT which they claim was wrongfully appropriated from them. This will require the New

York Court to make determinations regarding the capabilities and value of the Carthage

Facility.

63.     Furthermore, as noted above, in the New York Action the Corporate Defendants have

asserted counterclaims against, among others, GEM, GEM Ventures and RES

Management for contribution and indemnity on the basis that if RDX and Danzik's

allegations of fraud and breach of warranty against them are upheld, GEM, GEM Ventures

and others had full awareness of all of the facts concerning CWT, the Carthage Facility

and its fuel and related process given their involvement in managing CWT, and RDX and

Danzik appear to have had intimate involvement with GEM in the management and

operation of CWT and in negotiating a potential unit purchase with GEM for an extended

period of time prior to signing the Unit Purchase Agreement.

64.     The New York Action and the RDX Action therefore both place directly in issue the

question of what all of the parties knew about CWT and its plant, equipment and products

in the material period.   It makes practical sense for the New York Court to deal with all of these issues together rather than for this to be sorted out and decided in two separate proceedings in different jurisdictions.

65.   With respect to **Issue #2** in the RDX Action, RDX's claim turns entirely on whether or not GEM succeeds in its claims in the New York Action that the Corporate Defendants and RDX were not entitled to treat the Securities Purchase Agreement as at an end and to complete the Unit Purchase Agreement.  This claim is directly in issue in, and in fact is the primary substance of the New York Action.  As such, any determination by the New York Court on this issue should be dispositive.

66.   With respect to **Issue #3** in the RDX Action, RDX's claim in this proceeding concerns tax credits granted by the United States EPA, and CWT's eligibility to receive such tax credits. The Corporate Defendants have asserted counterclaims against RDX for failure to deliver these very same tax credits in the New York Action as it was required to do under the Unit Purchase Agreement.  Paragraph 103 of our counterclaim in the New York Action states:

> "103.   Upon information and belief, at least $3 million in tax credits has been received by RDX and/or its subsidiaries but never remitted to the CWT Defendants. Separate and apart from any contractual obligations, those tax credits are trust funds to be received by RXD and Danzik and paid over to the CWT Defendants. In breach of that trust, Danzik and RDX have misappropriated those funds."

67.   In determining this issue in the New York Action the New York Court will need to assess whether or not any of the claims by CWT for tax credits in the relevant period were proper, which again should be dispositive of this issue.

- 23 -

68.    With respect to **Issue #4** in the RDX Action, the issue raised is not clearly articulated in the statement of claim.  However, the claim appears to be the same as or is closely linked to **Issue #3**, and for the reasons set out in paragraph 54 is already before the New York Court and should continue to be addressed there.

69.    With respect to **Issue #5** in the RDX Action, again whether or not CWT's accounting records were accurate is the same as or is closely linked to **Issue #3**, and for the reasons set out in paragraph 54 is already before the New York Court and should be addressed there.

70.    With respect to **Issue #6** in the RDX Action, the issue raised in effect requires a determination of whether the fuel products sold by CWT met the applicable standards and terms of supply with CWT's customers, what specific representations are alleged to have been made and whether RDX was entitled to rely on them.  Again, the quality of CWT's fuel products and whether RDX was entitled to rely on any alleged representations by the defendants given its prior knowledge of CWT are matters raised in and will be addressed in the New York Action.

71.    The New York Action raises allegations of fraud against Danzik and his wife Elizabeth as a result of their failure to abide by the Deja II agreement to reinvest the $1 million that was paid to Deja II on March 11, 2013. That $1 million remains unaccounted for.


**No Real Connections to Alberta**

72.    As already stated above, there is no connection between the subject matter of the RDX Action or the parties and Alberta. To the contrary:

- 24 -

(a)   RDX, while incorporated in Alberta, does not so far as I am aware carry on any active business or hold any materials assets in Alberta; rather its head office and primary place of business is in Scottsdale, Arizona, in the United States; I also understand that RDX's Chief Executive Officer, Danzik, has residences in Arizona and in Wyoming, in the United States;

(b)   I believe that all or the vast majority of individuals with GEM who were involved in the discussions and dealings which are now the subject of the New York Action and who would have knowledge of what RDX knew and was told about the CWT business, plant, equipment, products and customers were at the time, and likely are still, based in New York;

(c)   RES Management, which acted as the general partner for CWT after Danzik took control of the business, is based in New York;

(d)   RRC is a Delaware corporation with its head office and primary place of business located in West Hempstead, New York;  RRC does not carry on business or have any other operations or presence in Alberta;

(e)   CWT Canada is a limited Delaware corporation with offices in Toronto, Ontario; CWT Canada has no assets in Alberta and does not carry on business in or have any other presence in Alberta;

(f)   CWT Enterprises is an Ontario corporation with offices in Toronto, Ontario;  CWT Enterprises has no assets in Alberta and does not carry on business in or have any other presence in Alberta;



(g)     I am advised by MacFarlane that he resides in Boston, Massachusetts and is frequently in New York on business. He does not hold assets or have any other connection to Alberta;

(h)     I am advised by Appel that he resides in the State of New York and does not hold assets or have any other material connection to Alberta;

(i)     I reside in Toronto, Ontario and do not hold assets or have any other material connections to Alberta;

(j)     CWT's sole plant is the Carthage Facility, which is located in Carthage, Missouri, in the United States. Its products are produced entirely from the Carthage Facility and sold to customers in the United States; I believe all of CWT's accounting, office administration and other head office functions are conducted from its office in Carthage, Missouri or from RDX's offices in Scottsdale, Arizona;

(k)     With respect to the various allegations of misrepresentations in the RDX Action, I am advised by each of MacFarlane and Appel that none of them had any discussions or dealings with any RDX personnel or representatives in Alberta, nor did I;

(l)     With respect to **Issue #1** in the RDX Action, the refinery in issue is the Carthage Facility, which is located in Carthage, Missouri, in the United States;

(m)     With respect to **Issue #2** in the RDX Action, the claims being raised by GEM as to the authority of the CWT Corporate defendants to sell their units in CWT is a legal question and is before the New York Court for determination;

(n)     With respect to **Issues #3 and #4** in the RDX Action, the claims for tax credits and RINs concern claims made by CWT in the United States for credits granted by the United States EPA; there is no connection to Canada;

(o)     With respect to **Issue #5** in the RDX Action, I believe that any of CWT's relevant accounting records would have been prepared at its head offices in West Hempstead, New York **[confirm]** and would now be maintained either at the Carthage Facility or at RDX's offices in Arizona; and

(p)     With respect to **Issue #6** in the RDX Action, as explained above all of CWT's customers are, or were at all material times, located in the United States, and not in Canada.

**Forum Selection Clause**

73.     With respect to the forum selection clause found at section 12.4 of the Unit Purchase Agreement, that clause was inserted in the Unit Purchase Agreement when RDX still had some business interests and assets in Alberta.  However, barely two months later, in or about June of 2013, RDX sold all of its Canadian holdings and so far as I am aware it no longer has any assets, employees or operations in Canada.

74.     At the time of the sale of the Canadian assets of RDX, I was a board member of the company and was informed by Danzik that RDX would be moving its public listing from a Canadian listing to a US listing as it no longer had operations or customers in Canada.

75.     When I signed the Unit Purchase Agreement on behalf of CWT Canada and CWT Enterprises, RDX had not yet sold its Canadian operations.  I would not have agreed to the forum selection clause in circumstances as they exist now, where all of the parties, including RDX, reside and carry on business outside Alberta and do not have any presence, assets, or business interests there.  I am advised by MacFarlane, who signed the Unit Purchase Agreement on behalf of RRC that he is of the same view.

76.     I am further advised by MacFarlane and Appel that they have never personally agreed that any action against them may be brought in Alberta. Neither have I.  We each agree the proper forum for the RDX Action is New York.  For me personally, it would be very difficult to simultaneously carry on litigation arising out the same series of transactions in two separate jurisdictions located in two different countries.

**SWORN BEFORE ME** at the City of
Toronto, in the Province of Ontario on
October ..*14th*.., 2014

}

_____
        Commissioner for Taking Affidavits
                *(or as may be)*

        M DACY

_____
            **JEAN NOELTING**

COURT FILE NUMBER                         1401 09394

COURT OF QUEEN'S BENCH OF ALBERTA

JUDICIAL CENTRE                           CALGARY

PLAINTIFF/RESPONDENT                      RDX TECHNOLOGIES CORPORATION

DEFENDANTS/APPLICANTS                     BRIAN APPEL, RESOURCE RECOVERY
                                          CORPORATION, CWT ENTERPRISES (CANADA),
                                          INC., CWT CANADA II LIMITED PARTNERSHIP,
                                          JEAN NOELTING, BRUCE MACFARLANE

DOCUMENT                                  ORDER

ADDRESS FOR SERVICE AND                   BISHOP & MCKENZIE LLP
CONTACT INFORMATION OF                    2300, 10180 – 101 Street
PARTY FILING THIS DOCUMENT                Manulife Place
                                          Edmonton, AB   T5J 1V3
                                          Attn: Nigel J. Forster
                                          Phone: 780-426-5550; fax 780-426-1305

                                          as agent for:

                                          FOGLER, RUBINOFF LLP
                                          77 King Street West
                                          Suite 3000, P.O. Box 95
                                          TD Centre North Tower
                                          Toronto, ON   M5K 1G8
                                          Attention: Milton Davis
                                          Phone: 416-864-9700; Fax: 416-941-8852

DATE ON WHICH ORDER WAS PRONOUNCED:       November 10, 2014
NAME OF MASTER WHO MADE THIS ORDER:       Master J.B. Hanebury
LOCATION OF HEARING:                      Calgary, Alberta

CLERK OF THE COURT
FILED
NOV 1 0 2014
JUDICIAL CENTRE
OF CALGARY

I hereby certify this to be a true copy of
the original ORDER
Dated this 10 day of Nov 2014
for Clerk of the Court

This is Exhibit " D " referred to in the
Affidavit of
Nigel J. Forster
Sworn before me this 9 day
of March A.D. 2016
A Notary Public in and for
the Province of Alberta

Zachary H. Lindop
Barrister & Solicitor

        UPON THE APPLICATION of the Defendants/Applicants for a procedural direction regarding the

pending Application of the Defendants/Applicants for a stay of this action, filed October 22, 2014 (the

"Application"); AND UPON hearing reference to the Affidavit of Jean Noelting sworn October 14, 2014

(the "Noelting Affidavit"); AND UPON hearing from counsel for the Applicants; AND UPON being advised

that the Plaintiff wishes to cross-examine on the Noelting Affidavit; AND UPON being advised that, at

the request of the Plaintiff, the Application will be adjourned by consent to Special Chambers; AND

UPON being advised of the agreement of the Plaintiff by its counsel to the dates set out herein; IT IS HEREBY ORDERED THAT:

1.  Neither the present procedural application of the Defendants/Applicants, nor the appearance today of counsel or agent for the Plaintiffs, nor the granting and entry of this Order, shall constitute an attornment by the Defendants/Applicants to the jurisdiction of Alberta for the hearing of the subject matter in this action.

2.  The Application is adjourned to be heard in Special Chambers on **April 30, 2015,** ~~or such other date as the parties may mutually agree.~~  *at 2 P.M. - "J.H."*  *"J.H."*

3.  The Plaintiff will cross-examine Jean Noelting on the Noelting Affidavit on **February 12, 2015,** commencing at **10:00 am (EST)** at Network Court Reporting, 100 King Street West, Suite 3600, Toronto, ON, or such other location as the parties may subsequently agree.

4.  The Plaintiff shall provide any reply evidence respecting the Application by not later than **5:00 pm (EST)** on **February 28, 2015,** and any affiants of such evidence shall be made available to be cross-examined on their evidence by not later than **March 24, 2015,** at a location to be determined.

5.  This Order and the examinations referred to herein shall be entirely without prejudice to the positions of the parties upon the main Application.

6.  There shall be no costs arising from this Order.


"J. B. Hanebury "
_____
M.C.Q.B.A.

**Form 27**
[Rules 6.3 and 10.52(1)]

| | |
|---|---|
| COURT FILE NUMBER | 1401 09394 |
| COURT OF QUEEN'S BENCH OF ALBERTA | |
| JUDICIAL CENTRE | CALGARY |
| PLAINTIFF/RESPONDENT | RDX TECHNOLOGIES CORPORATION |
| DEFENDANTS/APPLICANTS | BRIAN APPEL, RESOURCE RECOVERY CORPORATION, CWT ENTERPRISES (CANADA), INC., CWT CANADA II LIMITED PARTNERSHIP, JEAN NOELTING, BRUCE MACFARLANE |
| DOCUMENT | **APPLICATION** |
| ADDRESS FOR SERVICE AND CONTACT INFORMATION OF PARTY FILING THIS DOCUMENT | BISHOP & MCKENZIE LLP 2300, 10180 – 101 St. Edmonton, AB  T5J 1V3 Attn:  Nigel J. Forster Phone: 780-426-5550; fax 780-426-1305 |

CLERK OF THE COURT
**FILED**
APR 1 0 2015
JUDICIAL CENTRE
OF CALGARY

agent for

FOGLER RUBINOFF LLP
77 King Street West
Suite 3000, P.O. Box 95
TD Centre
Toronto, ON   M5K 1G8
Attention: Milton Davis
Phone: 416-864-9700; Fax: 416-941-8852

**NOTICE TO RESPONDENTS**
This application is made against you.  You are a respondent.
You have the right to state your side of this matter before the master/judge.
To do so, you must be in Court when the application is heard as shown below:

| | |
|---|---|
| Date | **April 16, 2015** |
| Time | **10:00 a.m.** |
| Where | 601N – 5th St. SW, Calgary, Alberta |
| Before Whom | Presiding Master in morning Chambers |

Go to the end of this document to see what else you can do and when you must do it.

790388

**Remedy claimed or sought:**

1.  If necessary, an Order affirming, dispensing with, or abridging the time for service of this Application and any supporting materials, and deeming service of this Application and any supporting materials to be good and sufficient.

2.  An Order:

    a.  adjourning the pending Application of the Defendants/Applicants for a stay of this action, filed October 22, 2014 (the "Application"), from April 30, 2015 to a future special chambers date;

    b.  directing Denis Danzik, representative of the Plaintiff, to provide answers to the Undertakings given, taken under advisement, or improperly objected to at his Cross-Examination on Affidavit held on March 25, 2015;

    c.  directing Mr. Danzik to re-attend at an Examination to answer questions improperly objected to during his Cross-Examination; and

    d.  permitting the Defendants/Applicants to file reply evidence to the evidence already given and to be provided by Mr. Danzik.

3.  An Order that neither this Application, nor any evidence filed by the Defendants/Applicants in reply to the evidence given and to be provided by Mr. Danzik, shall constitute an attornment to the jurisdiction of Alberta for the hearing of the subject matter in this action.

**Grounds for making this application:**

4.  The Defendants/Applicants applied on October 22, 2014 for a stay of proceedings in this action pursuant to Rule 3.68 of the *Alberta Rules of Court* and s. 17 of the *Judicature Act* (Alberta) on the basis that, *inter alia*, the Courts of Alberta lack jurisdiction to hear the subject matter of the action, and that a different forum is the proper *forum conveniens* in which to hear and adjudicate this matter.

5.  By Order of Master J.B. Hanebury granted on November 10, 2014, this Honourable Court adjourned the application of the Defendants for a stay of proceedings in this action to April 30, 2015 at 2:00 pm., and set out a procedure for finalization of evidence for use at that application.

6.  Master Hanebury's Order was modified slightly by Order of Master S.L. Schulz on January 19, 2015.

7.    Both prior Orders were made expressly without prejudice to the main Application brought by the Defendants/Applicants for a stay of proceedings.

8.    On March 25, 2015, Denis Danzik, representative of the Plaintiff, was cross-examined on his Affidavit sworn March 5, 2015 in relation to the Application (the "Cross-Examination").

9.    During the Cross-Examination, Mr. Danzik was asked for 19 Undertakings.  Of those 19 Undertakings:

   a.    5 were given;
   b.    3 were taken "under advisement";
   c.    8 were objected to; and
   d.    3 were not given but the request for an undertaking was subject to disagreement between counsel.

10.    To date, no answers to the undertakings given by Mr. Danzik have been provided, and no position as to the undertakings taken "under advisement" has been communicated.

11.    Further, some of the objections to undertakings were improper as the answers would have been relevant and would have assisted the Court in determining what remedy to grant in relation to the Application.  These undertakings should be directed to be answered by Mr. Danzik.

12.    During the Cross-Examination, Mr. Danzik also objected to answering 75 questions asked.  Many of these objections were improper as the answers would have been relevant and would have assisted the Court in determining what remedy to grant in relation to the Application.

13.    Such further and other grounds as counsel may advise and this Honourable Court may permit.

**Material or evidence to be relied on:**

14.    The filed Transcript of the Cross-Examination of Denis Danzik on March 25, 2015, and the Exhibits thereto.

15.    Such materials or evidence as counsel may advise and this Honourable Court may permit.

**Applicable rules:**

16.    Rules 1.3, 1.4, 1.5, 6.7, 6.11, and 13.5 of the *Alberta Rules of Court*; and

17.     Such further and other rules as counsel may advise and this Honourable Court may consider.

**Applicable Acts and Regulations:**

18.     Such Acts and Regulations as counsel may advise and this Honourable Court may consider.

**Any irregularity complained of or objection relied on:**

19.     The action has been commenced in an improper and/or inconvenient forum.

**How the application is proposed to be heard or considered:**

20.     In person, with one, some, or all of the parties present, before a Master in morning Chambers.

---

**WARNING**

If you do not come to Court either in person or by your lawyer, the Court may give the applicant(s) what they want in your absence. You will be bound by any order that the Court makes. If you want to take part in this application, you or your lawyer must attend in Court on the date and at the time shown at the beginning of the form. If you intend to rely on an affidavit or other evidence when the application is heard or considered, you must reply by giving reasonable notice of the material to the applicant.

COURT FILE NUMBER                1401 09394

COURT OF QUEEN'S BENCH OF ALBERTA

JUDICIAL CENTRE                  CALGARY

PLAINTIFF/RESPONDENT             RDX TECHNOLOGIES CORPORATION

DEFENDANTS/APPLICANTS            BRIAN APPEL, RESOURCE RECOVERY
                                 CORPORATION, CWT ENTERPRISES (CANADA)
                                 INC., CWT CANADA II LIMITED PARTNERSHIP,
                                 JEAN NOELTING, BRUCE MACFARLANE

DOCUMENT                         ORDER

ADDRESS FOR SERVICE AND          BISHOP & MCKENZIE LLP
CONTACT INFORMATION OF           2300, 10180 – 101 Street
PARTY FILING THIS DOCUMENT       Manulife Place
                                 Edmonton, AB   T5J 1V3
                                 Attn: Nigel J. Forster
                                 Phone: 780-426-5550; fax 780-426-1305

                                 as agent for:

                                 FOGLER, RUBINOFF LLP
                                 77 King Street West
                                 Suite 3000, P.O. Box 95
                                 TD Centre North Tower
                                 Toronto, ON   M5K 1G8
                                 Attention: Milton Davis
                                 Phone: 416-864-9700; Fax: 416-941-8852

I hereby certify this to be a true copy of
the original  ORDER

Dated this 16 day of Aper 2015

KG

for Clerk of the Court

DATE ON WHICH ORDER WAS PRONOUNCED:        April 16, 2015

NAME OF MASTER WHO MADE THIS ORDER:        Master J.T. Prowse

LOCATION OF HEARING:                       Calgary, Alberta

UPON THE APPLICATION of the Defendants/Applicants for procedural directions regarding the
pending Application of the Defendants/Applicants for a stay of this action, filed October 22, 2014 (the
"Stay Application"); AND UPON hearing from counsel for the Defendants/Applicants; AND UPON being
advised that the Stay Application was adjourned to Special Chambers by the Orders of Master J.B.
Hanebury on November 10, 2014 and Master S.L. Schulz on January 19, 2015, along with procedural
directions being made for the completion of evidence for the Application; AND UPON it appearing
necessary to adjourn the Stay Application and provide further directions for the completion of evidence;

2

AND UPON noting the consent of counsel for the Plaintiff/Respondent by the signature of its counsel hereon; IT IS HEREBY ORDERED THAT:

1.   Neither the present procedural application of the Defendants/Applicants, nor the appearance today of counsel or agent for any party, nor the granting and entry of this Order, shall constitute an attornment by the Defendants/Applicants to the jurisdiction of Alberta for the hearing of the subject matter in this action.

2.   The Stay Application of the Defendants/Applicants originally set for **April 30, 2015** in Special Chambers is hereby adjourned, *sine die*, to a future Special Chambers date to be agreed upon by the parties.

3.   The Defendants/Applicants are at liberty to file further Affidavit evidence in reply to the evidence given by the Plaintiff or otherwise in support of the Stay Application, and the filing of such Affidavit evidence shall not constitute an attornment by the Defendants/Applicants to the jurisdiction of Alberta for the hearing of the subject matter in this action.

4.   This Order and the provision of additional evidence referred to herein shall be entirely without prejudice to the positions of the parties upon the main Stay Application.

5.   There shall be no costs arising from this Order.

M.C.Q.B.A.

CONSENTED TO THIS _16_ DAY OF APRIL, 2015 BY:

**McLENNAN ROSS LLP**

Per: D. Robb Beeman,
Counsel for the Plaintiff

COURT FILE NUMBER          1501-08364

COURT OF QUEEN'S BENCH OF ALBERTA

JUDICIAL CENTRE          CALGARY

Clerk's Stamp
CLERK OF THE COURT
FILED
AUG 1 8 2015
CALGARY, ALBERTA

IN THE MATTER OF THE *COMPANIES'*
*CREDITORS ARRANGEMENT ACT*, R.S.C. 1985
c. C-36, as amended

AND IN THE MATTER OF THE BUSINESS
CORPORATIONS ACT, R.S.C. 2000, c. B-9, as
amended

AND IN THE MATTER OF A PLAN OF
COMPROMISE OR ARRANGEMENT OF RDX
TECHNOLOGIES CORPORATION and
RIDGELINE ENERGY SERVICES (USA) INC.

DOCUMENT          **MEMORANDUM OF LAW OF THE**
**APPLICANTS CWT ENTERPRISES (CANADA)**
**INC., CWT CANADA II LIMITED**
**PARTNERSHIP, and RESOURCE RECOVERY**
**CORPORATION (collectively "CWT")**

ADDRESS FOR SERVICE AND          **BISHOP & MCKENZIE LLP**
CONTACT INFORMATION OF          2300, 10180 —101 St.
PARTY FILING THIS DOCUMENT          Edmonton, AB T5.11V3
          Attn: Nigel J. Forster
          Phone: 780-426-5550; fax 780-426-1305
          agent for
          **FOGLER RUBINOFF LLP**
          77 King Street West
          Suite 3000, P.O. Box 95
          TD Centre
          Toronto, ON M5K 1G8
          Attention: Milton Davis
          Phone: 416-864-9700; Fax: 416-941-8852

This is Exhibit " E " referred to in the
Affidavit of
Nigel J. Forster
Sworn before me this ........9........ day
of ........March........ A.D. 2016
_____
A Notary Public in and for
the Province of Alberta

Zachary H. Lindop
Barrister & Solicitor

1

- 2 -

## PART 1 - OVERVIEW

1.      This CCAA[1] Application is a brazen abuse of this Honourable Court's process designed to avoid prison, fines and other sanctions for civil contempt of court by Dennis Danzik (**"Danzik"**), the CEO, Executive Director and guiding mind of the Applicant RDX Technologies Corporation (**"RDX"**). He stands accused,[2] of lying on the issues before this Court, and stealing money that is in issue on this Application, an Application that is calculated to flout, and is a collateral attack on, the authority and orders of both this Court and the New York Court in ongoing proceedings.

2.      CWT appears before this Honourable Court out of respect for its process, in response to the Application. However, respectfully, CWT does not attorn to or admit this Honourable Court's jurisdiction in this matter, on four grounds (*detailed below*):

(a)     RDX and this matter are already, and have for some time been, before the New York Courts (the **"New York Action"**);

(b)     RDX does not meet the criteria of CCAA sec. 9(1)[3], which confers jurisdiction under the statute;

(c)     CCAA sec. 11.03(2)[4] denies the Court jurisdiction to grant stays in respect of injunctions against directors. RDX is asking here for a stay of a contempt hearing (the **"Contempt Hearing"**) in respect of an injunction against Danzik (the **"New York Injunction"**);

(d)     The parties and issues here are already before this Honourable Court in an ongoing action (the **"First Alberta Action"**)[5].

---

[1] *Companies' Creditors Arrangement Act*, RSC 1985, c C-36.
[2] Affidavit of Jeffrey M. Eilender sworn August 18, 2015 ("Eilender Affidavit"), para. 45
[3] Sec. 9. (1): *Any application under this Act may be made to the court that has jurisdiction in the province within which the head office or chief place of business of the company in Canada is situated, or, if the company has no place of business in Canada, in any province within which any assets of the company are situated.*
[4] Sec. 11.03(2): *Subsection (1)* [allowing stays as against directors] *does not apply in respect of an action against a director on a guarantee given by the director relating to the company's obligations or an action seeking injunctive relief against a director in relation to the company.*
[5] *RDX Technologies Corporation v. Brian Appel, Resource Recovery Corporation, CWT Enterprises (Canada) Inc., CWT Canada Ii Limited Partnership, Jean Noelting, Bruce Macfarlane*, Court of Queen's Bench of Alberta, Court File Number 1401 09394.

- 3 -

3.     The CCAA is meant to "facilitate compromises and arrangements between companies and their creditors" with a view to a viable future. The evidence before this Court suggests that these goals are not the purpose behind this Application.

4.     On the contrary, the evidence compels the conclusion that RDX's Application is merely tactical. It is meant to avoid the New York Injunction, frustrate the Contempt Hearing, and head off an unfavourable outcome in the First Alberta Action by presuming jurisdiction in Alberta, without having to contend with adverse evidence already brought forward in the First Alberta Action.

5.     The New York Action[6] was begun in March 2013. It centres on RDX's purchase of CWT for $20 million. It involves multiple parties, 19 motions (to date - the Contempt Hearing, is scheduled for November 4 and 5, 2015, and 531 filings.[7]

6.     The Honourable Justice Shirley Werner Kornreich, a Judge since 1994, has heard all the New York Action proceedings. Justice Kornreich was appointed as an Acting New York Supreme Court Justice in January 2002, and to the Commercial Division in March 2009.[8]

7.     On March 18, 2015, Justice Kornreich granted the New York Injunction against RDX and Danzik, requiring them to pay $3,175,967 (US) into a segregated account pending disposition of the

---

[6]*GEM Holdco, LLC, and GEM Ventures, Ltd., Plaintiffs, -against- CWT Canada II Limited Partnership, Resource Recovery Corporation, Jean Noelting, Ridgeline Energy Services, Inc., Dennis Danzik, Douglas Johnson and kelly sledz, Defendants - Resource Recovery Corporation and Jean Noelting, Third-Party Plaintiffs -against-Edward Tobin, Christopher Brown, Deja II, LLC, Elizabeth Danzik, Res Management, Inc. Third-Party Defendants,* New York Supreme Court no. 650841/2013.
[7] Eilender Affidavit, para 111.
[8] Eilender Affidavit, para 111.

- 4 -

New York Action. This money, tax credits received by RDX from the U.S. Treasury, does not

belong to RDX, as Her Honour expressly found[9]:

> *It is unclear if Danzik is attempting to transfer assets to a new company*
> *to evade the [RDX's and Danzik's] creditors' claims or if he is forming a*
> *new corporate entity* for the purpose of raising additional capital.
> However, Danzik is a nondomiciliary and [RDX] is a foreign corporation.
> Moreover, <u>*there is no question of fact that the $3,175,967 in tax credits*</u>
> <u>*do not belong to the [RDX and Danzik]. The money either belongs to the*</u>
> <u>*CWT Parties or the federal government*</u>. [..] No matter [RDX]'s liquidity
> needs, <u>*it is not entitled to use this money because, regardless of the*</u>
> <u>*outcome of this litigation, [RDX] will not keep the money*</u>.

8.    Danzik and RDX appealed Her Honour's Order. The appeal was dismissed. Still, they have

not complied. They have not segregated the $3.175 million. They are in contempt. Hence the

Contempt Hearing in November. RDX and Danzik do not come to this Court with clean hands.[10]

9.    Danzik and RDX have unequivocally attorned to the New York Cout's jurisdiction. Yet they

are now asking this Court to exercise its discretion and stay the New York Action and the Contempt

Hearing.[11] They have also put before this Court issues that are being or have been dealt with by

Justice Kornreich already. Given their ulterior purpose and unclean hands, the Court ought not to

exercise its discretion.

10.    Danzik is also guilty of material non-disclosure. In his Affidavit, Danzik does not admit his

default under Justice Kornreich's Order, or the Contempt Hearing.  He does not concede Justice

Kornreich's finding that the $3.175 million does not belong to Danzik or RDX.

---

[9] Decision and Order of Kornreich J. dated March 18, 2015, Exhibit 24, Affidavit of Dennis M. Danzik, sworn July 2, 2015 ("Danzik Affidavit"). Emphasis added.
[10] Eilender Affidavit, paras. 55-58 and 64.
[11] See Proposed CCAA Initial Order, para. 13.

- 5 -

11.    Instead Danzik claims, simplifying, that Justice Kornreich made her Order *per incuriam*.[12] This is without foundation. It is a collateral attack on Justice Kornreich's Order, and the New York Action. It is an attempt to relitigate that which is *res judicata*.

12.    In any event, it appears that this Honourable Court does not have jurisdiction under sec. 9 of the CCAA to hear this Application. Nothing connects RDX or Danzik to Alberta. Almost nothing connects them to Canada. RDX, although an Alberta corporation, has its head office in Arizona. Danzik is in Arizona, and in Wyoming. RDX does no business in Alberta, or in Canada. It has no assets in Alberta. It has no employees here. It has no place of business here. Its shares are the subject of a Cease Trade Order by the Alberta Securities Commission.[13] Danzik discloses none of this in his Affidavit or in his Application or written argument, either.

13.    In the First Alberta Action, RDX and Danzik pleaded and filed evidence suggesting there were assets in Alberta (untrue). Danzik was cross-examined on this issue. His evidence did not stand up. He avoided answered questions, made admissions that undermined his affidavit, refused to answer over 100 questions, and gave 19 undertakings which he has never answered. [14]

14.    A stay Application brought by CWT in the First Alberta Action remains pending.[15] The inescapable inference is that RDX and Danzik have brought these extensive, complex proceedings instead of simply answering undertakings in the First Alberta Action, because they have no response.

---

[12] Danzik Affidavit, para. 176.
[13] *Re RDX Technologies Corporation*, 2015 ABASC 793, August 4, 2015; Eilender Affidavit, para. 93-98.
[14] Eilender Affidavit, para. 78 and Exhibit 2.
[15] Eilender Affidavit, para. 71.

- 6 -

15.     Danzik and RDX fail to make any mention of this background to the First Alberta Action in the materials filed in this Application. Indeed Danzik's Affidavit is suspiciously devoid of any mention of the stay Application in the First Alberta Action. Instead it seems tailored to give the reader the false impression that the First Alberta Action is well underway and may result in substantial financial recovery for RDX – a complete fiction, seemingly designed to deceive this Honourable Court into believing that there is light on the horizon for this company.

16.     Danzik is an unreliable witness. His evidence is demonstrably deficient and self-serving, and should be rejected.

17.     In addition, Danzik is likely soon to be formally declared to be in contempt of the New York Injunction for the $3.175 million he took, which was found not to belong to him. He now plainly brings these proceedings to try to avoid the consequences of his non-compliance with the New York Injunction.

18.     Even more troubling: based on the dates of the Affidavits filed by RDX, some of which date back to April 2015, and others which date to June 2015, it was apparently preparing this CCAA proceeding while simultaneously litigating in New York and Alberta.[16] Yet this Application was not commenced and served until those other actions began going badly for it. The obvious inference is that this Application is not brought in good faith. It is a back-up plan, a premeditated strategy to insulate RDX and Danzik from the impact of litigation.

---

[16] The Contempt Hearing was originally returnable on June 26, 2015. Danzik filed no material. The Court had a scheduling issue, after which the matter was put off to July. Danzik then filed a series of affidavits in early August, and the Court adjourned the Contempt Hearing to November. At the same time as he was *not* filing materials in New York, Danzik was having Canadian counsel prepare the CCAA materials.

- 7 -

19.    Danzik ought not to be heard by this Court until he purges his contempt of the New York Injunction. Danzik's and RDX's non-compliance with it, coupled with his wrongful taking of money belonging to others, and the filing of these new proceedings to sidestep unfavourable evidence in the New York Action and the First Alberta Action, make this a classic case for the application of the general rule that a person in contempt should not be heard by the Court until the contempt is purged.

20.    As recognized by the Federal Court of Appeal in *Innovation & Development Partners/IDP Inc. v. R.* [17]:

> Exercising ourselves the discretion the Motions Judge has failed to exercise judicially, we have reached the conclusion that ***this is a most obvious case where the "general rule that a party in contempt will not be heard in the proceedings until the contempt is purged" should apply.*** To use the words of Stone J.A. in *Apple Computer Inc,* ***the conduct of the respondent "betrays an attitude of defiance or even indifference ... towards compliance with court orders" such, in the present circumstances, that it cannot but lead to a refusal to grant the respondent an audience before the Court until the contempt is purged.*** It is manifestly impossible in this case to conclude that the respondent's continuing contempt of the Order of McKeown J. to pay costs of $500.00 and its past conduct did not impede the course of justice nor the ability of the Court to enforce its Orders. Even as we write these reasons, we simply cannot even assume, considering its past attitude, that the respondent will show more respect for Orders of this Court than it has until now for Orders of the Trial Division.

21.    Similarly, the context of this Application, and Danzik's "attitude of defiance or even indifference" toward the process of the New York Court, make this a case where this Honourable Court should apply the general rule.

---

[17] (1994), 114 D.L.R. (4th) 326, 81 F.T.R. 90. Emphasis added.

- 8 -

22.    Another preliminary obstacle to this Application: sec. 11.03 of the CCAA expressly denies CCAA Courts the jurisdiction to stay injunctive proceedings against directors. The Contempt Hearing is in relation to exactly that: an injunctive proceeding against an RDX director. This comprises not only Danzik's contempt of the New York Injunction. The relief being sought against Danzik includes an injunction that he disgorge his ill-gotten money.

23.    RDX says that a forum selection clause ("FSC") allows it to sue in Alberta. But the FSC does not *restrict* lawsuits to Alberta. It only *permits* lawsuits here.[18]

24.    And, in any event, the FSC most certainly does not confer jurisdiction over this Honourable Court: the issue of the provincial jurisdiction is of "prime importance" and RDX bears the burden of demonstrating that jurisdiction.[19] That onus cannot be discharged simply by pointing to a forum selection clause in one of RDX's agreements.  The *CCAA* speaks to the factors that may confer jurisdiction, and agreements between parties are not among them.

25.    Besides - as CWT argued in the First Alberta Action - the Alberta Court lacks jurisdiction, since the issues were and are already being dealt with in New York. RDX and Danzik have actively participated in and attorned to the New York Court.

26.    Similarly, this Application repeats many of the same issues RDX and Danzik already raised in the First Alberta Action. RDX and Danzik have taken no steps to advance it since March. Having

---

[18] "Any Proceeding *may* be brought in the courts of the Province of Alberta..." Unit Purchase Agreement, para. 12.4; Eilender Affidavit, Exhibit 8; Emphasis added.
[19] *Oblats de Marie Immaculee du Manitoba, Re*, 2002 SKQB 161, at para. 13.

- 9 -

invoked this Court's process, they are now simply ignoring it, and have launched this Application instead.[20]

27.     It is an abuse of this Court's process by RDX and Danzik to now ask it to assert jurisdiction over this Application. It is a diversion from Danzik's misappropriation of $3.175 million. It is a barely disguised move to thwart the ongoing process of the New York Court, and negate the First Alberta Action. When apprised of the First Alberta Action, Justice Kornreich observed[21]:

> You know, most courts don't look kindly on a second action started in a different venue, when an action is going on in a first venue, and for quite some time. Most courts don't like that. It is game-playing. But I don't know what the Canadian court is going to do, I don't know what I'm going to do.

28.     Another *indicium* that this Application is not meant to "facilitate compromises and arrangements" under the CCAA is RDX's and Danzik's false urgency.[22] RDX asked for a hearing on August 7, 2015, a mere four days after delivering its CCAA application. Yet it filed 23 affidavits, 10 of which were *pro forma*, the remainder of which were highly contentious, and all sworn between April 14 and June 3, 2015. Having sat on this evidence for several months and done nothing, RDX now argues urgency.

29.     Had RDX filed this application in April when it was contemplated, there could have already been a hearing on ample notice to all parties.  RDX now seeks to benefit from its own delay.

---

[20] Eilender Affidavit, para. 74-81.
[21] Motion Transcript, January 29, 2015, Supreme Court Of The State of New York, Index No. 650841/2013, at p. 14, *per* The Honorable Justice Shirley Werner Kornreich; Eilender Affidavit, Exhibit 11.
[22] In stark contrast with the First Alberta Action.

- 10 -

30.     Again, RDX has raised here, as it did in the First Alberta Action, serious allegations of fraud. RDX knows these will be refuted in detail, as they were in the other actions. They are specious. Danzik admit he knew of the alleged "fraud" four months *before* he bought RDX. They both know the allegations cannot be decided upon in summary proceedings at all, let alone upon a one-hour application brought in the face of jurisdictional issues.

31.     These (and other) facts all point to the ulterior purpose behind this Application. The CCAA is a remedial statute meant to help companies in distress, not meant for forum-shopping litigants looking avoid obligations elsewhere, and re-open decided issues.

32.     In sum this Honourable Court does not have jurisdiction to hear RDX's Application. Even if it did, the Application should be stayed or dismissed for being *res judicata* or an abuse of process. And in any event, this Court should not exercise its discretion to grant RDX and Danzik the stays they seek.

## PART 2 - FACTS

### Cast of Characters

33.     CWT makes and sells Renewable Diesel Oil ("**RDO**") using a thermal depolymerisation technology to generate RDO from waste grease, offal, animal carcasses and other organic-rich wastes.[23]:

> The groundbreaking new fuel source provided by RDX Technologies is an EPA-approved, carbon-neutral Renewable Diesel Oil (RDO) made from everyday food and cooking oils collected from wastewater.

---

[23] Affidavit of Jean Noelting sworn October 14, 2014 ("Noelting Affidavit"), para. 17; Eilender Affidavit, Exhibit 17.

- 11 -

34.    The prospect of investing in RDX's business brought the parties to this action together. This is their, and relevant non-parties', background information:

| NAME | ROLE | LOCATION |
|---|---|---|
| • **RDX** (formerly Ridgeline Energy Services Inc.) | Water treatment and energy technology company that refines liquid fuels from materials mined from waste water. | Scottsdale, Arizona (incorporated in **Alberta**) |
| • **CWT** (formerly CWT Inc.) | Entered into contracts with customers for RDO. | Delaware / New York |
| • **RRC** | Former limited partner in CWT. | New York |
| • **CWTC** | Former limited partner in CWT. | Delaware / Toronto |
| • **CWTE** | Former limited partner in CWT. | Toronto |
| • **Jean Noelting** ("Noelting") | Former CEO of CWT; Director of CWTC, CWTE, RDX. | Toronto |
| • **GEM** | Former limited partner in CWT. | Delaware / New York |
| • **Dennis Danzik** ("Danzik") | CEO of RDX; former CEO of CWT | Arizona/Missouri |
| • **Elizabeth Danzik** ("Danzik") | Spouse of Danzik | Arizona/Missouri |
| • **Deja II, LLC** | U.S. corporation owned and | Delaware / Wyoming |

- 12 -

| NAME | ROLE | LOCATION |
|------|------|----------|
| ("Deja II") | operated by Elizabeth, co-managed by Danzik. | |

### CWT: RDO, EPA, Tax Credits and RINs[24]

35.    In May 2004, a CWT subsidiary opened an RDO refinery in Carthage, Missouri ("**Carthage Facility**"). It began selling RDO in 2007. It was CWT's only refinery until it closed in 2012 or 2013.

36.    CWT was eligible for two types of benefit: tax credits from the U.S. Treasury, and environmental credits from the United States Environmental Protection Agency (the "**EPA**").

37.    The EPA's renewable fuels program rewards producers with "Renewable Identification Numbers" ("**RINs**") for each unit of fuel that meets its standards. RINs are bought and sold as a regulated commodity. Producers who do not meet EPA standards can buy RINs as an offset against EPA requirements. The EPA found that the Carthage Facility's RDO met its standards for RINs.[25]

38.    CWT was able to claim the tax credits from the U.S. Treasury through 2013 of $1 per gallon of RDO made and sold. The credits could be applied to offset taxes, but CWT owed none, so it was entitled to payment of $1 per gallon. It is this money that Danzik misappropriated.[26]

---

[24] Noelting Affidavit, paras. 18-22; Eilender Affidavit, Exhibit 17.
[25] Noelting Affidavit, para. 20; Eilender Affidavit, Exhibit 17.
[26] Noelting Affidavit, para. 21; Eilender Affidavit, Exhibit 17.

- 13 -

### CWT: All American

39.     CWT was founded and operated CWT from New York. CWT had a research and development facility in Philadelphia. It has never had facilities or operations in Canada.[27]

40.     Until 2013, CWT had only a handful of customers. All were in the U.S.[28] CWT has never had customers in Canada. Its distribution services contractor that supplies product to customers is in Albany, New York.[29]

### Refinancing CWT: The Parties Come Together

41.     CWT[30] filed for bankruptcy in 2009 and emerged in 2011. By December 2012, it was running into cash flow problems. It needed capital.

42.     To get new financing, RRC and CWTC secured a commitment from GEM for $2.5 million to $4 million (US) by April 30, 2013 in return for GEM's increased ownership interest in CWT.

43.     On December 21, 2012 they made the deal formal with a Securities Purchase Agreement ("**Securities Purchase Agreement**") and other agreements on the ownership, control and funding of CWT.[31]

44.     The Securities Purchase Agreement included a venue clause. All litigation had to be in New York. The related agreement gave GEM managerial control over CWT.[32]

---

[27] Noelting Affidavit, paras. 17 - 18; Eilender Affidavit, Exhibit 17.
[28] New Hampshire, Vermont, Massachusetts, Virginia and Missouri.
[29] Noelting Affidavit, para. 19; Eilender Affidavit, Exhibit 17.
[30] In its former guise of CWT Inc.
[31] Noelting Affidavit, pars. 22 - 23; Securities Purchase Agreement, Exhibit "B"; Eilender Affidavit, Exhibit 17.
[32] Noelting Affidavit, para. 24; Eilender Affidavit, Exhibit 17.

- 14 -

45.    In December 2012, GEM introduced RDX and its CEO, Danzik, to RRC, CWTE and CWTC. Danzik was reputed to have extensive knowledge of renewable fuels and familiarity with the field.[33]

46.    On or about December 12, 2012, before GEM took control, and at GEM's request, Danzik was appointed as CEO of CWT. He took on all management and operational aspects of the business.

47.    In this role, Danzik had unrestricted access to all of CWT's records, information, assets, plants, equipment, and fuel products.[34] This fact alone belies his protestations (and evidence) of fraud at RDX. In the four months form his appointment as CEO to his purchase of RDX in March 2013, he would have been aware of – and responsible for – any fraud.

*The Security Purchase Agreement Combusts*

48.    Within days of Danzik's appointment, GEM breached the Securities Purchase Agreement. Among other acts, it failed to comply with numerous funding requests by Danzik for CWT. This left CWT in a cash crunch. It had little or no inventory left to sell. It was in crisis.[35]

49.    CWT's limited partners[36] treated the Securities Purchase Agreement as at an end. Then on March 6, 2013, they removed a GEM affiliate, RES Management, as the general partner of CWT, and replaced it with CWTE.[37]

---

[33] Noelting Affidavit, para. 27; Eilender Affidavit, Exhibit 17.
[34] Noelting Affidavit, pars. 25 - 26; Eilender Affidavit, Exhibit 17.
[35] Noelting Affidavit, para. 31; Eilender Affidavit, Exhibit 17.
[36] Other than GEM.
[37] Noelting Affidavit, para. 31; Eilender Affidavit, Exhibit 17.

- 15 -

50.    This breakdown led to two events: a capital stock unit purchase agreement (the "**UPA**"), and the New York Action.

### The UPA Is Born; The $3.175 Appears (Then Disappears)

51.    RDX signed the UPA with CWTC, RRC, GEM and CWTE on March 11, 2013. Danzik was not personally a signatory. Under the UPA, RDX acquired all of the issued and outstanding units in CWT in return for[38]:

(a)    a promissory note to RRC for $16,936,262.68 ("**RRC Note**") and a promissory note to GEM for $3,063,737.32 (US) ("**GEM Note**");

(b)    25,862,069 shares in RDX common stock, of which RRC was to receive 6,243,860 shares and CWTC 15,656,479; and

(c)    warrants to purchase 4,100,000 shares in RDX common stock at a strike price of $1 per share, of which CWTC was to receive 3,471,934 shares and RRC 628,066.

52.    The UPA also recognized that any tax credits up to December 21, 2012 belonged to the CWTC, RRC, GEM and CWTE. Article 2.3 of the UPA obliges CWT to direct all payments for them to CWTC (for the first $5,015,000) and RRC (the next $1,066,858).[39]

53.    RDX has not paid any of this money. Yet RDX received $3.175 million (US) in tax credits. Danzik, and a related company have misappropriated it. This act of stealing (in the words of RDX's sworn evidence in the New York Action), has been thoroughly documented.[40]

54.    Given a chance to refute this evidence on cross-examination in the First Alberta Action, Danzik was evasive, obstructive and non-responsive.[41]

---

[38] Noelting Affidavit, para. 32 Unit Purchase Agreement, Exhibit "F", RRC and the GemNote, Exhibits "G" and "H"; Eilender Affidavit, Exhibit 17.
[39] Noelting Affidavit, para. 34; Eilender Affidavit, Exhibit 17.
[40] Noelting Affidavit, para. 35; Eilender Affidavit, para. 55 and Exhibit 17.
[41] Cross-examination of Dennis Danzik, March 25, 2015, pp. 106 – 108; Eilender Affidavit, Exhibit 2.

- 16 -

### Litigating in New York

55.   On the day the UPA was signed, March 11, 2013, GEM launched the New York Action, suing CWT, CWTC, RRC and RDX.[42]

56.   GEM wanted, among other things, to enjoin the closing of the sale to RDX under the UPA. RDX submitted an affidavit opposing the injunction.[43] The New York Court denied the motion the next day, March 12, 2013. The parties were free to implement the UPA.[44]

57.   From April to August 2013, GEM filed a series of Amended Complaints which added parties and claims against, among others, RDX, Danzik and Noelting. Many of the claims were dismissed.[45]

### Live (Issues) from New York

58.   Today in the New York Action, GEM's[46] remaining claim against RDX, Danzik, CWT, CWTC, RRC, Noelting and others is primarily in tort and contract for $27 million damages relating to the Securities Purchase Agreement.[47]

59.   GEM's claim is for the profit it would have obtained had it acquired and then sold its 60% of CWT to RDX. Danzik's and RDX's defence says that CWT is valueless, so GEM has no damages.

---

[42] The New York Action defendants were all represented by Jeffrey M. Eilender of the law firm, Schlam Stone & Dolan LLP. As of August 2014, Danzik and RDX have separate counsel in New York; Noelting Affidavit, para. 36; Complaint in New York Action, Noelting Affidavit, Exhibit "I"; Eilender Affidavit, Exhibit 17.

[43] Affidavit of Dennis Danzik dated March 10, 2013 in New York Action; Noelting Affidavit, Exhibit "J"; Eilender Affidavit, Exhibit 17.

[44] Reasons for Decision in New York Action, Noelting Affidavit, para. 38, Exhibit "K"; Eilender Affidavit, Exhibit 17.

[45] Noelting Affidavit, pars. 39 – 44; Exhibit "L"; Eilender Affidavit, Exhibit 17.

[46] And a related company, GEM Ventures Ltd.

[47] Noelting Affidavit, para. 45; Eilender Affidavit, Exhibit 17.

- 17 -

60.    Another issue in the New York Action is that RDX knew what it was buying. Danzik was

running CWT. He and RDX therefore had all the facts. RDX agreed to a no representations clause

in the UPA. If there was any "fraud", if there were any problems with CWT, Danzik and RDX not

only knew about them, they caused them. The New York Action asserts a claim against both

Danzik and RDX for diminishment of CWT's value.

### Danzik Gets RDX for Nothing

61.    RDX never paid the RRC and GEM Notes. In 2014 it renounced its liability to pay them.[48]

The upshot: Danzik through RDX has acquired CWT for no money, and then stripped it of millions

of dollars. He claims to have incurred massive expenses. Not a shred of evidence supports that he

has done so. Only his bald allegations.

62.    What the evidence in fact discloses is that Danzik took over $3 million of other people's

money (the tax credits) out of the company. He now stands in breach of the New York Injunction

that he give it back.

63.    On September 22, 2014, CWTC, RRC and Noetling brought forward a counterclaim,

crossclaim and third party claim in the New York Action. They say, simplifying, that Danzik, Deja

II and RDX took money, gave nothing in return, and breached their obligations. These are the

details:[49]

        (a)    against RDX and Danzik: indemnification and contribution for any finding of
               liability CWTC, RRC and Noelting in the New York Action, damages for breach of
               trust or breach of a constructive trust, disgorgement and an accounting for receiving
               and misappropriating at least $3 million (US) in tax credits which belonged and were

---

[48] Eilender Affidavit, para. 74 and Exhibit 16.
[49] Noelting Affidavit, pars. 46 - 52; Answer with Counterclaims, Crossclaims and Third Party Claims in New York
Action, Exhibit "Q"; Eilender Affidavit, Exhibit 17.

- 18 -

to be paid to CWTC and RRC under the UPA, and damages for conversion of these tax credits of at least $3 millions (US);

(b)     against RDX, Danzik, Elisabeth and Deja II: damages for fraudulent misrepresentations that they would use $1 million (CDN) of funds advanced by CWTC and RRC to repay the GEM Note which would, *inter al.,* give CWTC and RRC a first-in-priority security interest in the Carthage Facility under their agreements, when they knew these representations to be false;

(c)     against Danzik, Elizabeth and Deja II: damages for money had and received regarding money belonging to CWTC and RRC, for benefitting from receipt of the money, and for conversion in misappropriating the $1 million (CDN) and wrongfully retaining the money;

(d)     against RDX, Danzik and Deja II: damages for breach of contract for failing to use the $1 million (CDN) (*above*) for the purpose for which it was paid, and for failing to deliver freely tradable shares in RDX;

(e)     against GEM and related parties: damages for fraudulent misrepresentations to that GEM would permit CWTC and RRC to invest up to $1.5 million (US) in CWT if they agreed to sign, *inter al.,* the Securities Purchase Agreement, indemnification and contribution if RDX and Danzik's allegations of fraud or breach of warranty in this (i.e. Alberta) action are upheld;

(f)     against GEM and a related corporation: a declaratory judgment that, if claims in this action, viz. that (i) the fuel and Carthage Facility were worthless or had little value and therefore (ii) CWT had little value, are substantiated, CWTC, RRC and Noelting cannot be liable for tortious interference with the Securities Purchase Agreement because the agreements relied upon by GEM would be invalid on the basis of unilateral mistake or mutual mistake; and

(g)     against GEM, related parties, and RES Management: damages for breach of fiduciary duty in that (i) from December 12, 2012 to March 6, 2013, they controlled the management of CWT and failed to properly fund CWT, (ii) they put their interests ahead of CWT by using for their own benefit the funds they were to invest, and (iii) they permitted Danzik to harm CWT by altering its RDO production processes to save money and by gutting the management of CWT.

- 19 -

### The First Alberta Action & The Forum Selection Clause: "May" Not "Must"

64.    On August 15, 2014, CWT's lawyer wrote RDX's lawyer about the claims for millions of dollars against RDX and Danzik that were about to be made in the New York Action. Twelve days later, RDX launched the First Alberta Action.[50]

65.    The First Alberta Action raised issues and asserted claims which duplicated or were closely related to the issues and claims which were already raised and were to be determined in the New York Action.[51]

66.    Alberta was not a necessary or proper forum. RDX invoked the FSC to justify bring the action here, as it has on this Application. This is the FSC:[52]

> "12.4 Jurisdiction; Service of Process. Any Proceeding arising out of [*sic*]
> *relating to this Agreement* or any Contemplated Transaction *may* be brought in
> the courts of the Province of Alberta, and each of the parties irrevocably
> submits to the exclusive jurisdiction of each such court in any such Proceeding,
> waives any objection it may now have or hereafter have to venue or to
> convenience of forum, agrees that all claims in respect of the Proceeding shall
> be heard and determined only in any such court and agrees not to bring any
> Proceeding arising out of or relating to this Agreement or any Contemplated
> Transaction in any other court...".

67.    The use of "*may*" in the FSC was neither accidental nor trivial. It was discussed in advance.[53] CWT and RDX, with counsel negotiated and agreed to Alberta provided they had leeway.[54] "*May*" was important.

68.    *May*" in the FSC contrasts with "*shall*" used in the RRC Note that was part of the UPA:[55]

---

[50] Eilender Affidavit, para. 74.
[51] Eilender Affidavit, para. 75.
[52] Noelting Affidavit, para. 12.4 of the Unit Purchase Agreement, Exhibit "F". (Emphasis added); Eilender Affidavit, Exhibit 17.
[53] Cross-examination of Jean Noelting, February 11, 2015, qq. 50 – 51; Eilender Affidavit, Exhibit 18.
[54] Cross-examination of Jean Noelting, February 11, 2015, qq. 60 – 70; Eilender Affidavit, Exhibit 18.

> 20. *All judicial proceedings* brought against borrower arising out of or
> relating to this note, or any obligations hereunder or thereunder, *shall be*
> *brought* in any state or federal court of competent jurisdiction in the
> province of Alberta. [...]

69.     Unlike the RRC Note, the FSC does not restrict lawsuits to Alberta. It merely permits them.
In any event, Danzik is not party to the UPA. He cannot rely upon the FSC.

70.     The First Alberta Action deflected attention from Danzik's and Elizabeth's misappropriation
of $1 million paid on March 11, 2013 to Deja II to reinvest.[56] It pre-empted claims in the New York
Action.   It allowed RDX and Danzik to frustrate steps to compel performance of their obligations
under the UPA and the RRC Note.[57]

71.     The First Alberta Action was clearly diversionary. It was launched in Alberta for tactical
reasons. This is evidenced by RDX's and Danzik's failure to proceed with it and answer
undertakings.

### *RDX: No Connection to Alberta*

72.     None of the facts in RDX's claim in the First Alberta Action had any connection to Alberta.
None of the defendants had any connection to Alberta. None of the issues had any connection
either. All of them are being litigated in the New York Action.[58]

73.     RDX did have some assets and interests in Alberta until just over two months after the UPA,
June 2013, when it sold them all. The FSC, if it was negotiated at all, was premised on RDX having
Canadian operations, of which it has none.[59]

74.     Given the opportunity on cross-examination in the First Alberta Action to explain what
business RDX does in Alberta, Danzik was evasive.[60] He made the (weak) suggestion RDX does

---

[55] Affidavit of Jean Noelting, October 14, 2014:Unit Purchase Agreement, Exhibit "F". Emphasis added; Eilender
Affidavit, Exhibit 18.
[56] Noelting Affidavit, para. 57 , Exhibit "S"; Eilender Affidavit, Exhibit 17.
[57] Noelting Affidavit, para. 53; Eilender Affidavit, Exhibit 17.
[58] Noelting Affidavit, paras. 60 and 72; Eilender Affidavit, para 94-98.
[59] Noelting Affidavit, pars. 74 – 75; Eilender Affidavit, Exhibit 17.

- 21 -

business here because, he says, it manufactures on site for customers. But when pressed, the only customers Danzik could conjure up (with no tangible proof) were elsewhere, outside Alberta. He made mention of a yard in Alberta, but then admitted RDX does not own the yard.

75.    At most, RDX claims to have an "office" in Calgary.  In fact, Danzik has been forced to admit under cross-examination that the company does not really "work" out of that office nor does it have any employees there, but that at best RDX holds a "lease agreement" with Ridgeline Canada that allows them to use office space out of the other company's office in Calgary. Danzik undertook to produce a "lease agreement" in the First Alberta Action, but never did.[61]

76.    As of June 2013, RDX has had no presence Canada.

77.    On April 23, 2015 RDX issued a press release advising that effective April 15, 2015 the TSX Venture Exchange has suspended trading in the RDX's shares pending a review of the Company's affairs.[62]

78.    On August 4, 2015, the Alberta Securities Commission ended any vestige of a connection to Canada by issuing its Cease Trading Order against RDX.[63]

*Deliberate Insolvency*[64]

79.    It appears that RDX and Danzik have taken steps to put RDX beyond the reach of its creditors. They have been stripping RDX of assets, winding up its business or transferring its business to a new entity to avoid the many claims against RDX.

---

[60] Cross-examination of Dennis Danzik, March 25, 2015, pp. 3 – 4, 93 – 95, 98 – 102, 171; Eilender Affidavit, Exhibit 2.
[61] Cross-examination of Dennis Danzik, March 25, 2015, p. 11; Eilender Affidavit, Exhibit 2.
[62] Eilender Affidavit, Exhibit 22.
[63] *Re RDX Technologies Corporation*, 2015 ABASC 793, August 4, 2015; Eilender Affidavit, Exhibit 23.
[64] Eilender Affidavit, paras. 100-103.

- 22 -

80.     This is consistent with Danzik's affirmation to Noelting in July 2014 that he (Danzik) had no intention of making any payments to RRC or CWTC under the UPA or the promissory notes issued by RDX. Danzik also insisted that he had no intention of remitting the tax credits to CWT.

81.     Danzik claimed that if RRC or CWT Canada brought an action against RDX, they would never recover any money because he was taking steps to transfer RDX's assets to a new entity, leaving RDX judgment-proof. He would put it into bankruptcy. He also said that he had stripped CWT of its assets.[65]

82.     Danzik was true to his word (for once). On November 13, 2014 RDX issued a press release to say that RDX was setting up a new U.S. entity ("**RDX USA**"). Danzik was stepping down as Chief Financial Officer of RDX to assume the same position with RDX USA.[66]

83.     In the meantime, the evidence discloses that the Carthage refinery has been shut down since August 2014 and has produced no fuel since then; Danzik has been systematically stripping its assets and selling the parts; no new equipment has been delivered or installed to replace the parts that were sold; access to the facility had been cut off; and company files have been removed.[67]

84.     This evidence, confirmed in several affidavits from a half dozen witnesses filed in the New York Action and here, proves that Danzik is asset-stripping RDX. It also refutes as baseless the fraud allegations Danzik has made.

---

[65] Eilender Affidavit, para. 101.
[66] Eilender Affidavit, para. 102 and Exhibit 21.
[67] Eilender Affidavit, para.103.

- 23 -

### RDX Stalls the First Alberta Action[68]

85.    In response to the First Alberta Action, CWT brought an Application to stay it on the basis of *forum non conveniens*. Neither RDX nor any of the defendants had any meaningful connection to Alberta. New York was by far the most convenient forum given the connections of the parties and claims to it. Also the New York Action was already dealing with the same issues.

86.    In support of the stay Application, Noelting delivered an affidavit sworn October 14, 2014. It detailed the history of RDX, the FSC, the New York Action, the First Alberta Action, and the facts relied on for a stay.

87.    RDX did not respond for five months. Finally, Danzik delivered a brief (4 pages, excluding the jurat) responding affidavit sworn March 5, 2015.[69]

88.    This led to the cross-examination of Danzik on March 25, 2015. He refused innumerable legitimate questions. He gave 19 undertakings.[70]

89.    RDX and Danzik never honoured the undertakings. They did not answer the refusals. In fact, they did nothing further in the First Alberta Action. They simply let it stall. Instead they brought this CCAA Application.

### RDX and Danzik: Violating the New York Injunction[71]

90.    A key issue in the New York Action is the $3,175,967 in tax credits. RDX has admitted receiving them from the U.S. Treasury. It did so on behalf of CWT. It has failed to pay them to CWT.

---

[68] Eilender Affidavit, paras. 75-82.
[69] Eilender Affidavit, para. 78.
[70] Eilender Affidavit, para. 79.
[71] Eilender Affidavit, paras. 47-56.

- 24 -

91.     On December 4, 2014, CWT brought a motion in the New York Action for a preliminary injunction and an attachment against RDX and Danzik. This motion was prompted, in part, by the evidence of asset-stripping by Danzik and RDX (*above*).

92.     On March 18, 2015, Justice Kornreich issued the New York Injunction which provided in part as follows:

> **ORDERED** that the motion by CWT Canada II Limited Partnership, Resource Recovery Corporation, and Jean Noelting for a preliminary injunction and an attachment is granted against Ridgeline Energy Services, Inc. (Ridgeline)[72] and Dennis Danzik to the following extent: (1) *within 5 days of the entry of this Order on the NYSCEF system, Danzik must cause Ridgeline to place $3,175,967 into a segregated bank account (not to be used for any other purpose) where such funds are to remain until a further order of this court directs otherwise*; (2) upon doing so, Danzik must e-file an Affidavit of Compliance that attaches a bank record demonstrating such compliance (the account number may be redacted in the e-filed document, but shall not be redacted in the copy provided to the CWT parties); and (3) every month, Danzik's counsel must email Jeffrey M. Eilender, counsel for the CWT Parties, a pdf of a monthly statement for such bank account. [Emphasis added.][73]

93.     In her Reasons for Decision, Justice Kornreich made her finding that "the $3,175,967 in tax credits do not belong to [RDX or Danzik... and] belongs to the CWT parties or the federal government (*above*).

---

[72] RDX was formerly known as "Ridgeline Energy Services, Inc."
[73] Danzik Affidavit, Exhibit 24.

- 25 -

94.     On March 20, 2015 RDX and Danzik moved before the New York Appellate Division for an interim stay and a stay pending appeal of the New York Injunction. Their motion was denied, but RDX and Danzik were given an extension until March 27, 2015 to comply.

95.     On April 23, 2015 the New York Appellate Division, First Department issued an Order denying the motion by RDX and Danzik for a stay pending appeal.

96.     On March 26, 2015 Justice Kornreich of the New York Court directed the CWT parties to post a nominal undertaking of $10,000 (US) in connection with the New York Injunction. In the course of submissions, Justice Kornreich told counsel for RDX and Danzik:

> ....*Under no possible theory does this money belong to your client*, under his own admissions [...] *from what I see, basically Mr. Danzik has taken all of the assets and transferred it to another company*. That's the allegation and may well be the case, that there is nothing left."

97.     RDX and Danzik are in violation of the New York Injunction. They have failed or refused to fund the segregated account.

**Contempt**[74]

98.     This led to a motion to hold RDX and Danzik in contempt. CWT is asking for incarceration and monetary sanctions. It is also asking for a further injunction requiring Danzik to disgorge all of the money he has personally received (directly or indirectly) from RDX up to $3,175,967,

99.     On July 31, 2015, New York counsel for CWT attended before Justice Kornreich. RDX and Danzik were represented by counsel. The "Show Cause", i.e. Contempt Hearing was booked for November 4, 2015.

---

[74] Eilender Affidavit, paras. 61-67 and Exhibit 14.

100.    At the July 31 hearing, Justice Kornreich said, addressing counsel for Danzik and RDX:

> THE COURT: Please. Frankly, as far as I'm concerned, this portion of the
> case, the contempt, is not really about the weeds of the original case, it's
> something else. *It's about court orders and violations, or alleged violations
> of court orders. That's all it's about. And arguments about the facts of the
> case are not – you know, which are disputed, frankly, at this point, will not
> answer what is at issue here.* [Emphasis added.]

### Danzik: Unreliable Witness, Unreliable Evidence

101.    Throughout his cross-examination in the First Alberta Action, Danzig engaged in
obstructive, obfuscatory and argumentative conduct.[75]

102.    Again and again he responded to legitimate questions with evasion, bumptious contempt, or
outright refusal. Those questions remain unanswered today, as do the undertakings he gave.

103.    Danzik's conduct, and his inability or refusal to answer questions on his cross-examination
strip his evidence of any credibility.

104.    This Court ought to reject the evidence Danzik has filed on RDX's behalf on this
Application. Indeed, as a contemnor, Danzik ought not to be heard by this Court until he purges his
contempt.

### PART 3 - ISSUES AND LAW

105.    These issues are before the Court:

(a)    This Court does not have jurisdiction under sec. 9 of the CCAA to hear this
Application;

---

[75] For example, Cross-examination of Dennis Danzik, March 25, 2015, pp. 7 – 10, 11 – 12, 13 – 14, 16 – 17; Eilender
Affidavit, Exhibit 2.

- 27 -

(b)     This Court does not have jurisdiction under sec. 11.03 of the CCAA to order a stay of the New York Action;

(c)     Justice Kornreich's attachment Order, and RDX's and Danzik's liability to pay over the $3.175 million are *res judicata* and ought not to be interfered with;

(d)     This Application is an abuse of the Court's process;

(e)     The Court should not exercise its discretion to grant RDX and Danzik a stay of the New York Action.

*(a) CCAA Sec. 9: No Jurisdiction*

106.    Sec. 9(1) of the CCAA says:

> **Jurisdiction of court to receive applications**
>
> 9. (1) Any application under this Act may be made to the court that has jurisdiction *in the province within which the head office or chief place of business of the company in Canada is situated*, or, if the company has no place of business in Canada, *in any province within which any assets of the company are situated*. [Emphasis added.]

107.    RDX plainly meets neither criterion under sec. 9(1). It has no head office in Alberta. It has no assets here.

108.    Sec. 9 does not admit of exceptions. The CCAA does not confer jurisdiction by other means. Besides, RDX and Danzik have unequivocally attorned to the New York Court's jurisdiction.

109.    This Court therefore does not have jurisdiction to hear RDX's Application.

*(b) CCAA Sec. 11.03: No Jurisdiction*

110.    Secs. 11.02(a), 11.03(1) and (2) of the CCAA say:

> **Stays, etc. — initial application**
>
> 11.02 (1) A court may, on an initial application in respect of a debtor company, make an order on any terms that it may impose, effective for the period that the court considers necessary, which period may not be more than 30 days,

- 28 -

(a) staying, until otherwise ordered by the court, all proceedings taken or that might be taken in respect of the company under the *Bankruptcy and Insolvency Act* or the *Winding-up and Restructuring Act*;

(b) restraining, until otherwise ordered by the court, further proceedings in any action, suit or proceeding against the company; and

(c) prohibiting, until otherwise ordered by the court, the commencement of any action, suit or proceeding against the company.

**Stay - Directors**

11.03 (1) An order made under section 11.02 may provide that no person may commence or continue any action against a director of the company on any claim against directors that arose before the commencement of proceedings under this Act and that relates to obligations of the company if directors are under any law liable in their capacity as directors for the payment of those obligations, until a compromise or an arrangement in respect of the company, if one is filed, is sanctioned by the court or is refused by the creditors or the court.

**Exception**

(2) *Subsection (1) does not apply in respect of an action against a director* on a guarantee given by the director relating to the company's obligations or *an action seeking injunctive relief against a director in relation to the company*. [Emphasis added.]

111.    In other words, the broad powers to stay proceedings that the CCAA confers upon the Court do *not* apply in respect of an action for injunctive relief against a director.

112.    The Contempt Hearing arises from the New York Injunction, which is precisely that: an injunction and attachment against Danzik, RDX's Executive Director, in relation to RDX. As well, CWT is seeking a further injunction in the Contempt Hearing, requiring Danzik personally to disgorge his ill-gotten money.

113.    This Court therefore does not have jurisdiction to stay the New York Action, the New York Injunction, and the Contempt Hearing.

- 29 -

### (c) Res Judicata

114.    The law regarding *res judicata*, issue estoppel and abuse of process as it applies to foreign

proceedings has been summarized authoritatively by Donald J. Lange[76]:

> For the purpose of cause of action estoppel, *a judgment in a foreign court is conclusive against the parties to the litigation to the same extent as a domestic judgment.* The basic principle is one of choice of forum. A plaintiff who chooses a foreign court as the forum and loses, is estopped from relitigating the matter in a domestic forum. *A party may not split its case between a foreign jurisdiction and a domestic jurisdiction.* However, to succeed on a plea of either estoppel doctrine, the judgment on which the plea is based must be one which the domestic court would recognize and enforce. [...]
>
> Res judicata should be argued at the time the second proceeding is pending in the foreign jurisdiction, not after the judgment has become final and conclusive and it is sought to be enforced in domestic courts. *Where the facts are the same and the causes of action are the same although different legal descriptions are used in the foreign and domestic jurisdiction to describe the causes of action, the subsequent domestic action is barred.* [...]
>
> *Issue estoppel applies in the case of foreign judgments.* The impact of issue estoppel on a provincial proceeding, by reason of an extraprovincial proceeding, is an issue for that jurisdiction not for the extraprovincial jurisdiction. The issue must be the same, and it must be final for issue estoppel to apply. The finality contemplated for the enforcement of foreign judgments requires that the court pronouncing the judgment no longer have the jurisdiction to abrogate or vary it. A foreign judgment which is open to be reconsidered by the foreign court is not final for the purpose of issue estoppel in Canada.
>
> In *Barwell Food Sales Inc. v. Snyder & Fils Inc.,* [*Barwell Food Sales Inc. v. Snyder & Fils Inc.* (1988), 38 C.P.C. (2d) 192 (Ont. H.C.) at 193—94] Steele J. applied issue estoppel to an extraprovincial decision on the basis of the principle laid down in Law v. Hansen [(1895), 25 S.C.R. 69 at 72, 75] that a judgment of a foreign court of competent jurisdiction having the force of estoppel in the foreign country has the same effect in Canada. The plaintiff had commenced separate actions in Quebec and Ontario for the same relief. In the Quebec action, the plaintiff moved for an interlocutory injunction prohibiting the use of a trademark in Quebec but that motion was dismissed and was under appeal at the time that a motion was brought by the plaintiff in Ontario for an interlocutory injunction. Steele J. dismissed the motion and stated the principle:
>
> > In my opinion, in general, *where the same parties litigate the same issue in a foreign court of competent jurisdiction, and a final and conclusive judgment is obtained on the merits of the case, the matter is res judicata, as between the parties in an Ontario court.* In this respect, I rely on the following statements in *Law v. Hansen* (1895), 25 S.C.R. 69 at 72 and 73:

---

[76] *The Doctrine of Res Judicata*, 3d, ch. 7, sec. 13, footnotes and citations omitted. Emphasis added.

- 30 -

> *"It is now established in English law that a judgment of a foreign court of competent jurisdiction having the force of res judicata in the foreign country has the like force in England.*
>
> . . .
>
> Judgments in personam bind parties and privies, and, generally speaking, are conclusive at least upon the material issues tendered by the plaintiff's complaint."

A party who loses an issue in a foreign action is bound by that loss in the subsequent domestic action even if the other party in the second action was not a party in the foreign action. [...]

*A foreign decision gives rise to issue estoppel and abuse of process in a domestic court. It also gives rise to cause of action estoppel and abuse of process in a domestic court. [...]*

*It is an abuse of process to relitigate in one province issues which are determined in another province, or to relitigate issues which are already determined in lengthy and complex foreign proceedings.*

115.    These principles have obvious, direct application here. Justice Kornreich handed down a definitive decision about the $3.175 million. It does not belong to RDX. It must be paid into a segregated account (i.e. the New York equivalent of a payment into Court). Her Honour's decision was upheld on appeal.

116.    This is the unusual case where all the available doctrines apply: *res judicata*, issue estoppel and abuse of process. Any and all of these three doctrines bar RDX from relitigating Justice Kornreich's order.

*(d) Abuse of Process*

117.    The courts apply the abuse of process doctrine in various ways to maintain the integrity of the adjudicative function where, through misuse of the court's procedure, "the administration of

- 31 -

justice would be brought into disrepute",[77] where proceedings are "unfair to the point that they are contrary to the interest of justice",[78] or manifestly unfair to a party.[79]

118. The power to dismiss a case as an abuse of process is exercised only in the clearest of cases[80], by objective standards.[81]

119. The Courts invoke abuse of process to prevent re-litigation of cases, collateral attacks on orders, vexatious or futile lawsuits, and other misuses of the Court's functions or miscarriages of justice[82]. These include actions brought for purposes that are improper (e.g. harassment, oppression), or other than the assertion of legitimate rights.

120. These elements of abuse are present here in two ways:

    (a)    The relitigation of and collateral attack on Justice Kornreich's decision. This has been discussed above, in relation to *res judicata*.

    (b)    RDX's and Danzik's effective abandonment of the First Alberta Action. The neglect they have shown to it inversely proportional to vigour with which they are pursuing this Application. Surely it must be an abuse of this Court's process to begin an action and, when difficulties arise, abandon it only to begin a different proceeding with other procedural advantages.[83] It is also grossly unfair to CWT. Having defended the

---

[77] *Toronto (City) v. C.U.P.E., Local 79*, [2003] 3 S.C.R. 77 (S.C.C.), at para. 37 citing *Canam Enterprises Inc, v. Coles*, [2000] O.J. No. 4607, 51 O.R. (3d) 481 at para. 55 (Ont. C.A.), *per* Goudge J.A., dissenting, approved [2002] 3 S.C.R. 307 (S.C.C.); *Taylor Made Advertising Ltd. v. Atlific Inc.*, 2012 ONCA 459, at para. 32.

[78] *Behn v. Moulton Contracting Ltd.*, 2013 SCC 26 (CanLII), at para. 39, citing *R. v. Power*, 1994 CanLII 126 (SCC).

[79] Paul M. Perell, "A Survey of Abuse of Process", *supra*; *Foy v. Foy (No. 2)*, *supra*.

[80] Paul M. Perell, "A Survey of Abuse of Process", *supra*; *Temilini v. Ontario Provincial Police Commissioner* (1990), 73 O.R. (2d) 664 (C.A.), leave to appeal refused (1991), 1 O.R. (3d) xii (S.C.C.).

[81] *Foy v. Foy (No. 2)* (1979), 26 O.R. (2d) 220 (C.A.), leave to appeal refused [1979] 2 S.C.R. vii.

[82] *Hanna v. Abbott*, [2006] O.J. No. 3283, 82 O.R. (3d) 215 (C.A.), at paras. 29 - 32

[83] "The Superior Court is not a sandbox playground where "do-overs" can be expected on demand." - *Marina Bay Sands Pte. Ltd. v Jian Tu aka Tu Jian*, 2015 ONSC 5011, at para. 1, *per* Dunphy, J.

- 32 -

First Alberta Action, it now faces a fresh, second attack, without resolution of the first one.

121.   RDX's Application is not about the assertion of rights. It's about the avoidance of an adjudication both here and in New York. It is a textbook abuse of process.

122.   As part of this Court's jurisdiction to prevent abuses of its process, Danzik's evidence should not be heard. He is a contemnor. A Court will not hear a litigant who has wilfully breached a court order until the litigant has cured the breach. In the words of Laskin, J.A.[84]:

> *The general rule against granting an audience to a contemnor who has failed to purge the contempt reflects the exercise of the court's discretion. That discretion is grounded in the inherent jurisdiction of the court to control its own processes* and, in Ontario, in s. 140(5) of the *Courts of Justice Act*, R.S.O. 1990, c. C.43, which gives the court express power to stay or dismiss a proceeding as an abuse of process. *The rationale underlying this exercise of discretion is that a court will not allow a litigant to abuse the court's processes, or to impede the course of justice,* or to undermine the court's ability to enforce its own orders.

*(e) Stays Are Discretionary*

123.   In keeping with the remedial intent of the CCAA, its stay provisions are broad and discretionary.[85]

124.   This discretion was analyzed and explained in *ICR Commercial Real Estate (Regina) Ltd. v. Bricore Land Group Ltd.*[86]

> [...] The fact that Parliament did not see fit to limit the discretion in any significant manner, despite having been given the opportunity to do so, confirms the broad discretion given in ss. 11(3) and (4) to the supervising CCAA judge. *Discretion is never completely unfettered, but an appellate court should be reluctant to impose rigid*

---

[84] Dissenting, in *Dickie v. Dickie*, 2006 CanLII 576 (ON CA) at para. 85, but affirmed unanimously in [2007] 1 S.C.R. 346, 2007 SCC. Emphasis added.
[85] *Canwest Global Communications Corp. (Re)*, 2009 CanLII 70508 (ON SC), at paras. 27 - 32.
[86] [2007] 9 WWR 79; 33 CBR (5th) 50; 299 Sask R 194 (C.A.), at paras. 54 – 56. Emphasis added.

- 33 -

*tests, standards or criteria where Parliament has declined to do so.* Some guidance can be taken from the jurisprudence.

In *Canadian Airlines Corp., Re* [2000 CanLII 28202 (AB QB), 19 C.B.R. (4th) 1 (Alta. Q.B.) at para 15] Paperny J. (as she then was) indicated that *the obligation of the supervising CCAA judge is to "always have regard to the particular facts" and "to balance" the interests.* As Farley J. said in *Ivaco Inc., Re,* [(2003), 2003 CanLII 64275 (ON SC), 1 C.B.R. (5th) 204 (Ont. S.C.J. [Commercial]) at para 3] the supervising CCAA judge must also be concerned not to permit one creditor to mount "an indirect but devastating attack on the CCAA stay" so as to give one creditor an inappropriate advantage over other unsecured creditors as well as over secured creditors with priority.

In *Ivaco Inc. (Re)* [[2006] O.J. No. 5029 (Ont. S.C.J.)]https://www.canlii.org/canlii-dynamic/en/sk/skca/doc/2007/2007skca72/2007skca72.html - ftn53 Ground J. stated this to be the criteria to determine whether a stay should be lifted:

> 20    *It appears to me that the criteria which the court must consider in determining whether to lift a stay, being whether the proposed cause of action is tenable, the balancing of interests as between the parties, the relative prejudice to the parties, and whether the proposed action would be oppressive or vexatious or an abuse of the court process,* would all be met with respect to a trial of issues to resolve interpretation of the APAs with respect to the calculation of the working capital adjustments.

Ground J. went on to confirm that finding a tenable or reasonable cause of action is not the only factor to be considered [...]

125.    This Application bears all of the hallmarks that, under the principles outlined in *ICR Commercial Real Estate,* discourage Courts from exercising their discretion in favour of imposing stays: it is vexatious, an abuse of process, futile, prejudicial to CWT and an affront to the New York and Alberta Courts.

126.    Given the abusive nature of this Application, and that fact that RDX and Danzik do not come to Court with clean hands, the Court ought not to exercise its discretion in their favour.

- 34 -

## PART 4 – ORDER SOUGHT

127.   The Applicants ask for an Order:

a) If necessary, affirming, dispensing with, or abridging the time for service of this Application and any supporting materials, and deeming service of this Application and any supporting materials to be good and sufficient.

b) A declaration that this Application and its supporting materials, any appearance, and any resulting Order, shall not constitute an attornment to the jurisdiction of Alberta for the hearing of the subject matter in this Application.

c) Staying this Originating Application and action, permanently.

d) In the alternative, adjourning the Originating Application and this Application to a future mutually convenient date with directions for the orderly provision and cross-examination on evidence.

e) The costs of this Application on a full indemnity basis.

f) Such further and other relief as this Honourable Court deems just.

ALL OF WHICH IS RESPECTFULLY SUBMITTED THIS 18th DAY OF AUGUST, 2015

| BISHOP & McKENZIE LLP | FOGLER, RUBINOFF LLP |
|---|---|
| Per: Nigel J. Forster<br>Alberta Agent for<br>Fogler, Rubinoff LLP | for   Per: Milton A. Davis<br>Counsel for the CWT Parties |



**Bishop & McKenzie** *LLP*

2300, 10180 - 101 Street
Manulife Place
Edmonton, Alberta T5J 1V3
T: 780 426 5550
edmonton@bmllp.ca
www.bmllp.ca

**Nigel J. Forster**
Direct Line: 780 421 2401
Email Address: NForster@bmllp.ca

**OUR FILE NO.    57,746-089**

August 10, 2015

Mr. Gary Wharton
Bernard LLP
1500 -570 Granville Street

Dear Sir:

This is Exhibit " F " referred to in the
Affidavit of
Nigel J. Forster
Sworn before me this ......9...... day
of ......March...... A.D. 2016        Via email: **wharton@bernardllp.ca**

A Notary Public in and for
the Province of ...Alberta...
Zachary H. Lindop
Barrister & Solicitor

**Re:    Re: RDX Technologies Corporation**
**Court of Queen's Bench of Alberta Action No. 1501 08364**

I am Alberta agent for Mr. Davis and his clients in this matter.  I write further to the exchange of email correspondence between counsel over the past week.  As the only Alberta counsel apparently engaged thus far I feel compelled to draw to everyone's attention what I think will be a substantial procedural issue to be dealt with in respect of your client's application.

I have reviewed the application materials, as well as some of the materials that will imminently be provided in relation to a cross-application relating to the Alberta Courts' jurisdiction to make the Order being sought. Without getting into the merits of the opposing applications, I would note that in addition to your client's 23 Affidavits, the Court will be dealing with a preliminary jurisdictional application involving several more Affidavits, as well as several hundreds of pages of further responding materials detailing legal proceedings in the state of New York, as well as evidence of the assets (or lack thereof) of the Applicant in Alberta.

Reference will also be made to Action No. 1401 09394 in the Court of Queen's Bench of Alberta and the pending stay of proceedings application brought by the Defendants in that action on the basis of Alberta being an unsuitable forum for the hearing of an action involving RDX Technologies Corporation.  This will also include the 198 page transcript of cross-examination of Dennis Danzik and its 32 exhibits.

I have not yet seen what materials may be supplied by GEM Resources in respect of your client's application.  I am advised that as of Friday, GEM had not yet retained Canadian counsel, which might take some time.  I do also note from Mr. Bernstein's email message of August 6, 2015 that it appears his clients would require approximately 30 days to prepare their responding materials, which suggests to me that they may also be substantial.

Established in 1903 for the practice of law.
Offices in Edmonton and Calgary.

As this application at present therefore already involves easily over a thousand pages of evidence, and counsel from at least 4 different jurisdictions (most of whom will be traveling a great distance at great expense to attend in Calgary), I must respectfully suggest that it is inconceivable that this matter could be heard in the 1-2 hours allotted on August 20, 2015. A full day is more realistic.

I would refer all counsel to the enclosed Alberta CCAA Initial Order explanatory notes dated December 2012 and the enclosed Notice to Profession dated December 7, 2010, as well as the enclosed Booking Procedures document referred to therein. We will all note that the procedure is to pre-book dates with Ms. Stevenson or Ms. Lorenz in Calgary, followed by providing a confirming letter detailing (among other things) the material to be relied upon and the names of opposite counsel. Practice in Alberta is invariably to confirm this information with opposing counsel prior to sending a confirming letter, unless for some extremely rare reason it would not be appropriate to coordinate with opposing counsel, which I do not understand to be the case here. In any event, having not seen any confirming letter, I believe any dates selected will be in imminent jeopardy of cancellation unless we follow this procedure.

For ease of reference to all counsel I am also enclosing today's Commercial Duty List schedule: I would respectfully suggest that we all examine our schedules and select a date that is respectful of all counsel's schedules, especially those from out of the jurisdiction who have no offices in Alberta, and where there is a full day available before one of the judges. There appear to be plenty of available full days in September and October and I am sure we can find a mutually agreeable date that actually works for everyone.

I suggest we renew efforts at finding a mutually agreeable date for the hearing of these applications. There seems to be no compelling urgency to press ahead unilaterally given that some of the evidence offered in support of the application is already 3 months old and I believe the next hearing in the New York action is not scheduled to take place until November. The alternative is that my clients would need to write to the Commercial Coordinators explaining that the present booking for August 20 was not arranged with counsel and provides insufficient time to hear responding applications, and suggesting the booking be cancelled. This would no doubt get things off on a very wrong foot with the coordinators and Justice Yamauchi, so I think this should be avoided.

Yours truly,

**BISHOP & McKENZIE LLP**

Per:

Nigel J. Forster

NJF /
Enc.

cc:    Mr. Milton A. Davis, Fogler Rubinoff LLP, Toronto, via email
       Mr. Jeffrey M. Eilender, Schlam Ston & Dolan LLP, New York, via email
       Mssrs. Charles G. Berry and Daniel Bernstein, Arnold & Porter LLP, New York, via email



# Bishop & McKenzie LLP

2300, 10180 – 101 Street
Manulife Place
Edmonton, Alberta  T5J 1V3
T: 780 426 5550
edmonton@bmllp.ca
www.bmllp.ca

**Nigel J. Forster**
Direct Line:  780 421 2401
Email Address: NForster@bmllp.ca

**OUR FILE NO.**    **57,746-089**

August 18, 2015

Via email: **wharton@bernardllp.ca**

Mr. Gary Wharton
Bernard LLP
1500 -570 Granville Street

Dear Sir:

**Re:      Re: RDX Technologies Corporation**
          **Court of Queen's Bench of Alberta Action No. 1501 08364**

Enclosed for service on you are:

1.  A filed copy of our cross-application returnable August 20, 2015, in substantially the same form
    previously circulated on August 13;

2.  A filed Memorandum of Law of the CWT Parties, to be referred to at this application;

3.  A sworn Affidavit of Jeffrey M. Eilender.  Exhibits thereto will follow by subsequent email message
    because they are very large.

As well you will shortly see my letter of today's date to Justice Yamauchi requesting an adjournment due to
the medical ailments of my principal counsel.  I once again request the courtesy of your agreement to adjourn
your application in light of this new information.

Established in 1903 for the practice of law.
Offices in Edmonton and Calgary.

Page 2

Yours truly,

**BISHOP & McKENZIE LLP**

Per:

**Nigel J. Forster**

NJF /
Enc.

cc:   The Honourable Mr. Justice K.D. Yamauchi, Court of Queen's Bench of Alberta, via fax: 403.297.3819 (without enclosures)
Ms. Paula Lorenz, Court of Queen's Bench of Alberta, Commercial Coordinator, via fax: 403.297.8617 (without enclosures)
Mr. Milton A. Davis, Fogler Rubinoff LLP, Toronto, via email
Mr. Jeffrey M. Eilender, Schlam Ston & Dolan LLP, New York, via email
Mssrs. Charles G. Berry and Daniel Bernstein, Arnold & Porter LLP, New York, via email
Mr. Ryan Zahara, Blake, Cassels & Graydon LLP, Calgary, via email

# BERNARD LLP
### BARRISTERS & SOLICITORS

W. Gary Wharton
Direct No.  604-661-0601
Email:  wharton@bernardllp.ca
File No.  052478-0001

August 19, 2015

*Via Facsimile*

Court of Queen's Bench of Alberta
Calgary Courts Centre
601 – 5th Street S.W.
Calgary, AB  T2P 5P7

**Attention:   Paula Lorenz, Commercial Coordinator**

Dear Sirs/Mesdames:

Re:    **In the matter of the** *Companies' Creditors Arrangement Act*, **R.S.C. 1985, c. C-36**
**And in the matter of the** *Business Corporations Act*, **R.S.C. 2000, c. B-9**
**And in the matter of a plan of arrangement or compromise of Ridgeline Energy**
**Services (USA) Inc. and RDX Technologies Corporation**

We are the solicitors for Ridgeline Energy Services (USA) Inc. and RDX Technologies Corporation in the above-captioned matter.

We write to confirm that the hearing set for Thursday, August 20, 2015 at 2:00 p.m. for one hour before the Honourable Mr. Justice Yamauchi has now been adjourned and a new hearing has been set for **September 18, 2015 for a full day commencing at 10:00 a.m.** before the Honourable Madam Justice Dario.

Yours truly,

BERNARD LLP

Per:

W. Gary Wharton

WGW/jdm

052478\0001\1123

BERNARD LLP IS A PARTNERSHIP OF LAW CORPORATIONS

TEL: 604.681.1700    FAX: 604.681.1788    ADDRESS: 1500-570 Granville Street, Vancouver, BC, Canada, V6C 3P1    WEBSITE: www.bernardllp.ca



# BERNARD LLP

**BARRISTERS & SOLICITORS**

Page 2

cc: Blake, Cassels & Graydon LLP (Calgary)
   Attn: Ryan Zahara

*Via*
*Email* Fogler, Rubinoff LLP
   Attn: Milton A. Davis

   Schlam Stone & Dolan LLP
   Attn: Jeffrey M. Eilender

   Bishop & McKenzie LLP
   Attn: Nigel J. Forster

   Arnold & Porter LLP
   Attn: Charles Berry / Daniel Bernstein

   Miller Thomson LLP
   Attn: Terrence Warner



**Bishop & McKenzie** LLP

2300, 10180 - 101 Street
Manulife Place
Edmonton, Alberta T5J 1V3
T: 780 426 5550
edmonton@bmllp.ca
www.bmllp.ca

**Nigel J. Forster**
Direct Line:  780 421 2401
Email Address: NForster@bmllp.ca

**OUR FILE NO.   57,746-089**
**COURT FILE NO.  1501 08364**

August 20, 2015

**Via fax: 403.297.2752**

Ms. Paula Lorenz
Commercial Coordinator
Calgary Courts Centre
601 - 5 Street SW
Calgary, AB   T2P 5P7

Dear Ms. Lorenz:

**Re:     Re: RDX Technologies Corporation, Court of Queen's Bench of Alberta Action No. 1501 08364**
**Commercial List Booking – September 18, 2015 (10:00 am to 4:00 pm)**
**Confirming Letter**

I am the Alberta Agent for Fogler, Rubinoff LLP, counsel for CWT Enterprises (Canada) Inc., CWT Canada II Limited Partnership, and Resource Recovery Corporation (collectively, "CWT").  Please accept this confirming letter for the booking of the hearing of this matter for **September 18, 2015, from 10:00 am to 4:00 pm (MDT)** before the Honourable Madam Justice C. Dario, pursuant to Commercial Practice Note 1 and booking procedures.  I confirm as follows:

1.  There are at present two applications before the Court:

    a.  the Originating Application of RDX Technologies Corporation and Ridgeline Energy Services (USA) Inc. (collectively, "RDX") in the matter of the *Companies' Creditors Arrangement Act*, R.S.C. 1985, c. C-36; and

    b.  the cross-application of CWT for a stay of the Originating Application on the basis of, *inter alia*, jurisdiction and *res judicata.*

    We will be requesting that the CWT application be heard first, as being preliminary to any of the relief requested by RDX.

2.  CWT will rely on the following materials, which we understand you already have copies of:

    a.  Application by CWT, filed August 18, 2015;

    b.  Memorandum of Law of CWT, filed August 18, 2015;

Established in 1903 for the practice of law.
Offices in Edmonton and Calgary.

Case 16-20002   Doc 68-2   Filed 03/09/16   Entered 03/09/16 15:36:24   Desc Exhibit
Reply Declaration - Forster   Page 103 of 110

Page 2

    c.   Affidavit of Jeffrey M. Eilender, filed August 19, 2015;

    d.   Brief of Authorities to Memorandum of Law, filed August 19, 2015; and

    e.   Correspondence filed with the Court between August 13 and 20, 2015.

With these materials before the Court in combination with the materials filed by RDX, we estimate it will take the Honourable Justice approximately one full day to read materials in advance.

3.   Represented parties and their counsel, to the best of my present knowledge, will include:

    a.   Mr. Gary Wharton, Bernard LLP (Vancouver), for RDX;

    b.   Mr. Milton A. Davis, Fogler, Rubinoff LLP (Toronto), for CWT;

    c.   Mr. Nigel J. Forster, Bishop & McKenzie LLP, as agent for Mr. Davis;

    d.   Mssrs. Charles G. Berry and Daniel Bernstein, Arnold & Porter LLP (New York, NY) for GEM Resources.  I do not yet know if this party will be present at the hearing;

    e.   Mr. Ryan Zahara, Blake, Cassels & Graydon LLP, for Sigma Capital Partners, LLC.  I do not yet know if this party will be present at the hearing.

4.   I can also advise that Mr. Jeffrey M. Eilender, legal counsel for CWT in New York, may attend and request special dispensation to address the Court, notwithstanding that he is not admitted to the bar in Canada.

5.   I do not yet know the names or counsel for any other interested parties, as to date I have not received a complete list of those parties served with the Originating Application filed by RDX.

6.   I am not aware at present of any counsel requesting special accommodation to appear by telephone or video conference.

7.   I confirm filing deadlines for any moving party or applicant material is at **noon (MDT) on September 7, 2015** and for responding material **noon (MDT) on September 10, 2015**.

Yours truly,

**BISHOP & McKENZIE LLP**

Per:

Nigel J. Forster

NJF /
cc:    Mr. Milton A. Davis, Fogler Rubinoff LLP, Toronto, via email
        Mr. Jeffrey M. Eilender, Schlam Ston & Dolan LLP, New York, via email
        Mr. Gary Wharton, Bernard LLP, Vancouver, via email
        Mssrs. Charles G. Berry and Daniel Bernstein, Arnold & Porter LLP, New York, via email
        Mr. Ryan Zahara, Blake, Cassels & Graydon LLP, Calgary, via email

# ARNOLD & PORTER LLP

Charles G. Berry
Charles.Berry@aporter.com

+1 212.715.1169
+1 212.715.1399 Fax

399 Park Avenue
New York, NY 10022-4690

September 9, 2015

**VIA FACSIMILE**

The Honourable Mr. Justice K. D. Yamauchi
Calgary Courts Centre
601 - 5 Street SW
Calgary, AB   T2P 5P7
Fax: 403-297-8617

> Re:   RDX Technologies Corporation, Court of Queen's Bench of Alberta,
> Action No. 1501-08364

Justice Yamauchi:

We are counsel to GEM Holdco LLC ("GEM") in New York litigation against RDX Technologies Corporation ("RDX") and Dennis Danzik ("Danzik"), and we write in connection with the above-captioned action. Although we do not plan to appear at this Court's September 18, 2015 hearing in Calgary, we write to express concern with the application submitted by RDX.

RDX's application omits the following material information regarding the September 22, 2014 Settlement of the "New York Action," Index No. 650841/2013 (Sup. Ct. N.Y. Co.):

- Pursuant to the Settlement, RDX, Danzik, Tony Ker, and Richard Carrigan (the "Settling Defendants") released GEM, GEM Ventures Ltd., Global Emerging Markets North American, Christopher Brown, Edward Tobin, and Demetrios Diakolios ("Plaintiffs") from any and all claims, including but not limited to any and all claims which were asserted or could have been asserted in connection with the New York Action or the Unit Purchase Agreement dated March 11, 2013.

- Pursuant to the Settlement, RDX executed a promissory note and agreed to pay GEM or its assigns a total of US$9.5 million in the form of cash or (under certain conditions) RDX shares, in equal monthly installments over a two-year period.

# ARNOLD & PORTER LLP

September 9, 2015
Page 2

- RDX defaulted on the aforementioned obligation in April 2015 and remains in default.

- Pursuant to the Settlement, Danzik agreed that if he or RDX fails to make full and timely payment to GEM, then GEM may file in New York Supreme Court a confession of judgment, sworn by Danzik, which provides that Danzik and RDX are jointly and severally liable for US$27 million.

- Pursuant to the Settlement, in May 2015 GEM filed the confession of judgment by Danzik.

- GEM is currently seeking enforcement of the US$27 million confession of judgment, including against Danzik personally, in New York Supreme Court, where Danzik and RDX consented to jurisdiction.

GEM is concerned that Danzik is abusing the proceeding in this Court to gain tactical advantage in the New York Action, where he faces personal liability.  Accordingly, GEM respectfully submits that RDX's request for a stay of litigation as to RDX and Danzik be denied.

GEM reserves all rights.

Sincerely,

Charles G. Berry

cc:    Gary Wharton, Bernard LLP (by email)
       Nigel Forster, Bishop & McKenzie LLP (by email)
       Milton Davis, Fogler Rubinoff LLP (by email)
       Jeffrey Eilender, Schlam Stone & Dolan LLP (by email)
       Daniel Bernstein, Arnold & Porter LLP (by email)
       Pamela Lorenz, Court of Queens Bench of Alberta (by fax)

# BERNARD LLP
### BARRISTERS & SOLICITORS

W. Gary Wharton
Direct No. 604-661-0601
Email: wharton@bernardllp.ca
File No. 052478-0001

September 14, 2015

*Via Facsimile*

Court of Queen's Bench of Alberta
Calgary Courts Centre
601 – 5th Street S.W.
Calgary, AB  T2P 5P7

**Attention:  Paula Lorenz, Commercial Coordinator**

Dear Sirs/Mesdames:

Re:     **In the matter of the *Companies' Creditors Arrangement Act*, R.S.C. 1985, c. C-36
And in the matter of the *Business Corporations Act*, R.S.C. 2000, c. B-9
And in the matter of a plan of arrangement or compromise of Ridgeline Energy
Services (USA) Inc. and RDX Technologies Corporation**

We are the solicitors for Ridgeline Energy Services (USA) Inc. and RDX Technologies
Corporation in the above-captioned matter.

Our clients' application pursuant to the CCAA, together with the motion of CWT, is currently set
for Friday, September 18, 2015 before Madam Justice Dario.  The parties request that their
respective motions be adjourned to a later date, specifically October 7, 2015 if available.

If the Court requires any further information, please do not hesitate to contact us.

Yours truly,

BERNARD LLP

Per:

W. Gary Wharton

WGW/jdm

052478\0001\\\1125

BERNARD LLP IS A PARTNERSHIP OF LAW CORPORATIONS

TEL: 604.681.1700    FAX: 604.681.1788    ADDRESS: 1500-570 Granville Street, Vancouver, BC, Canada, V6C 3P1    WEBSITE: www.bernardllp.ca

# BERNARD LLP
### BARRISTERS & SOLICITORS

Page 2

cc:   Blake, Cassels & Graydon LLP (Calgary)
      Attn:  Ryan Zahara

*Via*
*Email*  Fogler, Rubinoff LLP
      Attn: Milton A. Davis

      Schlam Stone & Dolan LLP
      Attn:  Jeffrey M. Eilender

      Bishop & McKenzie LLP
      Attn:  Nigel J. Forster

      Arnold & Porter LLP
      Attn:  Charles Berry / Daniel Bernstein

      Miller Thomson LLP
      Attn:  Terrence Warner



THE HONOURABLE MADAM JUSTICE
CORINA DARIO

**COURT OF QUEEN'S BENCH OF ALBERTA**

CALGARY COURTS CENTRE
SUITE 2401 - N
601 - 5TH STREET S.W.
CALGARY, ALBERTA  T2P 5P7

PH    (403) 297-4500
FAX   (403) 297-3819

September 16, 2015

**DELIVERED VIA FACSIMILE**

*Fax No.: 1 (212) 715-1399*
Mr. Charles G. Berry / Mr. Daniel Bernstein
Arnold & Porter LLP

*Fax No. 1 (604) 681-1788*
Mr. W. Gary Wharton
Bernard LLP

Dear Counsel:

Re:    **In the matter of RDX Technologies Corporation
       Action No.: 1501-08364**

Submissions on this matter are to be on the public record in open court.

Should you wish to attend, you may do so to make these submissions. If you are unable to attend in person, you may apply to attend by teleconference.

This matter is set to be heard this Friday, September 18, 2015 at 10 A.M.

Kind regards,

C. Dario
CD/llt

cc:    Mr. Ryan Zahara
       Blake, Cassels & Graydon LLP
       *Fax No.: (403) 260-9700*

       Mr. Jeffrey M. Eilender
       Schlam Stone & Dolan LLP
       *Fax No.: 1 (212) 344-7677*

       Mr. Terrence M. Warner
       Miller Thomson LLP
       *Fax No.: 1 (780) 424-5866*

       Mr. Milton A. Davis
       Fogler, Rubinoff LLP
       *Fax No.: 1 (416) 941-8852*

       Mr. Nigel J. Forster
       Bishop & McKenzie LLP
       *Fax No.: 1 (780) 426-1305*

# BERNARD LLP
### BARRISTERS & SOLICITORS

W. Gary Wharton
Direct No. 604-661-0601
Email: wharton@bernardllp.ca
File No. 052478-0001

October 5, 2015

*Via Facsimile*

Court of Queen's Bench of Alberta
Calgary Courts Centre
601 – 5th Street S.W.
Calgary, AB  T2P 5P7

**Attention:  Paula Lorenz, Commercial Coordinator**

Dear Sirs/Mesdames:

Re:     **In the matter of the *Companies' Creditors Arrangement Act*, R.S.C. 1985, c. C-36
And in the matter of the *Business Corporations Act*, R.S.C. 2000, c. B-9
And in the matter of a plan of arrangement or compromise of Ridgeline Energy
Services (USA) Inc. and RDX Technologies Corporation**

We are the solicitors for Ridgeline Energy Services (USA) Inc. and RDX Technologies
Corporation in the above-captioned matter.

We write to confirm that we will not be proceeding on October 14, 15 or 16, 2015 and that you
may release these dates.

If the Court requires any further information, please do not hesitate to contact us.

Yours truly,

BERNARD LLP

Per:

W. Gary Wharton

WGW/jdm

052478\0001\\\1125

BERNARD LLP IS A PARTNERSHIP OF LAW CORPORATIONS

TEL: 604.681.1700     FAX: 604.681.1788     ADDRESS: 1500-570 Granville Street, Vancouver, BC, Canada, V6C 3P1     WEBSITE: www.bernardllp.ca

# BERNARD LLP

### BARRISTERS & SOLICITORS

Page 2

cc:     Blake, Cassels & Graydon LLP (Calgary)
        Attn: Ryan Zahara
*Via*
*Email*    Fogler, Rubinoff LLP
        Attn: Milton A. Davis

        Schlam Stone & Dolan LLP
        Attn: Jeffrey M. Eilender

        Bishop & McKenzie LLP
        Attn: Nigel J. Forster

        Arnold & Porter LLP
        Attn: Charles Berry / Daniel Bernstein

        Miller Thomson LLP
        Attn: Terrence Warner

        Burnet, Duckworth & Palmer LLP
        Attn: Andrew F. Sunter